# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TEAMSTERS LOCAL UNION NO. 727 HEALTH AND WELFARE FUND, TEAMSTERS LOCAL UNION NO. 727 PENSION FUND and TEAMSTERS LOCAL UNION NO. 727 LEGAL AND EDUCATIONAL ASSISTANCE FUND, <br><br> Plaintiff, <br><br> v. <br><br> L & R GROUP OF COMPANIES, <br><br> Defendant. | No. 11 C 1747 <br><br> Hon. Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Teamsters Local Union No. 727 Health and Welfare Fund, Teamsters Local Union No. 727 Pension Fund, and Teamsters Local Union No. 727 Legal and Educational Assistance Fund sued Defendant L & R Group of Companies under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(g)(2), (a)(3), and 1145. The Complaint alleges that L & R failed to submit payments and reports from 2003 to the present required by collective bargaining agreements between L & R and Teamsters Local Union No. 727. L & R now seeks summary judgment concerning its restitution counterclaim based on alleged overpayments L & R made to Plaintiffs. For the reasons stated below, L & R's motion for summary judgment is granted in part and denied in part.

## FACTS

The following facts are undisputed unless otherwise noted.

### A. The Parties

In 2008, L & R, which is a Los Angeles-based parking property company, purchased

System Parking, Inc. ("System Parking"), a Chicago-based parking operation. System Parking entered into collective bargaining agreements ("CBAs") with the Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers, and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers, and Wash Rack Attendants Union, [Teamsters] Local No. 727 ("Union"). (Dkt. No. 60, at ¶ 1-3.) L & R assumed certain liabilities related to the CBAs between System Parking and the Union. (Dkt. No. 60 at ¶ 5.) L&R sold System Parking in September 2010.[1] The Teamsters Local Union No. 727 Health and Welfare Fund, Teamsters Local Union No. 727 Pension Fund, and the Teamsters Local Union No. 727 Legal and Educational Assistance Fund (collectively "the Funds") collected funds from multiple employers, including System Parking, as part of the CBA between System Parking and the Local Union No. 727 in order to provide benefits for its employees.

### B. The Collective Bargaining Agreements

Four CBAs are at issue. Two cover cashiers, hikers, attendants, porters, maintenance workers/custodians, drivers, washers, collectors, customer service representatives, dispatchers, bellmen, doormen, working foremen and all other garage and parking lot employees between: (1) November 1, 2001 and October 31, 2006 ("Commercial CBA 1"), and (2) November 1, 2006 and October 31, 2011 ("Commercial CBA 2"). The other two cover employees who performed valet services between (1) July 1, 2000 and June 30, 2005 ("Valet CBA 1"), and (2) July 1, 2005 and June 30, 2011 ("Valet CBA 2"). (Dkt. No. 60 at ¶ 4.)

### C. The Benefits Funds

During the period of the agreements, the Teamsters Local Union No. 727 Health and Welfare Fund provided medical benefits, prescription drug benefits, short-term disability

---

[1] Because there is no dispute that L & R owned System Parking between 2008 and 2010 (Dkt. No. 60 at ¶ 2), this Court refers to the two entities interchangeably with respect to this period.

2

benefits, life insurance, dental insurance, vision insurance, and a member assistance plan. The Teamsters Local Union No. 727 Pension Fund provided retirement benefits. The Teamsters Local Union No. 727 Legal and Educational Fund provided legal and educational assistance benefits. According to Fund Manager William Coli, between 275-300 employers contributed to the Funds. (Dkt. No. 60 at ¶ 9.)

Central to the dispute is how much was contributed to the benefit funds on behalf of System Parking employees and how the amount due was calculated by each party. It is undisputed that System Parking paid into the benefit funds for its full-time and part-time employees for hours worked and not for any additional hours paid to employees for paid vacation, holiday and/or sick leave. (Dkt. No. 60 at ¶ 6.) The parties dispute whether this was the proper method of calculation.

### D. Contracts, Policies and Procedures

In addition to the CBAs, a Restated Agreement and Declaration of Trust Agreement of the Teamsters Local Union No. 727 Health and Welfare Fund ("Trust Agreement") governed the relationship between the Union and System Parking. The parties entered this agreement on July 25, 2000 (amended in 2006 and 2011). The relevant parts of the Trust Agreement include Article VI-Contributions, Article VII-Controversies and Disputes, and specific policies and procedures listed herein.

The following policies and procedures were effective during the period covered by the CBAs: (1) the Teamsters Local Union No. 727 Benefits Funds Policy for Erroneous Payments and Overpayments Made by an Employer ("Funds Policy for Erroneous Payments"), dated September 30, 2009, which addresses situations where contributing employers make overpayments to the Funds; (2) the Statement of Audit Procedures: Health and Welfare, Pension,

and Legal and Educational Assistance Funds, which addressed the Funds ("Funds Audit Procedures") auditing procedures for all contributing employers; and (3) the Statement of Collection Procedures: Health and Welfare, Pension, and Legal and Educational Assistance Funds ("Funds Collection Procedures"), dated June 25, 2008, which addressed the method by which the contributions from employers are collected and submitted. This last document also addressed how to handle payment delinquencies and outlined the legal action the Funds might take in the event an employer did not adequately address the alleged delinquency.

### E. Audit History

There are three audits at issue: two performed by the Funds and one performed by L & R. Periodically, the Funds conducted financial audits of employers' benefit contributions. The Funds Audit Procedures included the purpose of the audit and the roles and responsibilities of each of the parties during the audit. (Dkt. No. 60 at ¶ 14.) In December 2005, the Funds filed a complaint against System Parking, Inc. for delinquent contributions of $553,965.82. The parties settled that action in 2007 with Systems Parking agreeing to pay the Funds $48,000.00 over a two-year period at $2,000.00 per month. (Dkt. No. 60 ¶ 15.)

The Funds subsequently contracted with Bansley & Keiner, LLP, Certified Public Accountants ("B & K") to conduct an audit sometime in or around 2008. During 2008 and 2009, the parties corresponded back and forth in writing and held meetings to discuss the results of the 2005 audit and litigation, procedures on how the parties would manage future audits, and the management of the 2008 audit. (Dkt. No. 60 at ¶ 15-17.) On March 20, 2009, B & K provided the Funds and System Parking, with a first draft of the 2008 audit report for the period January 1, 2003 through March 31, 2008. The 2008 audit reported a deficiency of $808,000.

System Parking personnel reviewed the 2008 audit. The review identified purported

errors, which System Parking reported in writing to the Funds per the Policy on Erroneous Payments. (Dkt. No. 60 at ¶ 18-19.) In response, on November 9, 2009, B & K followed up with a letter to System Parking. The November 9, 2009, letter, which came after System Parking reported the errors, outlined new audit findings. B & K found that a decrease in the original deficiency of $210,000 was due to L & R but a subsequent unrelated increase in the original deficiency was owed to them in the amount of $330,000. This increase resulted from alleged underpayments by L & R. Thus, the overall total deficiency amount increased from $808,000.00 to $949,149.29. With accrued interest, liquidated interest, and fees added, the total purported deficiency increased to $1,563.627.38 as of June 4, 2010. (Dkt. No. 60 at ¶ 19.)

Because of B & K's new findings, System Parking conducted its own internal audit and found that it made overpayments in the amount of $1,629,533.50. System Parking submitted another report to the Funds, and demanded that the Funds reimburse or credit the overpayment amount. (Dkt. No. 60 at ¶ 24-25; Dkt. No. 58-19.) The Funds subsequently conducted a second audit covering period April 2008 through September 2010.

### F. Procedural History

On March 14, 2011, the Funds filed a complaint seeking $1,563,627.38 for alleged delinquent contributions owed by L & R for audit period January 1, 2003 through March 31, 2008. (Dkt. No. 1.) L & R filed its answer and a counterclaim demanding $1,629,553.60 for alleged reimbursement or credit for mistaken contribution overpayments. (Dkt. No. 13.) L & R moved for default judgment against the Funds on its counterclaim. (Dkt. No. 40.) The Court denied L & R's motion for default judgment on May 29, 2012. (Dkt. No. 43.)

That same day, L & R moved to compel discovery and extend time for discovery following the Plaintiff's motion to compel an audit of the L & R's records for the period March

2008 through September 30, 2012. The Court extended discovery to January 18, 2012. On January 12, 2012, L & R purportedly produced over 20,000 documents. The Court then extended fact discovery to May 25, 2012. After L & R claimed that they did not receive any responses from the Funds concerning the second audit, they filed the motion to compel. (Dkt. No. 39.) The Court granted L & R's motion. (Dkt. No. 43.)

On August 1, 2013, L & R filed the present motion for summary judgment on its restitution counterclaim for $1,635,356.56 concerning the audit period January 1, 2003 through March 31, 2008. The Funds filed a timely response to L & R's motion for summary judgment and L & R's Rule 56.1 statement of facts. The Funds then filed its Rule 56.1 Statement of Facts to which L & R filed a timely response. (Dkt. Nos. 59, 60, 62.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In determining whether a genuine dispute of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). Factual disputes "are genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmovant." *CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 676 (7th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 248, 255 (1986)) (internal quotations and citations omitted).

On summary judgment, the Court will limit its analysis of the facts to the evidence that is supported by the parties' Local Rule 56.1 statements. *See F.T.C. v. Bay Area Business Council, Inc.,* 423 F.3d 627, 634 (7th Cir.2005); *Bordelon v. Chicago Sch. Reform Bd. of Tr.,* 233 F.3d 524, 529 (7th Cir.2000). When a proposed statement of fact is supported by the record and not adequately controverted by the opposing party, the Court will accept that statement as true. *See Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001). To adequately dispute a statement of fact, the opposing party must cite to specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *See id.; see also Judson Atkinson Candies, Inc.,* 529 F.3d at 382 n. 2; *Cady,* 467 F.3d at 1060.

## **DISCUSSION**

With the exception of L & R's overpayment claim for $35,428.30, there are genuine issues of material fact that preclude summary judgment. Here, L & R points to its own audit to show that it made overpayments to the Funds. (Dkt. No. 60 at ¶ 24.) But the evidence also indicates that the Funds performed their own audits (Dkt. No. 60 at ¶ 14) and reviewed at least one of the purported overpayments identified by L & R (Dkt. No. 60 at ¶ 25, n.5). Drawing all reasonable inferences in the Funds' favor, this Court finds that a reasonable jury could conclude that L & R did not make overpayments based on the Funds' records and audits. To do so, the jury will have to consider whether to credit the Funds' take on L & R's contributions and whether L & R's internal audit should receive greater weight than the Funds' independent audits. When deciding motions for summary judgment, courts do not weigh evidence or make credibility determinations because such considerations are for the jury. *Omnicare, Inc. v.*

7

*UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Here, the record indicates that there are disputes concerning amounts paid by L & R that a jury should resolve.

ERISA Section 502(a)(3) states in relevant part:

> A civil action may be brought—by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan. Federal courts have exclusive jurisdiction over actions brought pursuant to this provision. 29 U.S.C. § 1132(e).

While ERISA's anti-inurement clause in § 1103(c)(1) states: "the assets of a plan shall never inure to the benefit of any employer" it also states that "if such a contribution is made by an employer to a multiemployer plan by mistake of fact or law, paragraph (1) shall not prohibit the return of such contribution or payment to the employer…." 29 U.S.C. § 1103(c)(1), (c)(2)(A)(ii).

### A. Mistaken Overpayments by L & R in the Amount of $1,255,802.56

There are genuine issues of material fact concerning whether L & R mistakenly made overpayments for specified employees in the amount of $1,255,802.66. The Trust Agreement states in Article VI-Contributions, "that Nothing in this Restated Agreement shall prevent a Contribution which is made by an Employer by a mistake of fact or law to be returned by the Trustees to such Employer, upon written request, within twelve months after the Trustees determine the Contribution was made by such a mistake". (Dkt. No. 60-3 at p. 5.) This statement is supported by the Funds Policy for Erroneous Payments, which states "that under certain circumstances … a refund to an employer of erroneous payments or overpayments to the Funds … may be permitted" and that "the interpretation and application of this policy is solely within the authority and discretion of the Trustees … any decision the Trustees make with respect to refunding contributions will be final and not subject to appeal or further review." (Dkt. No. 58-7

at p. 1-2.) L & R alleged that its own internal audit revealed $1,255,802.66 in mistaken employee contribution overpayments made to the Funds. The sixty-five page document is a spreadsheet that includes the names of employees, dates reflecting the period the employee was covered, and alleged amounts paid into each of the benefits funds. (Dkt. Nos. 58-19; 58-20; 58-21; 58-22.)

L & R claimed that its internal audit came after several attempts between the parties to calculate and reconcile alleged deficiencies and overpayments. The following letters exchanged between the parties chronicle the continued failure of the parties to reach an agreement:

> (1) December 31, 2008 Letter from John Phillips, CEO of System Parking to Tom Marino, Payroll Audit Supervisor for B & K stating that in the draft audit report for the first audit outlining L & R deficiencies. According to L & R, the parties agreed following the litigation in 2005, that future audits would include both deficiencies and overpayments. (Dkt. No. 58-26.) L & R contends the Funds, through its Funds Auditor, B & K, have yet to honor their oral agreement;
>
> (2) March 20, 2009 Letter from Tom Marino to John Phillips in reply to his December 31, 2008 letter, stated that after a careful review there were still some issues remaining regarding the amount of deficiencies and a meeting to discuss in detail the findings was in order. (Dkt. No. 58-27.) The amount of the deficiency at that time was $808,000;
>
> (3) On April 30, 2009 Tom Marino sent another letter to John Phillips which stated that a review of employees who switched unions (and subsequently were covered by a different CBA as L & R alleged) following a significant break in their employment history triggered a "possible reduction in the total deficiency" in the amount of $35,428.30. Mr. Marino also suggested the parties meet to discuss the findings in detail. (Dkt. No. 58-28.) L & R claimed that as of the date of filing their motion for summary judgment, the Funds have yet to credit their account for the undisputed $35,428.30 overpayment;
>
> (4) Finally, in a November 9, 2009 Letter from Tom Marino to Todd Tucker, System Parking, Mr. Marino provided an explanation for several adjustments in the deficiency amount resulting in a total deficiency of $949,194.29 owed by L & R, increased from $808,000.00. (Dkt. No. 58-29.) Furthermore,

9

according to the Funds, the amount increased due to the Funds' inclusion of interest, liquidated damages and fees. As of the date the Funds' complaint was filed the amount of the delinquency was $1,563,627.38 and continues to increase as interest and fees accrue. (Dkt. No. 1.)

Following the Funds' Policy for Erroneous Overpayments Made by an Employer, L & R performed an internal audit to discover any errors and submitted in writing to the Administrator of the Funds the amount of the contribution that the employer desired to be refunded. (Dkt. No. 58-7 at ¶ 1-3.) The policy also stated that no refunds will be made if a participant's receipt of a benefit was based in reliance on the contribution for which the refund is requested. For example, according to the policy, if an employee receives a benefit for which the employee would not be eligible but for the erroneous contribution or overpayment, no refund is permitted. (Dkt. No. 58-7 at ¶ 7.) The policy also states that no refunds shall be made to an employer with an outstanding delinquency and will be held until the delinquency is resolved. (Dkt. No. 58-7 at ¶ 12.)

The parties' failed attempts at reconciliation stem from disputes concerning which employees' contributions, if any, were overpaid and for which periods. The results of the Funds' first audit and L & R's internal audit yielded drastically different results. Both parties claimed in excess of $1,000,000.00 of either deficiencies or overpayments. Furthermore, the Funds' dispute the validity of L & R's internal audit as it did not hire an outside firm to conduct the audit and L & R did not explain how it conducted its audit. These disputes create genuine issues of material fact regarding the calculation of overpayments payments of $1,255,802.56 and implicate the validity of the two parties' respective audits. These disputes preclude summary judgment on L & R's claim for overpayments in the amount of $1,255,802.66.

**B. Overcharges of $330,000 by the Funds Due to Calculations Based on Employee Hours Worked Versus Hours Paid**

There are genuine issues of material fact concerning whether to use hours worked or

hours paid to calculate payments. Congress anticipated "that a federal common law of rights and obligations under ERISA-regulated plans would develop," *Central States, S.E. & S.W. Areas Pension Fund v. Neurobehavioral Assoc., P.A.*, 53 F 3d 172 (7th Cir. 1995). Citing *UIU Severance Pay Trust Fund v. Local Union No. 18–U,* 998 F.2d 509, 512 n. 10 (7th Cir.1993) (holding that Congress had determined that actions affecting welfare and pension plans are governed by federal common law). When courts examine a contract in the ERISA context they apply federal common law rules of interpretation. *Central States, S.E. & S.W. Areas Pension Fund v. Kroger Co.*, 73 F. 3d 727, 731 (7th Cir. 1996). These federal common law rules instruct the Court to interpret the Agreement "in an ordinary and popular sense as a person of "average intelligence and experience" would. *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F. 2d 302, 308 (7th Cir. 1992) (quoting Evans v. Safeco Life Ins. Co., 916 F. 2d 1437, 1441 (9th Cir. 1990). The Court will not artificially create ambiguity where none exists. *Id.*

If an agreement is ambiguous, the trier of fact must resolve questions of interpretation. *Kroger*, 73 F. 3d at 732. In the ERISA context, a contract is ambiguous if it is "susceptible to more than one reasonable interpretation." *Id.* Here, L & R based its calculations on the number of hours worked by employees and not the number of hours for which it paid employees. According to L & R, it used hours worked because it claims that the benefits sections of the CBAs do not mention hours paid. L & R also claims that it used hours worked because a Contributions Report Form provided by the Funds included a column for "number of hours worked." L & R argues that this form shows that the CBAs contemplate payment for hours worked and not hours paid.

But the Funds' disagree. They cite to portions of the CBA that state "All hours worked or paid for (personal leave days, holidays, sick leave, bereavement pay) shall be considered as

11

hours worked in compensation" (Dkt. No. 13-1, p. 12 at ¶ 14.5) and "A vacation day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement". (Dkt. No. 13-2 at p. 15, ¶ 14.9.) If hours paid count as hours worked, then L & R's contributions should have been higher and no overpayments were made.

The Seventh Circuit has emphasized the centrality of the collective bargaining agreement in a § 515 claim. It is the collective bargaining and contribution agreements that establish the employer's obligation to the pension fund. *Central States S.E. & S. W. Areas Pension v. Kroger Co.,* 73 F. 3d 727, 730 (7th Cir. 1996) citing *Central States S.E. & S.W. Areas Pension Fund v. McClelland, Inc.*, 23 F. 3d 1256, 1258 (7th Cir. 1994). The parties in *Kroger* disagreed about the meaning of terms in a collective bargaining agreement and a supplement thereto. The Court held that when parties suggest different yet reasonable interpretations of a contract, the contract is ambiguous. *Kroger*, 73 F.3d at 732.

Here, the language in the Commercial CBAs supports different yet reasonable interpretations as to the meaning of hours worked. Though the plain and ordinary meaning of "worked" could suggest the number of hours an employee is engaged in actual work, the CBAs equate hours worked with hours paid in certain instances. It is not clear whether the CBAs limited this meaning to those instances, or whether this meaning applied throughout the contract. Therefore, genuine issues of material fact remain as to the preferred method of calculating employee contributions to the funds, either using hours worked or hours paid as a basis (and how each is defined), for the alleged $330,000.00, Therefore, granting the Defendant's motion for summary judgment is inappropriate.

## C. Agreed Upon Credit of $35,428.30 Owed to L & R for Employee Breaks in Service

The Funds admit that L & R is entitled to an amount of $35,428.30 based on employees who sustained a "significant break in employment" (agreed by the parties to be three months or more) before switching from one contract to another during the audit period (example: from a commercial to a valet contract). However, the Funds alleged that they planned to credit the amount of overpayment against any resulting deficiency owed by L & R. According to the Funds Policy for Erroneous Payments: "No refunds will be made to an employer with an outstanding delinquency, and will be held at least until the delinquency is resolved. (Dkt. No. 58-7 at p. 4, ¶ 12.) However, the policy goes on to explain that the Trustees may amend or suspend all or any part of these policies and guidelines in their sole and exclusive discretion…regardless if there are any refund requests pending, and may apply any amendment or change in policy retroactively to pending requests. (*Id* at ¶ 15.)

L & R met its burden in proving the validity of the discrepancy and the Funds agree that a refund is due. Given that there are no genuine issues of material fact and the issuance refund is at the sole discretion of the Trustees, it is appropriate to grant the Defendant's motion for summary judgment in awarding L & R $35,428.30 for overpayments made on behalf of employees with a significant break in employment.

## D. Audit Discrepancies in the Amount of $14,125.60 Owed to L & R

As a result of L & R's internal audit conducted in 2010, L & R found discrepancies in the amounts of $9,649.90 in 2003 and $4,475.78 in 2004. L & R alleged that the Fund Auditors understated L & R's contributions in the above amounts and thus owes L & R a refund or credit in the total amount of $14,125.60. The Funds agreed to investigate the identified discrepancies and, following their investigation, concluded that they provided full-time benefits or credited

pension accounts for those employees L & R identified as those whose contributions were mistakenly overpaid.

However, L & R claims the Funds never produced any documentation to support its findings. The Funds object and offer as evidence a letter dated December 12, 2012 from Nan Kmiecik of Elite Administration and Insurance Group, an agency contracted by the Funds to review the list of employees and social security numbers for whom L & R alleged they mistakenly overpaid. In the letter and attachment, Ms. Kmiecik listed the affected employees and indicated whether or not benefits were provided, effective date, and what type of benefit was provided. If the information was unavailable, a note "unable to verify" appears beside the employee's name. The list does not indicate the date through which coverage was effective only the start date. Without the period for which the employee was covered L & R claimed it is not possible to determine whether or not the Funds properly credited L & R for any and all overpayments. (Dkt. Nos. 60-7, 60-8.)

Because L & R's claims are based solely upon their internal audit findings and allegations contained within Paragraphs 25, 30-32 of their Rule 56.1 Statement of Facts (Dkt. No. 58 at p. 9-11, ¶¶ 25, 28, 30-32; Dkt. No. 60 at p. 14-19, ¶¶ 25, 28, 30-32.) and those claims are refuted by the Plaintiffs, there are genuine issues of material fact as it relates to the validity of L & R's internal audit results and hence the alleged amount of overpayments. Therefore, granting the Defendant's motion for summary judgment for $14,125.60 is improper.

## **CONCLUSION**

For the reasons stated, the Court denies L & R's Motion for Summary Judgment as to its claims for: (1) $1,255,802.66 for mistaken contribution overpayments; (2) for $330,000 for overcharges by the Funds; and (3) understated contributions in 2003 and 2004 discovered in L &

R's internal audit in the amount of $14,125.60. The Court grants L & R's Motion for Summary Judgment on its counterclaim for $35,428.30 for agreed upon overpayments related to specific employees who switched from one contract to another following a significant break in employment.

_[signature: Virginia M. Kendall]_

Northern District of Illinois

Date  March 31, 2014: