IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TEAMSTERS LOCAL UNION NO. 727 | ) | |
| HEALTH AND WELFARE FUND, | ) | |
| TEAMSTERS LOCAL UNION NO. 727 | ) | |
| PENSION FUND and TEAMSTERS | ) | |
| LOCAL UNION NO. 727 LEGAL AND | ) | Case No.: 1:11-cv-1747 |
| EDUCATION ASSISTANCE FUND, | ) | |
| | ) | Judge Jorge L. Alonso |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| L&R GROUP OF COMPANIES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF
LAW**

Defendant L&R Group of Companies, ("L&R" or "Defendant"), by and through its

undersigned attorneys, respectfully submits its Supplemental Findings of Fact and Conclusions of

Law, and states as follows:[1]

**FINDINGS OF FACT[2]**

A.    **System Parking Contributed almost $19 Million to the Funds during the
Funds' Audit Period.**

1.    L&R is a parking property owner and former owner of System Parking, Inc.

("System Parking"), which was a party to various collective bargaining agreements ("CBAs") with

---

[1] Defendant's Supplemental Findings of Fact and Conclusions of Law is submitted contemporaneously with
Defendant's Post-Trial Brief. This Supplemental Findings of Fact and Conclusions of Law largely restates
the facts and argument found in Defendant's Post-Trial Brief. Defendant incorporates by reference hereto
its Post-Trial Brief.

[2] References are as follows: "Tr. _____:_____" to indicate the trial transcript and the page and line
numbers of that transcript; and "Ex. ____" to refer to a trial exhibit.

Teamsters Local Union No. 727 (the "Union" or "Local 727") covering System Parking's commercial and valet employees. (Stip. Facts, Doc. No. 89-1, ¶¶ 5-7.)

2. The Funds are trusts established to receive contributions from numerous employers pursuant to collective bargaining agreements between employers and the Union. (Stip. Facts, Doc. No. 89-1, ¶¶ 1-4.)

3. The Funds provide separate types of benefits to the Union's participating collective bargaining members. (Tr. 24:2-25:7.) The Health and Welfare Fund provides various medical and prescription drug benefits to covered employees, (*id.* 24:2-11); the Pension Fund provides retirement benefits to plan participants, (*id.* 24:12-19); and the Legal and Educational Assistance Fund provides legal and educational assistance benefits to its participants. (*Id.* 24:20-25:3.)

4. Different benefits were provided to full- and part-time employees, and the Funds charged System Parking different contribution rates based upon whether an employee was full- or part-time. (*Id.* 24:6-11; Ex. 4 §§ 20.1-20.4; Ex. 5 §§ 20.1-20.4.)

5. Between 280 and 300 employers contribute to the Funds. (Tr. 21:24-25.)

6. Between January 1, 2003 and March 31, 2008, System Parking contributed **$18,818,658.21** to the Funds pursuant to the CBAs, which included: (1) $14,035,495.40 in Health and Welfare contributions; (2) $4,297,595.72 in Pension contributions; and (3) $485,567.09 in Legal and Education contributions. (Ex. 23 Vol. 3 at 1876; Tr. 199:6-19.)[3]

---

[3] The Funds' final audit, Ex. 23, is a voluminous exhibit in 3 volumes consisting of: (1) Accountant's Report on Agreed Upon Procedures; (2) Summary Report; (3) Summary Report by Month; (4) Individual Summary Report (Sub-Set) [also referred to as the "Individual Detail Report"]; (4) PILMC; and (5) Interest. Defendant's citations to the Individual Detail Report in Vol. 3 of Ex. 23 refers to the page numbers found at the bottom of the Individual Detail Report.

**B.    The CBAs Required Full-Time Contributions to Be Made for Employees Based Upon the 120-Day Rule and Subsequently, Based Upon Working 128 Hours a Month.**

7.    System Parking employees were covered by the following CBAs: (1) the November 1, 2001 through October 31, 2006 Commercial CBA ("2001-2006 CBA," Ex. 4); and (2) The November 1, 2006 through October 31, 2011 Commercial CBA ("2006-2011 CBA," Ex. 5).[4] The Commercial CBAs are referred to collectively in this Brief as the "CBAs."

8.    The CBAs required different contribution amounts for full-time and part-time employees, (Ex. 4 §§ 20.1-20.4; Ex. 5 §§ 20.1-20.4), and the following table sets forth contribution amounts during the Funds' audit period:

| Union Benefits | | Health | | Pension | | Legal | |
|---|---|---|---|---|---|---|---|
| From | To | F/T | P/T | F/T | P/T | F/T | P/T |
| Jan/03 | Feb/03 | $345.00/ month | $20.00/ month | $110.00/ month | $0.65/ hour | $17.00/ month | $0.10/ hour |
| Mar/03 | Feb./04 | $415.00/ month | $25.00/ month | $120.00/ month | $0.70/ hour | $17.00/ month | $0.10/ hour |
| Mar/04 | Feb/05 | $485.00/ month | $2.80/ hour | $130.00/ month | $0.75/ hour | $17.00/ month | $0.10/ hour |
| Mar/05 | Feb/06 | $530.00/ month | $3.05/ hour | $155.00/ month | $0.90/ hour | $17.00/ month | $0.10/ hour |
| Mar/06 | Oct/06 | $575.00/ month | $3.30/ hour | $180.00/ month | $1.05/ hour | $17.00/ month | $0.10/ hour |
| Nov/06 | Feb/07 | $575.00/ month | $3.30/ hour | $180.00/ month | $1.05/ hour | $17.00/ month | $0.10/ hour |
| Mar/07 | Feb/08 | $606.00/ month | $3.50/ hour | $211.00/ month | $1.20/ hour | $17.00/ month | $0.10/ hour |
| Mar/08 | Mar/08 | $630.00/ month | $3.65/ hour | $245.00/ month | $1.40/ hour | $26.00/ month | $0.10/ hour |

(*See* Ex. 4 §§ 20.1-20.4; Ex. 5 §§ 20.1-20.4.)

---

[4] Two additional Valet CBAs, (Ex. 6; Ex. 7) are not material to the claims, defenses, and counterclaim in this case because the audit at issue did not include contributions made pursuant to the Valet CBAs.

9.     From 2003 to October 31, 2006, CBA Section 20.5 provided that an employee would be treated as a full-time employee for purposes of contributions to the Funds, when the employee worked an average of over 32 hours per week for a 120-day period (the "120-Day Rules"), (Tr. 35:10-15, 148:12-25), and  specifically provided as follows:

> **20.5** For the purpose of contributions to the Health and Welfare, Pension and Legal Educational Assistance Funds only, any part-time employee who averages over 32 hours per week over any 120 day period shall be considered a regular full-time employee and full-time employee contributions will be required. Such employee shall not be removed from full-time contributions until another 120 day period elapses in which he does not average over 32 hours per week.

(Ex. 4 § 20.5.)

10.     From November 1, 2006 until 2011, CBA Section 20.5 changed the definition of when a part-time employee would be treated as a full-time employee for contributions to the Funds, required full-time contributions to be made on behalf of a part-time employee when he worked 128 hours in a months, and specifically stated as follows:

> **20.5** For the purpose of contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds only, any part-time employee who works one hundred twenty eight (128) hours or more in a calendar month shall be considered a regular full-time employee and full-time employee contributions will be required for that month.

(Ex. 5 § 20.5.)

**C.     System Parking Contributed to the Funds Based on Hours Worked**

11.     At all times, System Parking contributed to the Funds based on the hours worked by employees. That is, System Parking contributed benefits for each hour worked by covered employees and did not make contributions for additional hours *paid* to employees (including paid vacation, holiday, and sick leave). (Tr. 350:2-5.)

4

12.     CBA Section 20.5 did not require System Parking to make contributions to the Funds based on hours paid. (*See* Tr. 356:10-19.)

13.     Mr. Coli could not point to any language in Article 20 of the CBAs concerning benefit contributions that specifically required System Parking to make contributions to the Funds based upon hours paid.[5]  (*See* Tr. 88:22-89:22, 92:2-93:2.)

14.     The Funds prepared monthly contribution report forms ("Remittance Reports') to be submitted to employers for making contributions to the Funds, and required System Parking to provide monthly contributions based on "# of Hrs. Worked," not the number of paid hours. (Ex. 28 at 1; Tr. 85:24-86:2, 359:8-360:2.) Nothing in the Remittance Report form defined hours worked to mean hours paid. (Ex. 28 at 1; 359:8-360:2.)

15.     The Funds' auditors initially calculated System Parking's alleged deficiencies based on hours worked, not hours paid. (Tr. 93:7-10.)

**D.     System Parking Made Good Faith Mistakes in Contributions Resulting in Significant Overpayments, Based in Part on the Funds' Monthly Remittance Report Form**

16.     During the Funds' audit period, a majority of System Parking's approximately 900 employees worked in Chicago and the CBAs required System Parking to make contributions to the Funds on their behalf. (Tr. 348:2-24.)

17.     Each month, the Funds generated the Remittance Report forms and sent them to System Parking for the next month's submission of contributions. (Tr. 357:16-21, 360:3-5, 371:21-372:14.) The Remittance Reports included the employee's name, designated them as full- or part-time and determined the amount of contribution due. (*Id*. 371:21-372:14.)

---

[5] As explained below, the Funds rely on language in the "Holidays" and "Vacations" provisions of the CBAs in an attempt to support their argument that contributions should be based on all hours paid, rather than hours that System Parking employees worked. (*See* Tr. 26:22-28:2.)

18.     System Parking's payroll manager, Marithes Kinkle, completed the monthly Remittance Reports, calculated System Parking's contribution amounts, and sent payments to the Funds. (Tr. 357:11-25, 358:7-21; Ex. 28 at 1; Ex. 30(a).)

19.     After the Funds' audit period, Vivian Mateega reviewed Ms. Kinkle's work and learned of substantial errors Ms. Kinkle had performed in processing the Remittance Reports, which included: overpaying contributions because part-time employees (as defined under the CBAs) were improperly listed as full-time employees on the Funds' Remittance Reports sent to System Parking, and mistakenly making full-time contributions for them when no contributions were owed; erroneously submitting contribution payments for non-union employees[6]; mistakenly making contributions for employees listed on the Remittance Reports who were on personal leave when no contributions were due; and making contributions for employees that had been terminated.[7] (Tr. 340:15-21; 360:13-362:22.)

20.     Ms. Mateega also observed that Ms. Kinkle failed to scrutinize the names of individuals listed as full-time employees, and as a result improperly made full-time contributions on behalf of formerly full-time employees who had not worked for System Parking for several months (or even years) at a time.[8] (Tr. 362:23-363:24.)

---

[6] Ms. Kinkle advised Ms. Mateega that she had submitted all of System Parking's payroll records, including non-union employees, to the Funds upon their request for payroll records. (Tr. 360:13-361:9.)

[7] Although Ms. Kinkle indicated on the completed Remittance Reports when an employee was terminated, the Funds did not remove the employee from the next month's Remittance Reports sent to System Parking. Ms. Kinkle did not catch the fact that the Funds improperly included a terminated employee on the Remittance Report Form and she mistakenly submitted full-time contributions to the Funds for the terminated employees. (Tr. 361: 24 -362:22.)

[8] Ms. Mateega testified as follows:

> The full-time people [Ms. Kinkle] didn't pay that much attention to because we were paying the same monthly. The ones she really concentrated on was [sic] the part-timers because that would change based on the hours worked.

21.    Ms. Kinkle's mistakes in submitting contributions were not intentional and were made in good faith when calculating what contributions were owed using a complex Remittance Report system featuring hundreds of employees each month.[9] (Tr. 363:25-364:8, 387:6-24; *See* Ex. 28 at 1; Ex. 30(a).)

22.    Ms. Mateega notified L&R Vice President of Human Resources, Venishia Price, when Ms. Mateega learned that the System Parking had made mistaken overpayments to the Funds. (Tr. 364:9-19.)

23.    Neither System Parking nor L&R believed the mistaken overpaid contributions were properly made, and they never ratified the mistaken overpayments. (*See* Tr. 340:15-21, 370:24-371:5.)

**E.    Although the Purpose of the Funds' Audit Was to Ensure Contributions Were Consistent with the CBAs, the Funds' Auditors Intentionally "Zeroed Out" System Parking's Overpayments, Which Allowed the Funds to Claim a Deficiency for Employees on Whose Behalf System Parking Mistakenly Overpaid Contributions.**

24.    Since February 2003, payroll auditor Mr. Marino—who is not a CPA—has been responsible for coordinating, conducting, and overseeing all audits for the Funds. (Tr. 142:21-143:9.)

---

And so what would happen is that people will go out – we had a lot of people that were international, that they will take personal leave of absence for three, four months and come back after those three months. So, you know, if she wasn't notified this person is out, or sometimes she was notified, but because they were on a personal leave and [Ms. Kinkle] didn't understand how FMLA worked, she continued to pay that because she knew they were full-time employees.

(Tr. 363:4-16.)

[9] Some of Ms. Kinkle's mistakes resulted from her lack of understanding of various employment laws and her promotion to payroll manager from within. (Tr. 363:25-364:8.)

25. The stated purpose of B&K's audit was "to assist [the Funds] in determining whether contributions to the Trust Funds are being made in accordance with the collective bargaining agreement in effect and with the Trust Agreement of the Fund." "(Ex. 23 Vol. 1 at 1.) Mr. Marino testified that the goal of the Funds' audits is to determine whether deficiencies exist and to ensure contributions are consistent with the terms of applicable CBAs. (Tr. 197:22-198:5.)

26. The Funds' audit involved a review of System Parking's payroll records, contribution reports, and governing collective bargaining agreements. (Tr. 198:12-17.) B&K's May 13, 2010 audit letter advised that "[o]ur procedures generally include a review of the pertinent provisions of the collective bargaining agreements and comparing underlying employer payroll records to Fund contribution records." (*Id.*).

27. Given the voluminous records involved in the January 1, 2003–March 31, 2008 audit, (Tr. 152:21-153:1), Mr. Marino arranged for a third-party, K-Plus, to integrate payroll records and contribution reports into a payroll audit program. (*Id.* 144:2-14, 145:14-19.)

28. Mr. Marino provided K-Plus the criteria for developing the audit program and instructed K-Plus that the audit report should reflect "the employer's hours," "the appropriate contribution," and "the difference [between appropriate contribution amount and amount paid]."[10] (Tr. 145:24 -146:19.)

29. B&K also directed K-Plus to "zero-out" any negative amounts (*i.e.,* overpayments by System Parking) in the audit report, and to do so by adjusting "appropriate contribution rates" upwards to reflect the actual amount contributed by System Parking when that amount exceeded the amount due under the CBAs. (Tr. 209:2-15, 233:21-25.) As a result, the

---

[10] B&K provided K-Plus "the appropriate contribution rates that are detailed in the collective bargaining agreement," as well as the CBAs' "criteria for determining a full-time and part-time status of an employee." (Tr. 147:2-9.)

"calculated contribution" amount in the Funds' audit report was not actually the contribution amount to which System Parking agreed in the CBAs, but instead was the greater of the following: (1) the contribution amount actually due under the CBA, *or* (2) the amount actually paid (or in this case, overpaid) by System Parking. (*Id.* 209:16-21, 231:19-232:13, 233:9-20.)

30.     As a result of B&K's "zeroing-out" System Parking's overpayments, the Funds' audit failed to show overpayments made on behalf of certain employees, and in many instances showed purported *deficiencies* for employees on whose behalf System Parking had mistakenly made tens of thousands of dollars of overpayments.[11] (*See, e.g.*, Tr. 210:10-216:25, 217:5-218:23, 223:2-225:23, 231:1-11.)

31.     Mr. Marino testified that for all individuals for whom System Parking overpaid contributions, the "calculated contribution" amount in the Funds' audit would be the amount System Parking actually paid and not the lesser contribution amount actually required by the CBA. (Tr. 231:19-25.)

---

[11] For employee Cesar Olivares the report stated that full-time benefit contributions (which were as high as $485/month for Health, $130/month for Pension, and $17/month for Legal) were owed between January 2003 and August 2004 (when System Parking mistakenly made overpayments), notwithstanding the fact Mr. Olivares actually did not work any hours during that period (Ex. 23 Vol. 1, at 304-305), and accordingly was not due *any* contributions under the CBAs. (Tr. 218:17-23.) The report also erroneously listed full-time benefit amounts as due for employees Earl Johnson, Jr., Elmer Patino, and Jose Cuevas-Aguilar (among others), for months or years at a time, when in fact such employees did not work any hours during that time and were not due any contributions under the CBAs. (*See id.* 219:1-24, 222:15-225:19, 227:24-231:11.) System Parking also erroneously (and mistakenly) made full-time employee contributions in the amount of over $28,000 on behalf of Jose Cuevas-Aguilar for a *3.5-year period* when in fact no contributions were due to Mr. Cuevas-Aguilar for that time period under the CBA. (Tr. 227:24-228:25, 229:17-230:1; Ex. 23 Vol. 2, at 849-851.) Notwithstanding these overpayments, the audit report stated that System Parking was deficient in the amount of $2,300 for Mr. Cuevas-Aguilar for Health and Welfare contributions. (Tr. 231:1-11; Ex. 23 Vol 2 at 851.) In another instance, the audit report calculated that System Parking owed $22.60 for Health and Welfare contributions on behalf of Elmer Patino notwithstanding the fact System Parking erroneously made contributions on behalf of Mr. Patino when none were due for approximately one-and-one-half years. (Tr. 223:11-20, 225:10-19; Ex. 23 Vol. 1 at 484-485.)

32.     Mr. Marino did not actually read the audit policy and could not point to any Fund policy language requiring the Funds' auditors to disregard overpayments or to manipulate CBAs' "appropriate contribution rates" as a means of zeroing-out an employer's overpayments. (*See* Tr. 226:20-227:12.)

33.     Mr. Marino testified that the Funds did not direct him on how to conduct the System Parking Audit, and he never received any written instruction from the Funds directing B&K to look only at underpayments. (Tr. 195:25-196:2; 227:16-18.)

**F.     The Funds' Audit Report's Alleged Deficiencies Do Not Reflect CBA Requirements for System Parking's Contributions.**

34.     The Funds' final audit report (Ex. 23), states a total deficiency of $928,157.94.[12] (Ex. 23.)

35.     The Funds' auditors arrived at the alleged deficiencies by calculating the differences between the purported "Calculated Contributions" and "Actual Contributions" in the audit report. (*See* Ex. 23 Vol. 3 at 1876.) Besides the Funds' audit—which "zeroed out" System Parking's overpayments—the Funds provided no further evidence for its alleged deficient contribution claim.

36.     The "Calculated Contributions" in the Funds' audit did not adhere to the actual contribution amounts required in the CBAs, and consequently the stated deficiencies do not reflect any actual deficient payments under the CBA. (*See* Tr. 233:9-25.)

---

[12] The Funds' audit report consists of the following alleged deficiencies: (1) $669,395.20 in Health and Welfare contributions; (2) $231,913.98 in Pension contributions; and (3) $26,848.76 in Legal contributions. (Ex. 23 Vol. 3 at 1876; *see also* Tr. 234:9-14.)

37.     Mr. Marino admitted that System Parking's alleged deficiencies in the Fund's audit report would have been different had the Funds' audit report set forth the actual calculated contributions required by the CBAs. (Tr. 234:4-8.)

### G.     L&R Is Entitled To a Refund or Credit of Its Mistaken Overpayments Pursuant to the Funds' Policies in Effect During the Funds' Audit Period.

38.     The Funds' Restated Agreement and Declaration of Trust in effect during the Funds' audit period allows a refund for mistakenly overpaid contributions and states as follows:

> 6.04. Nothing in this Restated Agreement shall prevent a Contribution which is made by an Employer by a mistake of fact or law to be returned by the Trustees to such Employer, upon written request, *within twelve months after the Trustees determine that the Contribution was made by such a mistake*.

(Ex. 8 at p.21 ¶ 6.04 (emphasis added); Tr. 128:10-129:7).

39.     In September 2009, over a year after the Funds' audit period, the Trustees adopted a Refund Policy (the "2009 Refund Policy") for erroneous payments and overpayments made by an employer. (Tr. 127:12-15; Ex. 12.) Among other things, the 2009 Refund Policy states that "[n]o contributions will be refunded more than one year after the contributions are received by the Fund Office, absent extenuating circumstances or unanticipated equitable considerations as, in their sole discretion, may be determined by the Trustees." (Ex. 12 at p.2 ¶ 2.) The 2009 Refund Policy further states that "[i]f within one year from the receipt of contributions the Administrator discovers that an employer has made an erroneous payment or overpayment, the Administrator will notify the employer and the employer may thereafter make a request for a refund providing it does so within the one-year period set forth in Section 2 above." (*Id.* at pp.2-3 ¶ 5.)

40.     Mr. Coli acknowledged that L&R could not have complied with the 2009 Refund Policy during the Funds' audit period because the policy had not yet been written or adopted. (Tr. 130:7-12.)

41. To the extent that the 2009 Refund Policy has any effect—which it does not—L&R complied with the policy by sending a letter requesting a refund within one year of the 2009 Refund Policy's adoption. (Tr. 109:3-22.)

**H.  L&R Objected to the Funds' Audit Because it Did Not Account for Overpayments as Previously Agreed.**

42. On December 12, 2008, the Funds' auditors sent L&R a preliminary audit alleging delinquent contributions. (*See* Ex. 16A; Ex. 17.)

43. On December 31, 2008, L&R sent a letter to the Funds' auditors pointing out that the Funds' auditors did not account for mistaken overpayments in the Funds' audit when the Union previously agreed that future audits would include mistaken overpayments. (Tr. 105:3-11; Ex. 16A.)

44. On March 20, 2009, Mr. Marino responded to L&R's December 31, 2008 letter, but never addressed L&R's inquiry about including overpayments in the Funds' audit. (Ex. 17.)

45. The Funds' auditors included a new preliminary audit report in its letter and stated that L&R owed $808,000 in unpaid contributions, not including penalties, interest, or liquidated damages. (Ex. 17 at 04387.) The Funds' auditors never addressed System Parking's overpayments.

**I.  The Funds' Initial Audit was Calculated Based Upon "Hours Worked" and the Funds' Auditors Later Calculated the Audit based on "Hours Paid—Which Increased the alleged Deficiency by $330,000.00—When L&R pointed Out Mistakes in the Funds' Audit.**

46. The Funds' initial audit calculated System Parking's alleged deficiency based upon hours worked, not upon hours paid. (Tr. 93:7-10.)

47. The parties met in August and November 2009 to discuss the audit. On November 9, 2009, Mr. Marino wrote to L&R, acknowledging several errors in the Funds' audit

that decreased the alleged deficiency by $210,000.00, but increased the deficiency by $330,000.00 because the Funds' auditors changed the calculation based upon hours paid, bringing the alleged deficiency to $949,199.29. (Tr. 107:2-108:11; Ex. 21.)

48. The Funds rely on language in the CBA for "Holidays" and "Vacations" to support their argument that contributions should be based on all hours paid, rather than hours that System Parking employees worked, but neither the CBA "Holidays" nor the "Vacations"[13] provisions state that hours paid shall be considered hours worked in determining benefits owed under the CBAs. (Tr. 26:22-28:2; *See* Ex. 4 §§ 9.1, 14.1.)

### J. L&R's Internal Audit Showed $1,255,802.66 in Mistaken Overpayments to the Funds During the Funds' Audit Period.

49. Because of B&K's repeated errors, (Tr. 360:10-361:23), and because the Funds failed to adhere to its earlier agreement to reflect System Parking's overpayments in future audits, (*id.* 198:2-5, 250:10-251:19), L&R conducted its own internal audit by relying upon the Funds' Individual Detail Reports, which were  part of the Funds' audit report.[14] (*Id.* 318:12-320:24.)

50. Mr. Francis was given the Funds' audit and the Individual Detail Report (Ex. 29), a 1,803-page document that was part of the Funds' audit of System Parking and bases its calculations using hours paid as opposed to hours worked. (Ex. 20; Tr. 319:8-15.)

---

[13] The "Holidays" provision entitles certain employees to eight paid, enumerated holidays. (Ex. 4 § 9.1.) The provision states, among other things, that "[a] holiday for which an employee is paid and during which he did not work shall be considered as time actually worked by him under the terms of the Agreement." (*Id.*; *see also* Ex. 5 § 9.2.)  The "Vacations" provision entitles certain employees to paid vacation. (*See* Ex. 4 § 14.1.) The provision states, among other things, that "[E]mployees shall receive vacation pay on the basis of average hours worked in the previous year. All hours worked or paid for (personal leave days, holiday days, sick leave, bereavement pay) shall be considered as hours worked in determining compensation." (*Id.* ¶ 14.5; Ex. 5 § 14.7.)

[14] It is important to note that although System Parking made contributions to the Funds based upon "hours worked," L&R's Internal Audit is based upon "hours paid" because L&R relied upon the Funds' Individual Detail Reports, which were based upon "hours paid." (Ex. 20; Tr. 319:8-15, 320:19-24, 323:10-13.)

13

51.     Mr. Francis also analyzed the CBAs and determined the rules that applied to System Parking's contribution payments for full- and part-time employees to the Funds. (Tr. 319:16-20.)

52.     After understanding the CBA contribution rules, Mr. Francis reviewed the Individual Detail Report (Ex. 29) and calculated what he believed System Parking owed to the Funds for employees in comparison to what the Funds claimed System Parking owed, to determine if Mr. Francis' calculations agreed with the Funds' auditors.  (Tr. 319:21-320:6.)

53.     Mr. Francis concluded from his review that "every time there was an underpayment, it was correctly calculated by the auditors.  Every time there was an overpayment, the auditors agreed with what L&R paid as being the correct amount." (Tr. 320:9-17, 322:16-20.)

54.     Mr. Francis subsequently flew to Chicago to meet with Mr. Marino to make sure Mr. Francis understood the auditors' CBA rule interpretations, and after the meeting, Mr. Francis was comfortable that he was interpreting the CBA rules consistent with Mr. Marino. (Tr. 321:5-322:7.)

55.     Mr. Francis enlisted two L&R employees and a programmer to set up L&R's spreadsheet, and they inputted approximately 36,000 lines of information from the Funds' Individual Detail Report (Ex. 29) into L&R's spreadsheet to set up the same calculation method as the Funds' auditors.  (Tr. 320:19-24, 323:10-13.)

56.     The spreadsheet created at Mr. Francis's direction duplicated information in Mr. Marino's audit and became L&R's Internal Audit, which is Exhibit 27. (Tr. 323:10-23.)

57.     L&R's Internal Audit (Ex. 27) calculates L&R's overpayments based on hours paid as opposed to hours worked because L&R used the Funds' Individual Detail Reports (Ex. 29), when conducting its internal audit. (Ex. 20; Tr. 319:8-15, 320:19-24, 323:10-13.)

14

58.     L&R's Internal Audit (in the upper left-hand corner of page 1) encompasses eight (8) periods of time where System Parking was required to contribute different rates for full- and part-time employees based upon the specific Fund (Health & Welfare, Pension, and Legal & Education) and each period was assigned a code from 3 to 10, based upon the CBA requirements. (Tr. 323:24-327:11.)

59.     Next to the Code section, (in the upper right-hand side of page 1 of L&R's Internal Audit), L&R calculated System Parking's overpayments for January 2003 through March 2008 for each Fund (Health, Pension, and Legal), which totaled **$1,255,802.66**. (Tr. 328:13-23.)

60.     Below Code and Overpayment sections, the L&R Internal Audit lists, in spreadsheet format, the following: Month-Year; Page; Name; SSN; Code; Average Hours; and the Rate, L&R calculation, CBA calculation, and variance for each Fund. (Ex. 27, page 1.)

61.     The L&R Internal Audit provides information from the Funds' Individual Detail Report (Ex. 29) about employees and calculates variances between what L&R should have contributed for each employee under the CBAs and what the Funds' CPA incorrectly claimed L&R owed in its Audit. (Tr. 328:25-329:10.)

62.     The column identified as "Page" in L&R's Internal Audit represents the page number in the Funds' initial Individual Detail Report. (Ex. 29; Tr. 329:2-7.)

63.     The "average hours" column in L&R's Internal Audit for each employee was taken from the Funds' Individual Detail Report, and is based on hours paid. (Tr. 330:24-331:5.)

64.     The "L&R" column is L&R's calculation of what contributions should be due to the Funds for employees under the CBAs based upon the hours provided in the Funds' Individual Detail Report.  (Tr. 329:17-330:20, 331:7-11.)

65.     The "CPA" column refers to the calculations made by the Funds' auditor. (Tr. 331:12-14.) [15]

66.     The "variance" column is the difference between the contributions L&R calculated as owed based upon the CBA requirements, and the contributions the CPA (the Funds' auditors) improperly claimed were owed under the CBA.  (Tr. 331:15-18.)

67.     Once Mr. Francis completed the L&R Internal Audit, he presented it to his manager.  (Tr. 332:17-19.)

68.     L&R's Internal Audit shows the extent of L&R's mistaken overpayment for employees such as Charles Dotson who worked no hours from January 2007 through March 2008, as reflected by the Funds' Individual Detail Report (Ex. 29), but L&R contributed between $575.00 to $606.00 per month to the Health & Welfare Fund during that period; between $180.00 to $211.00 per month to the Pension Fund during that period; and $17.00 per month to the Legal & Education Fund during that period.  (Tr. 335:20-337:16.)

69.     System Parking made similar overpayments as those for Mr. Dotson to the Funds for other System Parking employees, and those overpayments are reflected in L&R's Internal Audit.  (Ex. 27; Tr. 333:4-335:19, 337:19-340:7.)

70.     The Funds' Collection and Field Representative Robert MacArthur admitted that although not reflected in the alleged deficiency, the Funds' audit shows that System Parking made overpayments.  (Tr. 274:18-21.)

---

[15] Entries under the "CPA" column are simply the contributions the Funds' auditors claim System Parking owed under the CBA.  *(Compare, e.g.*, Ex. 27, p.1, Abayomi Oluwole for December 2005 (CPA calculation of $530.00 for Health and Welfare), *with* Ex. 29, p. 2, Abayomi Oluwole for December 2005 (Calculated Contribution of $530.00 for Health and Welfare).)

**K.** **Consistent with the Funds' Trust Agreement, L&R Submitted the L&R Internal Audit to the Funds Seeking Over $1.6 Million in Credits or Refunds of the Overpayments, but the Funds' Did not Follow its Refund Policy and Never Made a Determination About L&R's Mistaken Overpayments.**

71. After L&R conducted its audit, L&R's counsel sent an April 23, 2010 letter to the Fund Manager, and requested a credit of over $1.6 million, meaning the Funds owed L&R approximately $680,359.78, after accounting for the alleged deficiency in the Funds' audit. (Tr. 109:3-22.)

72. L&R's letter to the Funds described in detail how L&R calculated the Refund Request as follows:

| | |
|---|---|
| L&R's Mistaken Overpayments | $1,255,802.66 |
| L&R's Disputed Hours Paid Calculation | $ 330,000.00 |
| L&R's Credit Agreed to by the Funds | $ 35,428.60 |
| L&R's 2003/2004 Unaccounted for Contributions | $ 14,125.60 |
| **Total L&R Requested Credit/Refund** | **$1,635,356.86** |

(Tr. 109:3-22.)

73. Mr. MacArthur never calculated whether or not L&R's requested overpayment was accurate. (Tr. 274: 14-17.)

74. The Funds never held a meeting with L&R to discuss its April 23, 2010 letter regarding overpayments. (Tr. 110:6-11.)

75. Mr. Coli never asked B&K to look into the April 23, 2010 letter regarding overpayments. (Tr. 111:10-17.)

76. Mr. Coli never asked the auditors to analyze L&R's internal audit for accuracy or to conduct their own calculation of overpayments. (Tr. 112:6-9, 113:24-114:23.)

77. Accordingly, the only calculation of L&R's mistaken overpayments was performed by L&R and captured in the L&R Internal Audit. (Tr. 114:24-115:4.)

78.     Generally, when the Funds receive a request for refund of overpayments, the Funds ask the employer for additional information regarding the request for a refund of a mistaken overpayment and in some cases ask the field representative and accounts receivable representative to analyze the mistaken overpayment. (Tr. 112:10-113:7.)

79.     The Funds did not follow its own process when L&R requested a refund for its mistaken overpayment. (Tr. 113:8-13.)

80.     On May 3, 2010, Mr. Coli sent a letter instructing the Funds' auditors to issue the final report for System Parking's audit without meeting with L&R regarding its request for a refund of its mistaken overpayments. (Tr. 109:23-110:11; Ex. 22.)

81.     On May 17, 2010, Mr. Coli sent a memorandum to the Funds' Audit and Collections Subcommittee stating that Mr. Coli received the Funds' final audit of System Parking, had several meetings with System Parking (none of which were about System Parking's letter regarding mistaken overpayments), and went through three drafts of the audit findings, and that the Funds and L&R were unable to come to an agreement as to the audit findings.  (Tr. 110:12-111:17; Ex. 24.)

**L.     The Funds Presented No Evidence that they Provided Full-time Benefits to the Employees for Whom System Parking Mistakenly made Overpayments.**

82.     Third-party administrator Elite Administration ("Elite") processed medical insurance benefit claims for the Funds during part of the Funds' audit period. (Tr. 284:8-285:1.)

83.     Elite does not administer the Funds' Pension or Legal and Education benefits. (Tr. 295:24-296:11.)

84.     During the Funds' audit period, System Parking's part-time employees were eligible for dental, vision, life insurance, and member assistance plan benefits under the Health

and Welfare Funds. (Tr. 293:4-9.) Full-time employees received these Health and Welfare Funds benefits, as well as medical, prescription, and short-term disability coverage. (*Id.* 293:10-20.)

85.     Part-time employees also were eligible to receive medical coverage (i.e., "expanded coverage") once the Funds received contributions for 500 hours of covered employment. (Tr. 293:21-294:3.) However, Elite's records did not distinguish between employees who were eligible for medical coverage because they were full-time employees or whether they were eligible for "expanded coverage" because they were part-time employees and System Parking made 500 hours of contributions to the Funds on their behalf. (*Id.* 294:4-22, 298:2-25.) In fact, Ms. Kmiecik considered all employees with medical coverage to be "full-time employees," despite the fact that such employees may have received medical coverage as a part-time employee eligible for "expanded coverage." (*Id.* 298:2-25.)

86.     In November 2012, the Funds asked Elite to determine whether 1,131 part-time employees for whom System Parking had (mistakenly) made overpayments were eligible for full-time benefits during the Fund's audit period. (Tr. 286:4-8, 287:6-16, 295:2-9; Ex. 26.)

87.     Ms. Kmiecik made the following findings:

(a)     Medical coverage could not be verified for 334 employees for whom System Parking made overpayments before June 1, 2003, because another third-party administrator, Bankers Life, administered the Funds' medical benefits during that time and Ms. Kmiecik did not contact Bankers Life to obtain eligibility information for these 334 individuals. (Tr. 288:24-289:14; 296:12-24; Ex. 26.)

(b)     Medical coverage could not be verified for 459 employees for whom System Parking made overpayments between June 1, 2003 and December 31, 2005 because Elite

destroyed pre-2006 eligibility records pursuant to Elite's document retention/purging practices. (Tr. 289:15-24, 297:1-8; Ex. 26.)

        (c)     The Funds did not provide medical coverage for 199 employees for whom System Parking made overpayments because the employees were not eligible for medical coverage according to Elite. (Tr. 289:25-290:9, 297:23-298:1; Ex. 26.)

        (d)     Medical Coverage was granted to 139 employees for whom System Parking made overpayments, but Ms. Kmiecik did not attempt to determine whether such employees were eligible for medical benefits by virtue of being considered full-time employees (as the Funds attempt to argue, based on System Parking's overpayments) or because System Parking made 500 hours of contributions to the Funds for those part-time employees, making them eligible for medical coverage as part-time employees under the "expanded coverage." (Tr. 291:4-9; 298:2-25; Ex. 26.) Regardless, Ms. Kmiecik does not know how much the Funds paid in benefits for these 139 employees. (*Id.* 299:3-5.)

## CONCLUSIONS OF LAW

## I.    PLAINTIFFS' CLAIM OF DEFICIENT PAYMENTS FAILS

### A.    The Funds' Stated Deficiencies Have No Support in the CBAs Because the Contribution Amounts Purportedly Owed in the Funds' Audit Are Not the Amounts Actually Due Under the CBAs

        88.     In order to prevail on its claim for delinquent contributions, Plaintiffs must show that a valid CBA was in place, and that Defendant failed to make contributions as required under the CBA. 29 U.S.C. §§ 1132(g)(2), (a)(3), and 1145. Plaintiffs fail to show that System Parking was deficient in *any* amount, let alone in the amount of $928,157.94 set forth in the audit report. (*See* Ex. 23 Vol. 3 at 1876.)

20

89.     The Funds' audit was not what it purported to be: namely, a determination of the difference, if any, between contributions made by System Parking and those actually due under the CBAs. The audit instead manipulated amounts due under the CBAs in order to avoid showing any overpayment.

90.     The stated purpose of B&K's audit was "to assist [the Funds] in determining _whether contributions to the Trust Funds are being made in accordance with the collective bargaining agreement in effect and with the Trust Agreement of the Fund._" "(Ex. 23 Vol. 1 at 1 (emphasis added).) B&K advised in its May 13, 2010 letter that "[o]ur procedures generally include a review of the pertinent provisions of the collective bargaining agreements and comparing underlying employer payroll records to Fund contribution records." (_Id._) Mr. Marino echoed the stated audit purposes when he testified: (1) that the CBA language setting contribution amounts was the sole provision impacting whether System Parking was obligated to make full- or part-time contributions (Tr. 148:12-25, 212:15-22); (2) that a goal of the audit was to ensure contributions were consistent with the terms of applicable CBAs.; (3) that B&K always consider[ed] the applicable collective bargaining agreement" when performing an audit (_id._ 145:3-7.); and (4) that the "Calculated Contribution" amount in the audit report reflected B&K's assessment of what was actually owed under the CBA. (_Id._ 199:24-200:2, 205:6-9.)

91.     B&K's audit procedures were the antithesis of the stated audit goals. In order to zero-out overpayments, B&K and its programmer manipulated the audit program to misstate the contribution amount due where System Parking made an overpayment. (Tr. 209:2-15, 233:21-25.) Contrary to the audit's stated goals and the plain language of the audit report, the "calculated contribution" amount in the report was either the amount due under the CBA _or_ the amount actually paid by System Parking, whichever number was higher. (_Id._ 209:16-21, 233:9-

20.) As a result, the total stated calculated contribution (the amounts System Parking owed) and the stated deficiencies are not amounts due under the CBA. (*Id.* 231:19-232:13.)

92.     The total calculated contribution amounts as required by the CBA is substantially lower than the figures found in Ex. 23. (Ex. 23 Vol. 3 at 1876.) The Funds failed to demonstrate that the actual amount of contributions System Parking was to have made under the CBAs was less than the **$18,818,658.21** made to the Funds between January 1, 2003 and March 31, 2008. (Ex. 23 Vol. 3 at 1876.) The Funds' claim of deficient payments therefore fails.

**B.     Neither the CBAs Nor the Funds' Policies Allow the Funds to "Zero Out" System Parking's $1.25 Million in Mistaken Overpayments.**

93.     Neither the governing CBAs nor the Trust Agreement in effect during the audit period required or permitted B&K to zero-out overpayments. The CBAs' contribution directives did not permit the Funds to adjust contributions amounts due to zero-out overpayments, and are not subject to adjustment at the whim of the Funds or B&K. (*See* Ex. 4 §§ 20.1-20.4; Ex. 5 §§ 20.1-20.4.) The axiomatic rules of contract interpretation provide that a court should "enforce the terms of a collective bargaining agreement if those terms are unambiguous," *i.e.,* when the CBA "is susceptible to only one reasonable interpretation." *Mazzei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 960 (7th Cir. 2001) (internal quotation omitted). The parties to the CBAs could have explicitly bargained to make the contribution amount the greater of set amounts or contributions actually made by the employer. They did not to do so, and this Court therefore rejects the Funds' attempt to superimpose contribution requirements onto the CBAs in an attempt to claim deficiencies. *Cf. Romasanta v. United Air Lines, Inc.*, 1982 WL 163, at *9 (N.D. Ill. Jan. 8, 1982) ("[I]t is not the province of the court to superimpose modified terms and conditions of employment").

94.     B&K's manipulation of contribution amounts due to zero-out overpayments also is inconsistent with the applicable Trust Agreement. Mr. Marino acknowledged he could not point to any Fund policy language requiring audits to disregard overpayments, much less to adjust

"appropriate contribution rates" as a means of zeroing out overpayments. (*See* Tr. 226:20-227:12.) In fact, the Trust Agreement at issue expressly allows the Trustees to return mistaken overpayments upon written request, with conditions. (Ex. 8 at p.21 ¶ 6.04; Tr. 128:10-129:7.) B&K's audit practices lack support in the governing CBAs and applicable Trust documents, and accordingly fail to support the Funds' claim of deficient payments.

95.     The Funds' reliance on the 2009 Refund Policy is misplaced. The 2009 Refund Policy does not apply to the overpayments made by L&R during the time period covered in the First Audit. Amendments adopted after the fact do not have a retroactive effect. *See, e.g.*, *Prudential Ins. Co. of Am. v. Evergreen Oak Elec. Supply and Sales Co. Employee Benefit Plan*, No. 92-C-7908, 1996 WL 18970, at *6 (N.D. Ill. Jan. 18, 1996). Indeed, Mr. Coli acknowledged that L&R could not have complied with the 2009 Refund Policy between 2003 and 2008, when the policy had not yet been written. (Tr. 130:7-12.) The Court rejects Plaintiffs' attempt to retroactively apply the 2009 Refund Policy to support the audit's zeroing out of mistaken overpayments. *Prudential Ins. Co.*, 1996 WL 18970, at *6 ("ERISA's common law in this area is well established -- a plan's amendment cannot be retroactive").

96.     The Funds' claim for a payment of allegedly deficient contributions fails for a more basic reason than the flaws in the B&K report: namely, the Funds failed to explain the basis for the alleged deficiencies. The Funds' final audit report (Ex. 23), states a total deficiency of $928,157.94, which constitutes the difference between the purported "Calculated Contributions" (which, as explained above, was adjusted upward where necessary to avoid documenting overpayments) and "Actual Contributions" in the audit report. (*See* Ex. 23 Vol. 3 at 1876.) The Funds provided no further details or explanation as to how System Parking allegedly was deficient in the amounts stated above. Given B&K's flawed auditing practices, which did not

23

adhere to the CBA's requirements, and the lack of specificity as to the basis for alleged deficiencies, the Funds' claim is entirely speculative. The Funds have not shown by a preponderance of the evidence that System Parking or L&R were deficient in paying any amount, let alone an amount of $928,157.94. The Court therefore finds in Defendant's favor in the Funds' claim.

### C. The Funds' Audit Overstates Deficiencies by $330,000.00 (In Addition to the Overpayments Identified in L&R's Internal Audit) as a Result of Erroneous Contract Interpretation.

97.     The Funds' claim also fails because $330,000.00 in alleged deficiencies are attributable to the Funds' erroneous interpretation of the CBAs to require contributions for all hours paid. Courts must examine a contract in the ERISA context by applying federal common law rules of interpretation. *Central States, S.E. & S.W. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 731 (7th Cir. 1996). Federal Common law rules instruct the Court to interpret the Agreement in an ordinary and popular sense as a person of "average intelligence and experience" would. *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir. 1992) (quoting *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990)). The Court cannot create ambiguity where none exists. *Id.* In the CBAs at issue here, the language shows that System Parking was to make contributions to the Funds based on hours worked.

98.     When viewing the CBAs at issue here in an ordinary and popular sense, it is evident that contributions to the Funds were required only for hours worked. The CBAs expressly indicate the limited situations in which "hours worked" and "hours paid" are to be synonymous. For example, the 2001-2006 CBA requires that all hours worked or paid for personal leave days, sick leave, or bereavement pay shall be considered as hours worked in <u>determining compensation</u>[16]—i.e., wages. (Ex. 4 § 14.5) The 2006-2011 CBA has similar language and

---

[16] The Funds presented no evidence and did not point to any CBA language showing that "compensation" means or implies benefits and specifically Health & Welfare, Pension, or Legal and Education benefits, or that the Holidays and Vacations provisions referred in any way to contributions to the Funds.

includes vacation time as hours worked specifically when <u>determining compensation</u>—i.e., wages. (Ex. 5 § 14.7.) However, both CBAs' contribution sections regarding benefits fail to make such an express indication when determining what contributions System Parking owed. (Ex. 4 §§ 20.1-20.5; Ex. 5 §§ 20.1-20.5.) Accordingly, as the CBAs specifically require "hours paid" to be considered "hours worked" only in <u>determining wages paid to employees</u>, and such language is notably absent in the sections concerning benefits paid,[17] the CBAs implicitly require contributions regarding benefits to be based solely on "hours worked."

99.     Moreover, the Funds initially appeared to interpret the CBAs in the same fashion. The Funds created and sent Remittance Reports to System Parking during the audit period, and the Funds expected System Parking to use the Remittance Reports to ensure accurate contributions. (Tr. 85:24-86:2, 360:1-2, 371:21-25.) The Remittance Report forms required System Parking to provide monthly contributions based on "# of Hrs. Worked," and omitted any mention of the number of hours paid. (Ex. 28 at 1; Tr. 359:8-25.) Further, throughout the audit period, the Funds never communicated to System Parking that System Parking was to make contributions based on hours paid. (Tr. 87:7-11.)

100.     The Funds' initial audit calculated the contributions owed based on hours worked, **not** hours paid. (Tr. 93:7-10.) The Funds did not assert that contributions were to be made based on hours paid (resulting in a $330,000.00 addition to the alleged deficiency) until L&R pointed out over $200,000.00 in errors in the Funds' preliminary audit. (Ex. 21; Tr. 108:5-15.) This was long after the audit period ended. The Funds' interpretation that the CBAs required

---

[17] At trial, Mr. Coli could not point to anything in the CBAs that required System to make contributions to the Funds based upon hours paid. (*See* Tr. 87:25-89:22, 90:12-93:2.)

25

System Parking to make contributions to the Funds based on hours paid is clearly erroneous. As a result, the Funds overstate the alleged deficiency by $330,000.00.

## II. DEFENDANTS ARE ENTITLED TO RESTITUTION OF OVER $1.6 MILLION

101.    Courts allow employers to seek the return of overpayments made to ERISA plans through common law claims for restitution. *See UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 512 (7th Cir. 1993) (listing cases); *Operating Eng. Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 651 (7th Cir. 2001) ("The payor's rights are governed by the principles of the law of restitution"). To succeed on its restitution of overpaid contributions claim, Defendant must show that: (1) the unauthorized payments are the sort of mistaken payments that equity demands be refunded (i.e. it was a good faith mistake); (2) it did not delay in bringing the action; (3) it did not ratify the past payments; and (4) it can demonstrate that the party from whom it seeks payment would be unjustly enriched if recovery were denied. *See UIU Severance Pay Trust Fund*, 998 F. 2d at 512.  L&R makes this showing. Moreover, Plaintiffs fail to present sufficient evidence that they provided benefits to employees for whom overpayments were made. *See Interpark, Inc. v. Teamsters Local Union 727 Health and Welfare Fund*, 2005 WL 1866088, at *4-5 (N.D. Ill. 2005).  Further, because Plaintiffs' 2009 Refund Policy cannot apply retroactively, the policy does not preclude Defendant from recovering its overpaid contributions. *See, e.g.*, *Prudential Ins. Co. of Am. v. Evergreen Oak Elec. Supply and Sales Co. Employee Benefit Plan*, 1996 WL 18970, at *6 (N.D. Ill. Jan. 18, 1996). Accordingly, Defendant is entitled to restitution of overpaid contributions.

**A.    Defendants Are Entitled To a Refund or Credit of $1,255,802.66 in Mistaken Overpayments Made During the Audit Period.[18]**

102.    Equity demands that the mistaken payments of the sort made by System Parking be refunded. Courts consistently have found similar types of mistaken overpayments to be properly refunded. In *Interpark*, 2005 WL 1866088, at *3-4, for example, the court in a summary judgment order found that an employer was entitled to restitution of $77,128.00 in contribution overpayments resulting from the incorrect classification of 37 employees. *Id*. In *Kraft Foods, Inc. Supplemental Benefits Plan I v. Woods, 1999 WL 1069247*, at *4 (N.D. Ill. Nov. 19, 1999), the court found that equity demanded unauthorized payments to be refunded where accounting mistakes by the employer caused it to pay over $2,000,000 in pension benefits as opposed to the approximately $1,300,000 due under the early retirement program. System Parking's mistaken overpayments resulted from the good-faith oversights and mistakes by Ms. Kinkle, and accordingly must be refunded. (See 360:13-23.)

103.    The overpayments at issue in this case—namely, full-time contributions made for employees working part-time (or not at all) under the CBA—are mistaken because they were based on or resulted from misapprehension of fact or faulty judgment. That they could have been avoided is immaterial for purposes of a restitution claim. Indeed, in *UIU Severance Pay Trust Fund*, 998 F.2d at 513 n.12, the Seventh Circuit noted that to an employer, contributions that an employee purposefully (but improperly) makes, without authority, may be as "mistaken" as those that derive from a misapprehension of law or fact. *Id.* Here the mistaken overpayments were not purposeful. Rather, the employee tasked with making contributions misapprehended her task,

---

[18] The $1,255,802.66 in overpayments is based on the Funds' interpretation of the CBAs as requiring contributions for all hours paid. Although L&R has at all times interpreted the CBAs as requiring contributions be made based on hours worked, L&R used the Funds' Individual Detail Reports (Ex. 29) (which were based on hours paid) to conduct its internal audit. (Ex. 20; Tr. 319:8-15, 320:19-24, 323:10-13.)

resulting in substantial mistaken overpayments. (*See* Tr. 340:15-21; 360:13-362:22.) These good-faith mistakes are the type that equity demands to be refunded.

104.    L&R consistently objected to the one-sided nature of the Funds' audit, and notified the Funds of the overpayments at issue in this case as soon as L&R determined the source of the overpayments. Accordingly, L&R fulfills the second element of its restitution claim.

105.    System Parking (and later, L&R) objected to B&K's failure to account for overpayments from the earliest stages of the audit. (*See* Tr. 235:8-10; 105:3-11; Ex. 16A.) L&R's counsel requested a credit of over $1.6 million after L&R conducted its audit. (Tr. 109:3-22.) The Funds never responded to the letter from L&R's counsel.[19] (*Id.* 110:6-11, 111:10-17.) When the Funds subsequently filed a Complaint, Defendant counterclaimed for restitution.

106.    There is no evidence that L&R somehow ratified past payments or took any action indicating the overpayments were properly made. (*See* Tr. 340:15-21, 370:24-371:5.) As stated above, System Parking and L&R consistently and repeatedly objected to the one-sided audit, and demanded a credit when it learned of the extent of the overpayments from L&R's Internal Audit.

107.    That System Parking mistakenly made overpayments for a long period of time does not somehow ratify the overpayments. The overpayments are attributable to the oversights and mistakes of only one individual *before* Ms. Mateega began overseeing her work. (Tr. 379:25-3.) Moreover, at no time did System Parking or L&R take any actions indicating in any respect that the overpayments were authorized or ratified. (*See* Tr. 340:15-21, 370:24-371:5.)

---

[19] When overpayments are requested the Funds generally asked the employer for additional information regarding the request for a refund of a mistaken overpayment and in some cases asked the field representative and accounts receivable representative to analyze the mistaken overpayment. (Tr. 112:10-113:7.)

108.    The Funds are not entitled to the $1,255,802.66 in mistaken overpayments and would be unjustly enriched if allowed to keep the overpayments. It is undisputed that System Parking's contributions during the audit period significantly exceeded what was due under the CBAs by virtue of the mistaken overpayments. (*See* Tr. 205:25-206:6, 229:17-24.) The Funds' claim for *additional* amounts in alleged deficiencies, interest, and fees, has no support in the CBAs and is disingenuous, given that the Funds have been and are in possession of overpayments to which they were not entitled.

109.    Equity requires the Funds to return overpayments to L&R unless the Funds can show they used mistaken overpayments to pay for full-time benefits. *See Interpark*, 2005 WL 1866088, at *4-5. The Funds provided no such evidence and have not made such a showing.

110.    The Funds did not set forth evidence indicating that the approximately 1,331 individuals on whose behalf System Park mistakenly overpaid contributions received additional benefits. In a similar case against the Funds, *Interpark*, the court granted summary judgment for the plaintiff employer where the Funds lacked specific evidence that employees received benefits, but instead generally argued that such employees would have been eligible for benefits. *Interpark*, 2005 WL 1866088, at *4. The court in *Interpark* concluded that the Funds' arguments were "premised on speculation involving unsubstantiated hypotheticals." *Interpark*, 2005 WL 1866088, at *4.

111.    As in *Interpark*, the Funds' claims to have provided full-time benefits to the employees at issue are speculative. The Funds offered no evidence that they provided full-time Pension or Legal and Education benefits to the employees at issue. The Funds also failed to demonstrate that the 1,131 employees on whose behalf System Parking mistakenly made overpayments—who were part-time, on personal leave, or whose employment had terminated—

received full-time Health and Welfare coverage because System Parking paid full-time contributions on their behalf. Elite Administration's Vice President, Ms. Kmiecik, confirmed that *199* such employees *were not eligible* for medical benefits. (Tr. 289:25-290:9; Ex. 26.) Ms. Kmiecik admittedly could not verify that an additional *793* out of 1,331 employees were eligible for full-time medical coverage. (Tr. 288:24-289:14, 289:13-24, 297:1-5; Ex. 26.) The Funds also failed to show that the 139 out of 1,131 employees who were eligible for expanded medical benefits were eligible because they were considered "full-time," rather than by virtue of the Funds having received contributions for 500 hours of their employment. (Tr. 293:21-294:4-22, 298:2-25.)

112.     The Funds failed to proffer evidence indicating that the 1,331 employees at issue in fact received full-time Medical, Pension, or Legal benefits that they would not have otherwise been entitled to. The Funds offered no evidence that they provided full-time benefits to the employees for whom System Parking overpaid contributions, and the Funds' speculative arguments concerning eligibility and are unpersuasive.

**B.     Defendant Is Entitled to a Refund or Credit of an Additional $330,000.00 Reflecting the CBAs' Requirement to Make Contributions Based on Hours Worked, Not Hours Paid.**

113.     The proper interpretation of the CBAs required contributions based only on hours worked.[20] Accordingly, L&R is entitled to a refund of $330,000.00—reflecting the difference between contributions for hours paid and contributions for hours worked during the audit period—in addition to the $1,255,802.66 refund or credit for mistaken overpayments as described above.

---

[20] L&R's Internal Audit is based on *hours paid*, **not** hours worked. Although L&R has at all times interpreted the CBAs as requiring contributions be made based on hours worked, L&R used the Funds' Individual Detail Reports (Ex. 29) (which were based on hours paid) to conduct its internal audit. (Ex. 20; Tr. 319:8-15, 320:19-24, 323:10-13.)

**C. Defendant Is Entitled to a Refund or Credit of an Additional $35,428.60, as Previously Ordered in the Court's Order on Summary Judgment.**

114. The Honorable Virginia M. Kendall granted Defendant's Motion for Summary Judgment in the amount of $35,428.30 for agreed-upon overpayments related to specific employees who switched from one contract to another following a significant break in employment. This amount is separate from the $1,255,802.66 and $330,000.00 in overpayments discussed above, and from the additional $14,125.60 reflecting unaccounted-for contributions. Plaintiff is ordered to refund L&R in the additional amount of $35,428.30.

**D. Defendant Is Entitled to a Refund or Credit of an Additional $14,125.60 Reflecting Unaccounted-for Contributions.**

115. Defendant is entitled to an additional credit of $14,125.60 based on the fact that B&K understated contributions to the Funds by this amount in 2003 and 2004. (*See* Ex. 24 at 4.)

<u>**CONCLUSION**</u>

As set forth above, the Funds failed to demonstrate their claim of deficient payments, and Defendant has proven it is entitled to $1,635,356.86 in restitution in the form of a credit for future contribution amounts owed as follows:

1. **$1,255,802.66** in mistaken overpayments made between January 1, 2003 and March 31, 2008;

2. **$330,000.00** in additional overpayments reflecting contributions based on hours paid, as opposed to hours worked as required under the CBAs.

3. **$35,428.60** in additional agreed-upon overpayments related to specific employees who switched from one contract to another following a significant break in employment, pursuant to the Court's March 31, 2014 Order granting in part Defendant's Motion for Summary Judgment (Doc. No. 69 at 15); and

4. **$14,125.60** in unaccounted-for contributions from 2003 and 2004.

Dated this 8th day of September, 2015.

*s/ Stacey A. Campbell*

Stacey A. Campbell, ARDC# 38378
Campbell Litigation, P.C.
740 17th Street, Suite 730
Denver, CO 80202
P:  303-536-1833
Stacey@campbell-litigation.com

Philip S. Holloway
Ford & Harrison LLP
55 East Monroe Street, Suite 2900
Chicago, IL 60603
P:  312-960.6109
pholloway@fordharrison.com

ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

STACEY A. CAMPBELL, being duly sworn, says that he is an Attorney associated with Campbell Litigation, P.C.., Attorneys for Defendant in this action, and that he served the attached **DEFENDANT'S SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** upon:

Linda M. Martin
Willig, Williams & Davidson
1845 Walnut St., 24th Floor
Philadelphia, PA 19103

William M. Tasch
Illinois Advocates, LLC
77 W. Washington, Ste. 2120
Chicago, IL 60602

Jonathan C. Magna
Illinois Advocates, LLC
77 W. Washington, Ste. 2120
Chicago, IL 60602

by depositing a copy in the United States  mails, postage paid, at 730 17th Street, Suite 740, Denver, CO 80202, on the 8th day of September 2015.

Service was accomplished pursuant to ECF as to Filing Users, and Counsel shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

s/ Stacey A. Campbell
Stacey A. Campbell, ARDC# 38378
Campbell Litigation, P.C.
740 17th Street, Suite 730
Denver, CO 80202
P:  303-536-1833
Stacey@campbell-litigation.com