THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | | |
|---|---|---|
| TEAMSTERS LOCAL UNION NO. 727 | : | Case No. 1:11-cv-1747 |
| HEALTH AND WELFARE FUND, | : | The Honorable Jorge L. Alonzo |
| TEAMSTERS LOCAL UNION NO. 727 | : | |
| PENSION FUND and TEAMSTERS | : | |
| LOCAL UNION NO. 727 LEGAL AND | : | |
| EDUCATIONAL ASSISTANCE FUND, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| L&R GROUP OF COMPANIES, | : | |
| Defendant. | : | |

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Plaintiffs Teamsters Local Union No. 727 Health and Welfare Fund ("Welfare Fund"), Teamsters Local Union No. 727 Pension Fund ("Pension Fund") and Teamsters Local Union No. 727 Legal and Educational Assistance Fund ("L&E Fund") (collectively the "Funds"), through their undersigned counsel, respectfully submit the following post-trial supplemental proposed findings of fact and conclusions of law in support of their claim against the Defendant for delinquent contributions and in support of their denial of Defendant's counterclaim for restitution of mistaken contributions.

I.     PLAINTIFFS' BRIEF SUMMARY OF THE PROPOSED FACTS

In mid-2008, the Funds' independent auditors conducted a random rotational audit of System Parking, Inc.'s ("System Parking") payroll records for the period January 1, 2003 through March 31, 2008.  Defendant purchased System Parking in 2008 and assumed System Parking's contribution obligations to the Funds.  The auditors' review of the payroll records provided to them by System Parking demonstrated that System Parking owed

1

approximately $808,000.00 in contributions to the Funds excluding interest, liquidated damages and audit fees. On December 12, 2008, the auditors provided a copy of its preliminary audit report to System Parking and the Funds to review for accuracy. Thereafter, the auditors and representatives of the Funds met with System Parking's representatives on five occasions between April 9, 2009 and March 19, 2010. Based upon demonstrative evidence provided by System Parking to the auditors, the auditors reduced the contributions owed by $210,000.00. At a meeting on August 19, 2009, the auditors learned from System Parking's intern that System Parking had not included hours paid to employees for leave time in the payroll records it provided to the auditors. [Under the applicable Collective Bargaining Agreements ("CBAs"), hours paid for vacations, holidays, sick, personal and bereavement leave are considered as hours worked.] The auditors revised the audit to include contributions owed for hours paid to employees for which System Parking had not made contributions. Under the applicable CBAs, hours paid for vacations, holidays, sick, personal and bereavement leave were considered as hours worked. The revision increased the contributions owed by System Parking to the Funds by $330,000.00. In turn, the total amount of contributions owed by System Parking to the Funds increased to $928,157.94 excluding interest, liquidated damages and audit fees.

The Funds demanded payment of the contributions plus interest, liquidated damages and audit fees. Defendant refused to pay contending that it had mistakenly overpaid $1,250,000.00 in contributions to the Funds between January 2003 and March 2008. Defendant admitted it did not conduct an in-depth analysis of the Funds' preliminary audit report until sometime after March 19, 2010. By letter dated April 23, 2010, Defendant's counsel requested the Funds refund all of the contributions it mistakenly paid between

2

January 1, 2003 through March 31, 2008.  The letter did not explain how Defendant arrived at its $1,250,000.00 demand and no documents were attached to the letter to support its demand.  At some point in time, after the Funds filed suit, Defendant's counsel provided to the Funds' counsel a copy of an internal audit conducted by Defendant.  Defendant did not provide an explanation of how the audit was conducted, the facts it based its conclusion on or any supporting documentation.

The Funds had a written policy for handling employer overpayments that was in effect on April 23, 2010 (the date of Defendant's letter requesting a refund.  The refund policy requires that all requests for refunds be in writing and conclusively demonstrate the contribution error.  In addition, the policy explicitly states that no contributions will be refunded more than one year after the Funds received the contributions absent extenuating circumstances or unanticipated equitable considerations.

On March 14, 2011, the Funds filed the instant action for contributions, interest, liquidated damages, audit fees, attorneys' fees and costs.  Defendant filed an answer and counterclaim denying that it owed contributions to the Funds and contending that under the doctrine of unjust enrichment it is entitled to a refund of the alleged $1,250,000.00 it mistakenly overpaid to the Funds between January 2003 through March 2008.

## II.    SUPPLEMENTAL PROPOSED FINDINGS OF FACT

### A.    Plaintiffs

1.    The Welfare Fund is a self-insured, jointly-administered, multi-employer employee benefit fund within the meaning of Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §186 and Sections 3(3) and 3(37)(A) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.SC. §§ 1002(3) and

1002(37)(A). The Welfare Fund provides medical benefits, prescription drug benefits, short-term disability benefits, life insurance, dental insurance, vision insurance, and a member assistance plan to its participants and their beneficiaries. *Stipulation 1.*

2.     Approximately 5,200 individuals and families are covered by the Welfare Fund. *Coli, Tr. 9-12.*

3.     For the past two years the Welfare Fund has been deficit spending. As of the end of May, 2015, the Welfare Fund had spent approximately $3.5 million more than it was receiving in contributions from employers. *Coli, Tr. 36:24-25; Tr. 37:1-9.* In 2014, the Welfare Fund spent approximately $10 million more than it received in contributions from employers. *Coli, Tr. 37:10-12.*

4.     As of the date of trial, the Welfare Fund had approximately five (5) months of reserves to pay claims and administrative costs. *Coli, Tr. 36:17-23*

5.     The Pension Fund is a self-insured, jointly-administered, multi-employer employee benefit fund within the meaning of Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §186 and Sections 3(3) and 3(37)(A) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.SC. §§ 1002(3) and 1002(37)(A). The Pension Fund provides retirement benefits to its participants. *Stipulation 2.*

6.     The Pension Fund has approximately 5,000 participants and is ninety percent (90%) funded. *Coli, Tr. 36:13-14; Tr. 37:13-25; Tr. 38:1-1-2.*

7.     The L&E Fund is a self-insured, jointly-administered, multi-employer employee benefit fund within the meaning of Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §186 and Sections 3(3) and 3(37)(A) of the Employee

Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1002(3) and 1002(37)(A).  The L&E Fund provides legal and educational assistance benefits to its participants.  *Stipulation 3.*

8.     The L&E Fund has approximately 5,000 participants and spends contributions as quickly as the contributions are received.  *Coli, Tr. 36:15-16; Tr. 38:3-6.*

9.     Each Fund is governed by a Board of Trustees ("Trustees") in accordance with Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5) and exists for the exclusive purpose of providing welfare, retirement, legal and educational assistance benefits to its participants and beneficiaries and defraying the reasonable expenses of administering the plans, in accordance with Section 404 of ERISA, 29 U.S.C. § 1104.  *Coli, Tr. 17:4-19;. Exhibit 8, Health and Welfare Fund Restated Agreement and Declaration of Trust ("Welfare Fund Trust Agreement"), Article 2, Purposes at 2.01 and 2.02, Article 5, Powers, Duties and Obligations of the Trustees at 5.01 and 5.02; Exhibit 9, Pension Fund Restated Agreement and Declaration of Trust ("Pension Fund Trust Agreement"), Article 2, Purposes at 2.01 and 2.02, Article 5, Powers, Duties and Obligations of the Trustees at 5.01 and 5.02; Exhibit 10, Legal and Educational Assistance Fund Restated Agreement and Declaration of Trust (L&E Trust Agreement"), Article 2, Purposes, at 2.01 and 2.02, Article 5, Powers, Duties and Obligations of the Trustees at 5.01 and 5.02 .*

10.     Each Fund has Employer Trustees, who are appointed by the employers contributing to the Funds, and Union Trustees, who are appointed by the Executive Board of the Teamsters Local Union No. 727 ("Union" or "Teamsters").  *Coli, Tr. 17:4-22; Exhibit 8, Welfare Fund Trust Agreement and Amendment No. 1, Article 4, Appointment, Removal, Voting and Resignation of Trustees, at 4.01; Exhibit 9, Pension Fund Trust Agreement and*

*Amendment No. 1, Article 4, Appointment, Removal, Voting and Resignation of Trustees, at 4.01; Exhibit 10, L&E Trust Agreement and Amendment No. 1, Article 4, Appointment, Removal, Voting and Resignation of Trustees, at 4.01.*

11.     The Trustees are fiduciaries of the Fund within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21).  The Trustees are also the administrators of the Funds. *Coli, Tr. 130:24-25.*

12.     As fiduciaries, the Trustees are statutorily obligated to collect the maximum amount of contributions from an employer as provided under the applicable CBA.  *Coli, Tr. 97:8-25; Tr. 98:1.*

13.     Because the Trustees are the administrators of the Funds, only the Trustees may determine whether to refund mistaken contributions.  *Coli, Tr. 130:19025.*  Accordingly, the Funds' auditors are not authorized to seek and adjust employer overpayments when conducting an audit.  *Id.*

14.     Additionally, the auditors are not authorized to seek and adjust employer overpayments due to the cost of payroll audits and the fact that audit fees are paid from monies contributed by participating employers to provide benefits to their employees.  *Coli*, *Tr.* 135:3-25; *Tr.* 135:1-23.

15.     Currently, the Welfare and Pension Funds have seven trustees; the L&E Fund has six trustees.  *Coli, Tr. 17:4-19.*

16.     The Trustees of each Fund are governed by a Restated Agreement and Declaration of Trust ("Trust Agreement").  *Coli, Tr. 17:20-25; Tr. 18:1-25; Tr. 19:1-19; Exhibit 8, Welfare Fund Trust Agreement; Exhibit 9, Pension Fund Trust Agreement; Exhibit 10, L&E Trust Agreement.*

6

17.     The provisions of the Fund's respective Trust Agreements set forth the same language with regard to the Trustees' powers, duties and obligations and the collection of contributions.  The paragraph numbering is the same in each Trust Agreement.  *Id.*

18.     The Funds are financed through contributions from various employers who are obligated to make contributions to the Funds by virtue of the employers having agreed to be bound by collective bargaining agreements with the Teamsters which require such contributions and by earnings on investments. *Stipulation 4; Coli, Tr. 21:21-25; 22:1-8.*

19.     The Funds are not a party to the System Parking CBAs but rather are a third-party beneficiary to the agreements.  *Coli, Tr. 106:2-3.*

20.     Approximately 280 to 300 employers contribute to the Funds, of which approximately 100 are in the parking industry.  *Coli, Tr. 21:24-25; Tr. 22:1-5; 23:15-21.*

21.     William Coli is the Manager for all of the Plaintiff Funds.  He has held this position since January, 1993.  *Coli, Tr. 15:5-13.    Coli, Tr. 16:1-1.*

22.     Robert MacArthur is employed by the Plaintiff Funds as a Field Representative.  He was assigned responsibility for System Parking in 2007 and continued in this assignment through September, 2010.  His job duties include, among other things, reviewing audits conducted by the Funds' auditors; reviewing audits with employers for accuracy; and collecting delinquent contributions, interest and liquidated damages from employers.  *MacArthur, Tr. 244:10-17; Coli, Tr. 16:14-23.*  MacArthur reports to Coli. *MacArthur, Tr. 244:2-3; Tr. 245:1, 18-21*

23.     The Funds engaged Bansley & Kiener, LLP ("B&K"), a certified public accounting firm, to conduct payroll audits on the Funds' behalf.  *Stipulation 14.*

24. Thomas Marino is employed by B&K as a Payroll Audit Supervisor. He is in charge of all audits conducted for the Funds and conducted the System Parking payroll audit at issue in this litigation. *Stipulation 39; Marino, Tr. 142:1-16, 21-23; Tr. 143:7-9.*

25. Brian Regan is employed by B&K as a compliance auditor in charge and is supervised by Marino. Regan provided limited assistance to Marino in conducting the System Parking payroll audit at issue in this litigation. *Stipulation 39; Regan, Tr. 238:10-22; Tr. 239:5-13; Marino, Tr. 154:13-23.*

26. Nanette Kmiecik is the Vice President of Elite Administration, a third-party benefits administrator. Elite Administration has processed benefit claims for the Welfare Fund since June 1, 2003. *Kmiecik, Tr. 283:4-14; Tr. 284:18-24; Tr. 285:7-14; 286:11-17.*

**B.** **Defendant**

27. L&R Group of Companies ("L&R") is a parking property owner. *Stipulation 5.*

28. L&R purchased and owned System Parking, Inc. ("System Parking") between 2008 and September 30, 2010[1]. *Stipulation 6.*

29. System Parking was a party to four (4) CBAs with the Teamsters between January 1, 2003 and March 31, 2008 the effective terms of which are as follows: November 1, 2001 – October 31, 2006 ("2001 Commercial CBA"), *Exhibit 4)*; November 1, 2006 – October 31, 2011 ("2006 Commercial CBA"). *Exhibit 5;* July 1, 2000 – June 30, 2005 ("2000 Valet CBA"), *Exhibit 6*; July 1, 2005 - June 30, 2010 ("2005 Valet CBA"), *Exhibit 7. Stipulations 7, 9.*

---

[1] L&R employee William Francis testified that L&R sold System Parking November 1, 2010. *Francis, Tr. 401:1-4.*

30. When L&R purchased System Parking, it assumed System Parking's obligations under the existing CBAs to contribute into benefit funds various amounts per month for full-time and part-time employees covered by the CBAs. *Stipulation 8.*

31. William Francis is the former Vice President of internal audits of L&R. Francis reviewed the System Parking payroll audit at issue in this litigation and worked with an external programmer and two L&R employees to prepare an excel spreadsheet of L&R's alleged mistaken overpayments to the Funds. *Tr. 310:23-25; Tr. 311:1-17; Tr. 318:8-25; Tr. 319:1-2; Tr 323:7-23.*

32. Vivian Mateega was employed by System Parking as the Regional Human Resources Director from the beginning of 2009 to July, 2011. She reviewed the System Parking audit at issue in this litigation and attended a meeting with Francis and the Funds' auditors. *Mateega, Tr. 347:15-21; Tr. 364: 25; Tr. 365:1-15.*

**C.    The Collective Bargaining Agreements**

33. All of the parking industry employers signed and were bound by the same CBAs with the Teamsters. *Coli, Tr. 22:15-25; Tr. 23:1-2; Marino, Tr. 17-23.*

34. System Parking is one of the parking industry employers' signatory to the parking industry CBAs. *Coli, Tr. 23:3-6; Exhibits 4-7.*

35. All provisions of a CBA must be reviewed in order to determine the contractual definition of "hours worked." *Coli, Tr. 89-5-15; Tr. 91:10-25; Tr. 92:1; Tr. 132:19-25; Tr. 133:1-20.* Accordingly, in order to determine the amount of contributions owed for an employee, the Funds rely on the contributions provision of the CBAs and on the CBA provisions concerning holiday, vacation, sick, personal and bereavement leave as these provisions state that hours paid

for such leave is deemed to be hours worked. *Coli, Tr. 26:14-25 through Tr. 36:1-8: Marino, Tr. 147:21-25 through Tr. 151:1-10; MacArthur, Tr. 247:19-25; Tr. 248:1-3; Tr. 265:2-12.*

36.     All four CBAs include a provision setting forth employee wage rates. *Exhibit 4, Article 8, pp. 9-10; Exhibit 5, Article 8, pp. 5-8; Exhibit 6, Article 7, p.4; Exhibit 7, Article 8, pp. 5-6.*

37.     All four CBAs include the following provision: "By the execution of this Agreement, each Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority." *Exhibit 4, Article 20.8; Exhibit 5, Article 20.8; Exhibit 6, Article 18.4; Exhibit 7, Article 19.5.*

38.     All four CBAs include a "Maintenance of Benefits" provision.  Pursuant to this provision, an employer may not reduce or change to the detriment of an employee the terms and conditions of employment nor may the employer transfer a Commercial employee to a Valet position if by doing so the employee's wages and benefits would be reduced.  *Exhibit 4, Article 27; Exhibit 5, Article 27; Exhibit 6, Article 24; Exhibit 7, Article 26; Coli, Tr. 31-15-25; Tr. 32:1-7.*

### a.  Commercial CBAs

39.     Under the Commercial CBAs, Article 20, "Health and Welfare, Pension and Legal and Education Assistance," of the 2001 and 2006 Commercial CBAs, System Parking was required to contribute to each Fund on behalf of "each regular full-time employee" and each part-time employee covered by the Agreement.  *Exhibit 4, Article 20.1 – 20.3, pp. 12-14; Exhibit 5, Article 20.1 – 20.4, pp. 15-17.*

10

40.    "Regular full-time employees" are those employees who, at the time of hiring, are guaranteed a forty (40) hour work week.  *Exhibit 4, Article 16.5, p. 11; Exhibit 5, Article 16.5, p. 14; Exhibit 6, Article 15.2, p. 8; Exhibit 7, Article 16.2, p. 10; Coli, Tr. 28:6-9.*

41.    Part-time employees are those individuals who do not meet the definition of a "regular full-time employee."  *Id.; Coli, Tr. 28:11-14.*

42.    The contribution rate for regular full time employees is generally more than the contribution rate for part-time employees.  *Exhibit 4, Article 20; Exhibit 5, Article 20.*

43.    However, under the CBAs, there are circumstances where a full-time contribution will be due for a part-time employee. Article 20.5 of the 2001 CBA provides that:

>    For the purposes of contributions to the Health and Welfare, Pension and Legal and Educational Fund only, <u>part-time employees who average over 32 hours per week over any 120-day period shall be considered as a regular full-time employee</u> and full-time employee contributions will be required.  Such employees shall not be removed from full-time contributions until another 120-day period elapses in which he does not average over 32 hours per week.

*Exhibit 4, Article 20.5, p. 14; emphasis added.*

44.    Article 20.5 in the 2006 Commercial CBA was amended to provide that:

>    20.5    For the purpose of contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds only, <u>any part-time employee who works one hundred twenty eight (128) hours or more in a calendar month</u> shall be considered a regular full-time employee and full-time employee contributions will be required for that month.

*Exhibit 5, Article 20.5; emphasis added.*

45. Article 20.5 in the commercial CBAs is used to determine whether a part-time employee is entitled to full-time contributions. *Marino, Tr. 206:11-22; Tr. 207:3-23.*

46. Article 9, "Holidays," of the 2001 and 2006 Commercial CBAs provides that a holiday for which an employee is paid, but does not work, is considered as time actually worked. *Exhibit 4, Article 9.1, p. 7; Exhibit 5, Article 9.2, p. 8.*

47. Article 12, "Sick and Personal Leave," of the 2006 Commercial CBA provides that a sick or personal day for which an employee is paid, but does not work, is considered as time actually worked. *Exhibit 5, Article 12.6, p. 10.*

48. Article 14, "Vacations," of the 2001 Commercial CBA provides "All hours worked or paid for (personal leave days, holidays, sick leave, bereavement pay) shall be considered as hours worked in determining compensation.". *Exhibit 4, Article 14.5, p. 10.*

49. Article 14, "Vacations," of the 2006 Commercial CBA provides "All hours worked or paid for (vacation, personal days, holidays, sick days, funeral leave pay) shall be considered as hours worked in determining compensation." *Exhibit 5, Article 14.7, p. 12.*

**b. Valet CBAs**

50. Under the 2000 and 2005 Valet CBAs, System Parking was obligated to make contributions to the Welfare Fund. *Exhibit 6, Article 18.*

51. Under the 2005 Valet CBA, System Parking was obligated to make contributions to the L&E Fund. *Exhibit 7, Article 19.*

52. The "Holidays" provision set forth in Article 8 of the 2000 Valet CBA and Article 9 of the 2005 Valet CBA contains the same language as set forth in the 2001 and 2006 Commercial CBAs. *Exhibit 6, Article 8, p. 15; Exhibit 7, Article 9, p. 6.*

53.     The "Vacations" provision set forth in Article 13.5 of the 2000 Valet CBA and Article 14.5 of the 2005 Valet CBAs contains the same language as set forth in the 2001 and 2006 Commercial CBAs.

**C.     Compensation**

54.     Employee compensation includes any and all things of value that an employee receives from the employer.  *Coli, Tr. 29:4-12.I*

55.     The Funds have consistently asserted that hours paid for vacation, holiday, sick, personal and bereavement leave under these provisions are deemed as hours worked and therefore, these hours must be included when calculating the amount of contributions to be made on behalf of an employee, especially a part-time employee who may be entitled to full-time contributions based on hours paid for such leave.  Employers who have disagreed on the method used by the Funds to determine the amount of contributions owed under the 120 day rule have nonetheless contributed to the Funds based on the Funds' interpretation. *Coli, Tr. 30:11-25; Tr. 31:1-25; 32:1-7.*

56.     L&R witnesses William Francis and Vivian Mateega testified that the salary and benefits they received for the work they performed for L&R was their compensation package from L&R. *Francis, Tr. 401:17-25; Tr. 402:1-4; Mateega, Tr. 383:18-25; Tr, 384:1-12.*

**D.     The Trust Agreements**

57.     Under the Trust Agreements of each Fund, the Board of Trustees are authorized to, among other things:

> a.   Increase or decrease benefits based upon their judgment of what the contributions, investment earnings and reserves will support (Article 2.02);

    b.   Formulate and promulgate rules and regulations which they deem necessary to facilitate the proper administration of the Trusts and Plans (Article 5.10); and

    c.   Collect contributions in accordance with the applicable CBAs and rules and regulations of the Trustees, to collect interest, twenty percent (20%) liquidated damages, audit fees and attorneys' fees incurred in the collection of contributions and, upon written request, to determine whether to refund a contribution made by an employer by mistake of fact or law (Article 6.01, 6.02, 6.04).

*Exhibit 8, Welfare Fund Trust Agreement; Exhibit 9, Pension Fund Trust Agreement; Exhibit 10, L&E Trust Agreement.*

58.    With regard to contributions, Article 12.01 of the Trust Agreements provides "In no event shall the Employers, directly or indirectly, receive any refund of Contributions, except as provided in Section 6.04, participate in the disposition of the Trust Fund, or receive any benefits from the Trust Fund. *Id.*

59.    Between January 1, 2003 and March 31, 2008, the Welfare Fund Trustees made benefit improvements. *Coli, Tr. 25:8-21.* The improvements were financed based on the contribution levels the Funds received and, to some extent, Fund reserves. *Coli, Tr. 25:2-25; Tr. 26:1-2.*

60.    In addition, Article 5.07 of the Trust Agreements state that no individual may act as an agent for the Funds or the Trustees unless specifically authorized by the Trust Agreements or in writing by the Trustees. *Id.*

### E.     <u>Trustees' Policies and Procedures Regarding Employer Contributions</u>

#### a.  <u>Procedure for Making Contributions</u>

61.      The Funds require every employer to complete and submit an Employer Remittance Report form ("remittance form") when making contributions. *Coli, Tr. 38:22-24; Exhibit 30A.* The Funds have used the same remittance form since 1999. *Coli, Tr. 41:5-8.*

62.      Each month the Funds' office prepares a remittance form for each employer based on the information the employer provided to the Funds the previous month. The employer is required to make corrections on the form to reflect the current employment status of an employee. *Exhibit 30A; Coli, Tr. 40:6-25; Tr. 41:1-4; Manteega, Tr. 378:8-25; Tr 379:1-5.* The Funds enter the employer's corrections and additions into its data base and revise the following month's remittance form to reflect the employer's changes. *Coli, Tr. 40:9-19; Tr. 47:2-13.*

63.      In order to complete the "hours worked" column, an employer must refer to the provisions of its CBA with the Teamsters. Because other employers contributing to the Funds have different CBAs with the Teamsters, "hours worked" would have a different meaning for each employer.

64.      Other than the information provided by an employer on the remittance form, the Funds have no way of determining an employee's employment status or whether an employee is full-time or part-time. *Coli, Tr. 41:22-25; Tr. 46:1-25; Tr. 47:1.*

65.      The reverse side of the remittance form sets forth the instructions for completing the form. The instructions direct employers to make contributions pursuant to the terms of its CBA with the Teamsters, to verify the accuracy of the information on the report and to make all appropriate changes to the report. *Exhibit 30A; Coli, Tr. 42:7-25; Tr. 43:1.*

66.     The remittance form includes the following statement which an employee authorized by an employer must sign:  "I hereby certify that the information contained in this report is true and correct and hereby agree to accept and abide by the terms of the Trust Agreements of the above Funds, and by the terms of the applicable Local 727 I.B.T. Labor Agreement and any amendments."  *Exhibit 30A.*

67.     Mateega expected System Parking's payroll manager to understand the CBAs and to review System Parking's payroll records, the wages that were paid and the hours worked to determine whether a contribution was required for an employee and the amount of the contribution. *Mateega, Tr. 375:5-20; Tr. 376:1-14.*

68.     Mateega does not know whether the payroll clerk was instructed to look at CBA provisions other than Article 20 to determine the appropriate amount of contributions to make for an employee.  *Mateega, Tr. 376:16-25; Tr. 377:1-3.*

69.     When completing the remittance forms, the System Parking payroll manager focused mainly on part-time employees because full-time employees received the same flat-rate contribution each month.  Because the payroll clerk did not focus on full-time employees she may have made mistakes.  *Mateega, Tr. 387:10-24; Tr. 390:3-9*

70.     Mateega does not believe John Phillips, the payroll manager's supervisor, reviewed the remittance reports and contributions that would be paid for accuracy.  *Mateega, Tr. 379:15-24.*

71.     Mateega asked the payroll manager what payroll information she provided to the auditors but she did not personally review this information.  *Mateega, Tr. 381:20-25; Tr. 382:1-10.*

72.     On occasion, Mateega found that System Parking overpaid contributions and she reached out to the Funds promptly to obtain a refund because there was a time period within which the request had to be made. *Mateega, Tr. 380:6-18; Tr. 381:1-4.*

73.     Mateega instituted new procedures for System Parking managers to report employee hours, including medical leaves, personal leaves and vacations because there were no such procedures in place when she joined System Parking. *Mateega, Tr. 385:9-25; Tr. 386:1-6.*

74.     Upon receipt of employer remittance forms and contributions, the information for each employee identified on the remittance form is entered into the Funds' data base. *Coli, Tr. 47:14-25; Tr. 48:1-25; Tr. 48:1-25; Tr. 49:1-6.*

### b.     <u>Coverage for Benefits</u>

75.     There is a three (3) month waiting period before a full-time employee becomes eligible for benefits under the Welfare Fund. A full-time employee is eligible for benefits when the Welfare Fund receives a fourth month of contributions for the employee. A part-time employee under the Commercial CBAs is eligible for three months of medical and prescription benefits upon the Fund's receipt of 500 hours worth of contributions for the employee. Once the employer makes the requisite contributions to the Funds and the employee meets the eligibility requirements, the Funds' office adds the employee to, or maintains the employee on the eligibility list. The Funds' office updates the eligibility list twice each month and sends the lists to the Welfare Fund's third-party administrator, Elite Administration. *Coli, Tr. 47:14-25; Tr. 48:1-14; Tr. 13:17-19; Kmiecik, Tr. 283:8-13; Tr.284:5-17.*

76.     Because a full-time employee is not eligible for welfare benefit coverage until the employer pays four months of contributions on the employee's behalf, an employee will not be

added to, or maintained on, the eligibility list until the fourth month of contributions is received by the Welfare Fund.

77. Likewise, because a part-time employee is not eligible for welfare benefit coverage until the employer pays 500 hours of contributions on the employee's behalf, a part-time employee will not be added to, or maintained on, the eligibility list until the Welfare Fund receives 500 hours of contributions.

78. Elite Administration determines from the current eligibility list whether an employee is covered for benefits and processes the employee's benefit claims. *Coli, Tr. 49:12-25; Tr. 49:1-25; Kmiecik, Tr. 283:23-25; Tr. 284:1-17.*

79. In November, 2012, at the Funds' prior counsel's request, Kmiecik reviewed the eligibility lists received from the Funds to determine if any of the employees listed on L&R's internal audit were included during the audit period January 1, 2003 through March 31, 2008. *Kmiecik, Tr. 286:4-17.* Kmiecik created a chart to record the results of her review. *Exhibit 26; Kmiecik, Tr. 287:17-21; Tr. 288:4-7.*

80. Kmiecik was able to verify benefit eligibility for 139 of the employees on L&R's audit. She was not able to verify the benefit eligibility for 334 employees listed on the audit for the period January 1, 2003 through May 31, 2003 because Elite Administration was not the Welfare Fund's third-party administrator during that period and therefore it did not possess that information. *Kmiecik, Tr. 288:24-25; Tr. 289:1-14.* Kmiecik was not able to verify the benefit eligibility for 459 employees on L&R's audit for the period June 1, 2003 through December 31, 2005 because, in the normal course of business, Elite Administration destroyed those records. *Kmieck, Tr. 289:15-24.* For the period January 1, 2006 forward, Kmiecik was not able to verify the eligibility of 199 of the employees on L&R's audit. *Kmiecik, Tr. 289:25; Tr. 290:1-25.*

Kmiecik explained that the reason the employees may not have been on the eligibility list is because the Fund made an error or the Fund did not receive a contribution for the employee but added the employee to the eligibility list retroactively after it received a late contribution for the employee. *Kmiecik, Tr. 2906-25; Tr. 291:1-3.*

81. Due to HIPAA[2] restrictions, the Welfare Fund does not have records regarding benefit claims paid on behalf of Fund participants. *Coli, Tr. 122:5-15.*

82. An employee's pension credit is determined annually based upon the amount of contributions the Pension Fund receives for the employee and the number of work hours that contribution represents. If an employee works less than full-time, the employee's pension credits are pro-rated based on the hours worked as determined by the contributions received. *Coli, Tr. 48:10-25; Tr. 49:1-6.*

83. Employees become vested in the Pension Plan and eligible for benefits upon five years of service with a thousand or more hours in each year or, if the employee is 65 years of age or older, upon five years of service. *Coli, Tr. 49:7-11.*

84. Employer contributions are pooled and expended to provide benefit coverage for all of the eligible employees on whose behalf contributing employers make contributions. The contributions made by a specific employer such as System Parking are not reserved for, and not expended solely on that employer's employees. *Coli, Tr. 122:21-25; Tr. 123:1-12.*

### c. **Refund Policy**

85. On September 30, 2009, the Funds' Trustees adopted a refund policy titled "Policy for Erroneous Payments and Overpayments Made by an Employer ("Refund Policy")." *Exhibit*

---

[2] "HIPAA" is the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d-6, Wrongful disclosure of individually identifiable health information. *See also,* 45 CFR Part 160 and Subparts A and E of Part 164.

*12.* The Refund Policy was amended on February 12, 2011. *Exhibit 13.* The amendments did not change substantive provisions of the 2009 policy. *Coli, Tr. 71:2-16.*

86. The Refund Policy applies to all employers contributing to the Funds. *Coli, Tr. 71:2-18.*

87. The Refund Policy explicitly states the importance of accurately reporting and paying contributions owed because the Trustees rely on this information and the contributions received to make decisions regarding funding, investments, actuarial, plan designs and benefits decisions. *Exhibits 12 and 13, p. 1.*

88. In addition, the Refund Policy explicitly states that no contributions will be refunded more than one year after the contributions are received by the Fund Office, absent extenuating circumstances or unanticipated equitable considerations; that the refund request must be in writing and conclusively demonstrate the contribution error; that no interest will be paid on any refund; and that a refund will be withheld until resolution of an employer's outstanding delinquency. *Exhibit 12, p. 2, ¶ ¶ 2-3, pp. 3-4, ¶¶ 11, 12; Exhibit 13, p. 2, ¶¶ 2, 3, p. 3, ¶¶ 11,12.*

89. The Trustees authorized a one (1) year limitation on contribution refunds because the contributions received by the Fund would have been used to provide coverage and pay benefits to all of the contributing employers' employees; to lease Blue Cross and Blue Shield PPO discount; to pay stop loss, dental, vision and life insurance premiums; and to improve benefits. *Coli, Tr. 136:21-25; Tr. 137:1.*

90. Further, the Refund Policy states that service credited to an employee based on refunded contributions will be cancelled. *Exhibit 12, pp. 3-4, ¶¶ 11, 12; Exhibit 13, p. 3, ¶¶ 11, 12.*

91.     When the Trustees approve a refund request, the refund monies are withdrawn from the Fund to which the overpayment was made. *Coli, Tr. 74:1-2,19-25; Tr. 75:1-4, 7-11.*

92.     Without supporting documentation, such as payroll records, the Funds' Trustees cannot determine whether System Parking overpaid contributions to each of the Funds. *Coli, Tr. 129:23-25; Tr. 130:1-6.*

93.     The Funds' auditors do not provide the Funds' office with a copy of an employer's payroll records or a copy of their work papers. *Coli, Tr. 139:19-23.*

94.     It is the employer's obligation to timely request a refund of mistakenly paid contributions and in support thereof, to submit documentation to the Funds to demonstrate conclusively that contributions were mistakenly paid. It is not the Fund's obligation to chase after an employer to obtain documentation the employer is obligated to provide to support a claim for mistaken contributions. *Coli, Tr. 98:10-22.*

c.      **Audit Policy**

95.     On June 25, 2008, the Trustees adopted a "Statement of Audit Procedures." ("Audit Procedures"). *Exhibit 14.* The Audit policy was amended on February 23, 2011. *Exhibit 15.* The Audit Policy sets forth the procedures to be followed by Fund staff and auditing firms engaged by the Trustees to perform payroll audits. *Coli, Tr. 53:1-3.*

96.     Approximately every three years, the Funds' conduct random rotational payroll audits of all of the employers contributing to the Funds. *Coli, Tr. 53:12-12-22; Exhibits 13 and 14 at p. 1, Section I.*

21

F.    **The System Parking Payroll Audit**

    a.  **The Audit Method**

97.    In 2008, System Parking was selected for a rotational payroll audit. The payroll audit covered a five (5) year period January 1, 2003 through March 31, 2008 because the funds' understood System Parking was to be sold. The audit included approximately 2,000 employees. *Stipulation 15; Coli, Tr. 54:16-25; Marino, Tr. 152:21-24.*

98.    Because of the size of System Parking's payroll records, B&K developed a program to perform the audit. The B&K programmer entered into the program the payroll records provided by System Parking and System Parking's contribution history from the Fund office. Marino reviewed the contribution provisions of the CBAs, the criteria to determine a contribution deficiency and whether an employee is full-time or part-time with the programmer and instructed him to create a report that reflected the Funds' contribution records, all of the employees' hours, a calculation of the contributions and identification of any deficiencies. *Marino, Tr. 144:5-14, 23-25; Tr. 145:3-13; Tr. 146:3-25; Tr. 147:1-9; Tr. 152:5-15; 195:2-8*

99.    System Parking did not provide any details to B&K regarding employee leaves. *Marino, Tr. 211:21-25; Tr. 212:1.*

100.    When conducting audits on behalf of the Funds, Marino relies on the contribution provisions and the holiday, vacation, sick, personal and bereavement leave provisions of the CBAs to determine whether an employee is entitled to receive full-time or part-time contributions. *Marino, Tr. 148:2-25; Tr. 149:1-25; Tr. 150:1-25; Tr. 151:1-10.*

101.    B&K's standard practice in conducting payroll audits for the Funds is to account for all hours paid to an employee to determine the amount of contributions owed and he did not

depart from this practice when he conducted the System Parking audit. *Marino, Tr. 196:24-25; Tr. 197:1-7*

102.    Neither the Funds' Trustees nor their employees told B&K how to conduct the System Parking audit or what CBA provisions to rely on for the audit. *Marino, Tr. 195:25; Tr. 196:1-13.*

103.    It took the auditors approximately 400 to 500 hours to perform the System Parking audit. *Marino, Tr. 153:2-6.*

104.    With each rough draft of the audit produced by the programmer, Marino and Regan manually performed calculations on a random sample of hundreds of employees and corrected any errors they found. *See e.g., Exhibit 23 for format of rough draft reports; Marino, Tr. 153:7-13; Tr. 154:13-25; Tr. 155:1-25; Tr. 156:1-25; Tr. 157:1-17; 19012-25; Tr. 191:1-7; Tr. 193:2-19; Regan, Tr. 239:1-22.*

**b.    The Interactive Process with System Parking Representatives**

105.    On December 12, 2008, Marino forwarded a preliminary audit report to John Phillips of System Parking and Robert MacArthur, the Funds' Field Representative assigned to System Parking[3]. *Stipulation 16; Marino, Tr. 157:18-22-25; Tr. 158:1-8; MacArthur, Tr. 245:18-21; Tr. 248:8-11.*

106.    By letter dated December 31, 2008 to Marino, Phillips identified five (5) issues he wished to discuss:  (a) no contributions were due for employees working under the Valet CBA; (b) the audit should not have included a period of time for which an employee worked in a non-union position before transferring to a union position; and (c) the report did not credit contributions paid

---

[3]  The initial audit included deficient contributions to the PILMC Fund.  Plaintiffs are not seeking contributions for the PILMC Fund in this litigation.

by System Parking in February 2006 for employee A. Oluwhole. *Exhibit 16; Tr. 158:9-11, 24-25: Tr. 159:1-6.*

107.    The letter was copied to Michael Coli, President of the Teamsters Union.  Michael Coli was not a Trustee of the Funds. *Exhibit 16; Coli Tr. 60:21-25; Tr. 61:1-13.*

108.    The Trustees never authorized Michael Coli to agree with John Phillips to include overpayment in an audit. *Coli, Tr. 105:15-25; Tr. 106:1-8.*

109.    By letter dated March 20, 2009, Marino responded to Phillips' December 31, 2008 letter. *Exhibit 17.*  Marino advised Phillips that his investigation demonstrated that (a) the employees identified as working under the Valet CBAs had an employment history under the Commercial CBA and therefore contributions at the Commercial CBA rate were due for these employees; (b) pursuant to the payroll  records the employee identified as working in a non-union position before transferring to a union position received the same wages before and after the transfer therefore contributions were owed for this employee; (c) the audit report incorrectly stated the hours worked by E. Hernandez in October 2005 and the audit was revised accordingly; (d) the audit counted the December 2006 payroll twice and the audit was revised accordingly; and (e) the Funds' records for February 2006 did not show a contribution for A. Oluwole and Marino was following up with the Fund office.  Marino attached a copy of the revised audit report to his letter which demonstrated that the contributions owed to the Funds totaled $826,353.94 excluding interest, liquidated damages and audit fees. *Exhibit 17 at Bates No. 0438; Marino, Tr. 159:7-25;Tr. 162:4-25; Tr. 163:1-25; Tr. 164:1-25; Tr. 165:1-25; Tr 166:1.*

110.    On April 9, 2009, Marino, his supervisor Gary Pater, William Coli and Robert MacArther met with Phillips to review the issues raised in his December 31st letter and the revised preliminary audit.. *Marino, Tr. 159:10-25; Tr. 160:1-5.*  All of Phillips issues were addressed at

the meeting. *Coli, Tr. 58:9-25; Tr. 59:1-25; Tr. 60:1-20; Marino, Tr. 160:8-25 through Tr. 166:1-20; MacArthur, Tr. 250:1-3, 10-25; Tr. 251:1-3.*

111.   During the April 9, 2009 Meeting, Phillips claimed System Parking had overpaid the Funds. He was advised that any request for a refund had to be directed to the Fund office. *Marino, Tr. 160:6-21; Tr. 161:1-14; Tr. 208:8-13; MacArthur, Tr. 251:11-19; Tr. 252:19-25; Tr. 253:1-3; Tr. 271:7-22.*

112.   By letter dated April 30, 2009, Marino further responded to the issue of whether full-time contributions were owed for employees who were transferred to valet positions under the Valet CBAs from commercial positions under the Commercial CBAs. *Marino, Tr. 167:2-24; Exhibit 18.*

113.   Between April 30, 2009 and August 19, 2009, MacArthur exchanged many emails and had conversations with Phillips inquiring about System Parking's progress reviewing the audit. During this same period, Phillips called Marino to discuss the calculation under the 120 day rule as set forth in Article 20.5 of the 2001 Commercial CBA. After reviewing the issue with B&K's programmer, Marino corrected the audit. *Marino, Tr. 168:1-25; Tr. 169:1-3.*

114.   On August 19, 2009, Marino, Regan and MacArthur met with Phillips and Todd Tucker, System Parking's Regional Manager and General Counsel and System Parking's intern Matt Hafeli to determine if System Parking found any other discrepancies in the revised preliminary audit report. Hafeli had created a schedule setting forth System Parking's disputes. A copy of the schedule was not distributed at the meeting. Instead, Hafeli pulled the schedule up on his computer and, with Marino looking over his shoulder, showed Marino the payroll records of two employees as examples of audit errors. System Parking had crossed off from the payroll records all hours paid to the employees for holiday and vacation leave. When asked why they

crossed out the hours paid, System Parking replied that hours paid were not hours worked and therefore, contributions were not owed for those hours. B&K considered this an error on the part of System Parking, as all hours paid must be included in determining employer contributions. Subsequent to the meeting, Hafeli emailed the schedule to Marino. Using Hafeli's schedule, Marino and Regan reviewed the records provided to B&K by System Parking and the Funds and based thereon, revised the preliminary audit report to include the hours paid to employees but not reported by System Parking and for which System Parking had not made contributions. Accordingly, System Parking's contribution deficiency increased by $330,000.00. *Marino, Tr. 169:11-25 through Tr. 172:21; MacArthur Tr. 254:19-25; Tr. 255:1-10, 23-24.*

115. At this same meeting, System Parking contended that they had made certain contributions that were reflected as deficiencies in the audit report. Marino reviewed the issue with the Funds' office and corrected the preliminary audit report. *Marino, Tr. 172:22-25; Tr. 173:1-19.*

116. By letter dated October 5, 2009, Marino forwarded the revised preliminary audit to Phillips and explained the revisions made to the audit report. *Exhibit 20.* The revisions included reductions for contributions paid but not credited in the initial preliminary report; the removal of non-union employees from the audit report; the deletion of payroll hours counted twice for the period December 2007 through March 2008; and, based on the schedule discussed by System Parking at the August 19, 2009 meeting and provided by Hafeli to the auditors thereafter, an increase of the contribution deficiencies based on hours paid to employees for which System Parking did not make contributions. *Id.; Marino, Tr. 175:19-25; Tr. 176:1-11; Tr. 183:3-8.*

26

117.    No one from the Funds' office directed Marino to revise the audit to include contribution deficiencies for hours paid but not worked. *Marino, Tr. 177:12-15; Tr. 188:21-25; 189:1-23.*

118.    On November 4, 2009, Marino, Regan, William Coli and MacArthur met with System Parking representatives Tucker and Vivian Mateega to review the revised preliminary audit report. *Marino, Tr. 173:20-25; Tr. 174:1-20; Tr. 175:11-18; MacArthur, Tr. 256:5-15; Tr. 257:11-25; Tr. 258:1-6.* During the meeting, Tucker asked for time to research issues discussed and scheduled another meeting for November 24, 2009. *Marino, Tr. 177:19-25.*

119.    Several days after the meeting, Marino wrote to Tucker memorializing the audit revisions discussed at the November 4th meeting: a $60,000.00 reduction upon verification of contributions paid but not credited; a $65,000.00 reduction with the removal of non-union employees from the audit; an $85,000.00 reduction correcting the double counting of payroll hours for a certain period; and a $330,000.00 contribution deficiency increase for contributions not made but owed for hours paid to employees as reflected in Hafeli's August 19, 2009 schedule. *Exhibit 21.*

120.    As a result of the $210,000.00 contribution deficiency reduction and the $330,000.00 contribution deficiency increase, the revised audit demonstrated that System Parking's contribution deficiency increased from $808,000.00 to $949,194.29 excluding interest, liquidated damages and audit fees. *Exhibits 20, 21; Marino, Tr. 176:12-25; Tr. 177:1-11.*

121.    On November 24, 2009 Marino, Regan and MacArthur met with Mateega. Tucker had a conflict and did not attend the meeting. Mateega advised that Phillips was no longer with System Parking. Marino explained where the parties were in the audit process. Mateega asked questions about the audit and requested Marino send her a copy. *Marino, Tr. 178:1-22; Tr. 179:3-*

27

10; Tr. 183:9-14; MacArthur, Tr. 259:7-24.  Shortly after the meeting, Marino mailed and emailed

a copy of the revised audit report to Mateega and then answered her follow-up questions on how

to read the report.  *Marino, Tr. 183:18-25; Tr. 184:1-20.*

122.     After the November 24, 2009 meeting, MacArthur had discussions and exchanged

emails with Mateega inquiring about System Parking's progress revising the audit.  *MacArthur,*

*Tr. 260:9-23.*

123.     On March 19, 2010, Marino and Gary Pater met with William Francis and Mateega.

Marino and Pater addressed the questions Francis had regarding certain employees and explained

to him how to read the audit report and how the calculation method used to perform the audit.

Francis did not mention any alleged mistaken overpayments or provide Marino and Pater with any

documents.  *Marino, Tr. 184:21-25; Tr. 185:1-25; Tr. 186:1-22; MacArthur, Tr. 261:2-25; Tr.*

*262:1-5; Francis, Tr. 320:25; Tr. 321:1-10; Tr. 322:8-12; Tr. 390:4-9.*

124.     Although Marino attended five (5) meetings with either System Parking or L&R

representatives between April 9, 2009 and March 19, 2010, not one of these representatives

questioned the audit report record of contributions paid for employees who may not have worked

any hours.  *Marino, Tr. 236:22-25; Tr. 237:1.*

125.     On April 1, 2010, MacArthur received a call from Stacey Campbell, Esquire,

counsel to L&R.  Campbell advised MacArthur that Francis turned the audit over to him to review,

that he would be a second set of eyes on the audit and that he would not be starting his review from

"scratch".  *MacArthur, Tr. 262:6-20.*  Campbell had no questions for MacArthur at this time.

126.     On May 3, 2010, William Coli directed B&K to issue a final audit report to System

Parking.  The final audit report was issued on May 10, 2010.  *Exhibits 22, 23; Coli, Tr. 63:14-25;*

*Tr. 64:1-7.*

127.    The Funds' final audit accurately reflects the amount of contributions, liquidated damages and audit fees System Parking owes to the Funds.

**G.    L&R Internal Audit**

128.    Francis was provided a copy of the October 5, 2009 revised preliminary audit for review. *Francis, Tr. 394:19-25; Tr. 395:1-3.*

129.    Francis did not discuss the Funds' audit with Phillips. *Francis Tr. 322: 13-15.*

130.    After meeting with Marino on March 19, 2010, Francis hired a programmer to create a program to compute contribution rates in effect during the audit period and obtained the assistance of two (2) L&R employees to enter into the program all of the information set forth in the 1803 pages of individual employee data. *Francis, Tr. 323:7-13; Tr. 395:3-16; Tr. 397:17-25; Tr. 398:4-14.*

131.    The two (2) L&R employees worked seven (7) days a week for approximately three weeks to enter the data into the program. *Francis, Tr. 395:17-20.*

132.    Francis did not review System Parking's payroll records in conducting L&R's internal audit. All facts underlying his audit came entirely from the 1803 pages of individual detail reports created by B&K. *Francis, Tr. 395:21-24; Tr. 396:20-25; Tr. 397:1-4.*

133.    Francis did not review the L&R internal audit line-for-line for accuracy but rather spot checked about 20 to 30 % of the lines based on his understanding of the CBAs by looking at dates and the number of hours recorded in the B&K individual detail report. *Francis, Tr. 398:15-25; Tr. 398:1-2.*

134.    In conducting the L&R internal audit, Frances assumed that in those instances where B&K's individual detail report indicated less than 120 hours for an employee under the

2001 Commercial CBA and less than 128 hours for an employee under the 2006 Commercial CBA that the employee was a part-time employee. *Francis, Tr. 399:9-25; Tr. 400:1-3.*

135.    Francis does not know when the Funds were given a copy of his internal audit. *Francis, Tr. 400:5-23.*

136.    Francis does not know if System Parking or L&R provided documentation to the Funds to support its claim that B&K understated System Parking's contributions by $9,649.90 in 2003 and by $4,475.78 in 2004. *Francis, Tr. 402:14-25; Tr. 403:1-20.*

137.    Francis agreed the Funds' auditors correctly calculated System Parking's underpayments but he did not include in his audit the contributions L&R owed to the Funds. *Francis, Tr. 319:16-25; Tr. 320:1-13; Tr. 3975-13.*

138.    William Coli received correspondence from Stacey Campbell (the "Campbell letter") dated April 23, 2010 demanding a credit to L&R in the amount of $680,359.78 "for contributions System did not owe during the audit period and for overpayments of full-time contributions System made for employees who actually worked part-time." *Exhibit 24, p. 1.*

139.    The Campbell letter also stated that System Parking disagreed with B&K's interpretation of the CBAs and therefore, System Parking was not required to make contributions on hours paid to employees for vacations, holidays, sick, personal, and bereavement leave. Accordingly, System Parking demanded the Funds' credit System Parking for the $330,000.00 contribution deficiency based on hours paid. *Exhibit 24, p. 4, Section B.*

140.    According to the Campbell letter, after System Parking received the October 5, 2009 revised preliminary audit report, System Parking conducted a limited review of the report which indicated that the Funds' did not credit contributions made to the Funds in 2003 ($9,649.90) and 2004 ($4,475.78) . *Id., p. 3, Section D.*

141.    No one from System Parking or L&R told Marino about this alleged discrepancy. *Marino, Tr. 188:5-23.*

142.    The Campbell letter also stated that after a meeting with Marino and Prater to review the revised audit report, System Parking conducted a more in-depth analysis of the audit and discovered that the Funds owed System Paring a credit of $680,359.78. *Id., p. 3, Section II, first paragraph.* Later in the letter, the amount of the credit demand increased to $1,250,000.00 without any explanation. *Id., p. 3-4, Section II.A.*

143.    In addition, the Campbell letter stated that as of the date of the letter, System Parking had not yet completed its analysis of the Funds' preliminary audit report. *Id..*

144.    Based on Campbell's representations, between December 12, 2008, the date Marino forwarded the initial preliminary audit to System Parking and April 23, 2010, the date of Campbell's letter, neither System Parking nor L&R conducted an in-depth analysis of the Funds' preliminary audit.

145.    No documents were attached to the Campbell letter to explain or support System Parking's claims, including the internal audit conducted by L&R. *Exhibit 24, 27; Coli,Tr. 73:18-25.*

146.    Coli received a copy of the L&R audit from the Funds' prior counsel.  No supporting documents or explanation was provided to counsel or the Funds explaining or supporting the audit.  Coli reviewed the audit with the Funds' prior counsel and concluded there was insufficient information to demonstrate that System Parking had made contribution errors and was entitled to a refund. *Coli, Tr. 68:5-25; Tr. 69:1-17; Tr. 139:7-13.*

147.    Coli presented Campbell's letter to the Audit and Contributions Committee of the Board of Trustees at is May 17, 2010 meeting. *Coli, Tr. 64:12-25; Tr. 65:1-25; Tr. 66:1-13.*

148.    By letter dated June 24, 2010, The Funds' prior counsel demanded L&R pay the deficient contributions owed to the Funds. *Exhibit 25; Coli, Tr. 66:14-25; Tr. 67:1-5.*

149.    Coli was unaware that L&R had relied on B&K's individual detail report to conduct its internal audit until his deposition in June or July, 2013. *Coli, Tr. 76:10-21.*

### H.    Summary Judgment Order.

150.    Pursuant to the Court's March 31, 2014 summary judgment Memorandum and Order, the Funds are to pay L&R $35,428.30 for agreed upon overpayments related to specific employees who switched from one contract to another following a significant break in service. *Dkt. No. 69, pp. 14-15.*

### I.    Contract Ambiguity

151.    In its summary judgment Memorandum and Order, the Court ruled that the meaning of "hours worked" as used in the Commercial CBAs is ambiguous. *Id., pp. 10-12.*

## II    SUPPLEMENTAL PROPOSED CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

152.    The Court has jurisdiction over this action pursuant to Sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA") as amended, 29 U.S.C. § 1132(g)(2) and 1145; and pursuant to Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

153.    Venue is proper in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because, *inter alia,* the breach took place in this District; and pursuant to Section 301(a) of the LMRA, 29 U.S.C. § 185(a) because the Court has jurisdiction over the parties; and, pursuant to 28 U.S.C. § 1391(a) because Plaintiffs' claims arose in this District.

B.  **Statement of the Governing Statutory Law**

1.  **ERISA AND THE LMRA**

154.     The terms and conditions of the contribution obligation to jointly administered, multiemployer union-management employee benefit trust funds are controlled by the LMRA and ERISA, both of which require a written agreement creating the obligation to make contributions to an employee benefit trust fund.  *See,* LMRA, 29 U.S.C. § 186(c)(5) and ERISA, 29 U.S.C. §§ 1132(g)(2) and 1145.

155.     A collective bargaining agreement establishes an employer's obligation to make contributions to a multiemployer benefit fund.  *Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co. ("Kroger I"),* 73 F.3d 727, 730 (7th Cir. 1996) citing *Central States, Southeast & Southwest Areas Pension Fund v. Joe McClelland Inc.,* 23 F.3d 1256, 1257-58 (7th Cir. 1994).

156.     Section 302(c)(5)(B) of the LMRA requires an employer to make contributions to an employee benefit trust fund in accordance with the written terms of the governing collective bargaining agreement.  29 U.S.C. § 186(c)(5).

157.     "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."  *ERISA,* 29 U.S.C. § 1145.

158.     "Under ERISA, trustees owe a duty to a plan's participants and beneficiaries to assure the financial integrity of the plans by, among other things, `holding employers to the full and prompt fulfillment of their contribution obligations.'"  *P-Americas, LLC v. Cent. States Southeast & Southwest Area Pension Fund,* 2014 U.S. Dist. LEXIS 106843 at *16; 2014 WL

3858396 (N.D. Ill. August 5, 2014) citing *Central States, Se. & Sw. Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 574, 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985).

159.     "In addition to protecting the interests of the plan's participants and beneficiaries, trustees of multiemployer plans also must balance the interests of multiple participating employers . . . , each of which has an interest in the collection of proper contributions from other employers." *P-Americas, LLC v. Cent. States Southeast & Southwest Area Pension Fund,* 2014 U.S. Dist. LEXIS 106843 at *16; 2014 WL 3858396 (N.D. Ill. August 5, 2014) citing *Central States, Se. & Sw. Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 574, 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985).

160.     "It is beyond dispute that protection of the financial integrity of multi-employer pension funds is the touchstone of ERISA." *Soft Drink Industry Local Union No. 744 Pension Fund v. Coca-Cola Bottling Co. of Chicago,* 679 F.2 Supp. 743, 747  (N.D. Ill. 1988) quoting *Dumac Forestry Servs. Inc. v. International Broth. Of Elec. Workers,* 814 F.2d 79, 83 (2d Cir. 1987).

161.     A multiemployer benefit plan is a third-party beneficiary of a collective bargaining agreement.  *Central States, Southeast & Southwest Areas Pension Fund. V. Gerber Truck Service, Inc.,* 870 F.2d 1148, 1150 (7th Cir. 1989); *Robbins v. Lynch,* 836 F.2d 330, 333 (7th Cir. 1988).

162.     A multiemployer benefit plan has the right to enforce the terms of a collective bargaining agreement according to the agreement's terms.  *Kroger I,* 73 F.3d at 731 quoting *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Trust Serv., Inc.,*  870 F.2d 1148, 1149 (7th Cir. 1989).

34

163.    Alleged agreements made by a Union officer to an employer about the manner in which benefit funds will conduct an audit of the employer's payroll are not enforceable about the benefit funds.  *Teamsters & Emplrs Welfare Trust v. Gorman Bros. Ready Mix,* 283 F.3d 877, 884-85  (7th Cir. 2002).

### 2.    Interpretation of the Collective Bargaining Agreements

164.     Federal courts examining a contract in the ERISA context apply federal common law rules of interpretation.  *Kroger I,* 73 F.3d at 731.

165.     "A contract should be read as a whole with its parts given effect."  *See, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. ZF Boge Elastmetall LLC,* 649 F.3d 641, 646 (7th Cir. 2011).

166.    Federal common law rules instruct courts to interpret a CBA "in an ordinary and popular sense as would a person of average intelligence and experience."  *Ross v. Indiana State Teacher's Association Insurance Trust,* 159 F.3d 1001, 1011 (7th Cir. 1998).

167.    Under Section 302(c)(5)(B) of the LMRA and Section 515 of ERISA, any limitation upon an employer's obligation to contribute to a multiemployer plan must be based upon the "unequivocal" written text of the governing collective bargaining agreement.  *Lewis V. Benedict Coal Co.,* 361 U.S. 459, 470-71, 80 S. Ct. 489 (1960); *Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland*, 23 F.3d 1256, 1258 (7th Cir. 1994).

168.    A multiemployer benefit plan must be able to rely on the plain language of a collective bargaining agreement in order to ensure that it has sufficient funds to pay out required benefits.  *Central States, Southeast & Southwest Areas Pension Fund. V. Gerber Truck Service, Inc.,* 870 F.2d 1148, 1150 (7th Cir. 1989).

169.    If an agreement is ambiguous, the trier of fact must resolve the question of the appropriate interpretation of the parties' collective bargaining agreements.  *Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co. ("Kroger I"),* 73 F.3d 727, 731 (7th Cir. 1996).

170.    When interpreting an ambiguous collective bargaining agreement, the trier of fact is to determine what the contracting parties intended the clause to mean.  *Central States, Southeast & Southwest Areas Pension Fund v. Kroger Company,* 226 F.3d 903, 911 (7th Cir. 2000).

171.    To determine what the contracting parties intended, the trier of fact may look at extrinsic evidence to determine the meaning the contracting parties attached to the ambiguous terms.  *Kroger Company,* 226 F.3d 903 at 911.

172.    Ambiguously worded collective bargaining agreements "should not be interpreted to render them . . . unenforceable where the wording lends itself to a logically acceptable construction that renders them . . . enforceable."  *Walsh v. Schlecht*, 429 U.S. 401, 97 S. Ct. 679, 685 (1977).

173.    The term "compensation" as used in the CBAs means wages and benefits, including the pension, health and welfare, and legal and educational assistance benefits administered by the Plaintiff funds.  *See Illinois Wage Payment and Collection Act,* 820 ILCS 115/1; *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corporation,* 258 F.3d 645, 652 (7th Cir. 2001); *Tatom v. Ameritech Corp.,* 2000 U.S. Dist. LEXIS 16720 at *25, 2000 WL 1648931 (N.D. Ill. , September 27, 2000) quoting the ILCS, 820 ILCS 115/1.

**3.  <u>Restitution of Alleged Mistakenly Paid Contributions</u>**

174.    ERISA allows but does not require employee benefit funds to refund a

participating employer's overpayments. *Employee Retirement Income Security Act, as amended,*

*29 U.S.C. § 1103(c)(2)(A)(ii).*

175.    "The assets of a plan shall never inure to the benefit of any employer and shall be

held for the exclusive purposes of providing benefits in the plans and defraying reasonable

expenses of administering the plan." *ERISA,* 29 U.S.C. § 1103(c)(1).

176.    "Under ERISA, an employer has a fiduciary duty to accurately report employee

work history and it is entitled to credit for an overpayment only if the payment was both made by

mistake of fact or law and the equities favor the refund." *Central States, Southeast and*

*Southwest Areas Pension Fund v. Blue Sky,* 2011 U.S. Dist. LEXIS 57945 at *40-*41 (N.D. Ill.

2011), citing ERISA, 29 U.S.C. § 1103(c)(2)(A)(ii) and *UIU Severance Pay Trust Fund v. Local*

*Union No. 18-U United Steelworkers of America*, 998 F.2d 509, 513 (7th Cir. 1993).

177.    "Funds must assume that all [employer] participants in a plan are following the

stated terms [of the collective bargaining agreement]; no other approach permits accurate

actuarial computations and proper decisions about which claims to pay." *Robbins v. Lynch,* 836

F.2d 330, 333 (7th Cir.1988).

178.    "Once the employer remits contributions to a [benefit] plan, those contributions

become assets of the [benefit] plan, to be used exclusively for the benefit of the plan participants

and beneficiaries, 29 U.S.C. § 1103(c)(1), though the plan may return mistakenly remitted

contributions to the employer within six months after the plan administrator discovers the

contribution was mistaken, 29 U.S.C. § 1103(c)(2)(A)(ii)." *Robinson v. Woodbridge*

*Construction and Carpentry, Inc.,* 2014 U.S. Dist. LEXIS 70846, *8 (N.D. Ind. May 22, 2014).

179.    "Mistaken contributions, once invested, may be just as essential to the funds' integrity and stability as non-mistaken contributions." *Plucinski v. National Pension Fund,* 875F.2d 1053, 1056 (3ʳᵈ Cir. 1989) citing *Crown Cork & Seal Co. v. Teamsters Pension Fund,* 549 F. Supp. 307, 311-12 (E.D. Pa. 1982), aff'd mem., 720 F.2d 661 (3ʳᵈ Cir. 1983).

180.    "Merely giving permission [to refund contributions] does not imply that Congress also wanted employers to be able to force the refund of contributions." *Plucinski v. National Pension Fund,* 875F.2d at 1056,  citing *Crown Cork & Seal Co. v. Teamsters Pension Fund,* 549 F. Supp. at  311.

181.    A claim for restitution of alleged mistaken contributions is equitable in nature. Recovery does not follow automatically upon a showing that [a party] mistakenly overpaid contributions.  Restitution is permitted "only if the equities favor it."  *Board of Trustees of the Pipe Fitters Retirement Fund, Local 597 v. Master-Tech Refrigeration Service Corp.,* 2010 WL 5110210 at *4 (N.D. Ill. December 8, 2010) quoting *UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of Am.,* 998 F.2d 509, 513 (7ᵗʰ Cir. 1993); *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corporation,* 258 F.3d 645, 651 (7ᵗʰ Cir. 2001).

182.    Equity is determined under the circumstances giving rise to the restitution claim. *St. Louis Construction Laborers Welfare Fund v. Park-Mark, Inc.,* 700 F.3d 1130, 1135 (8ᵗʰ Cir. 2012) citing *UIU Severance Pay Trust Fund v. Local Union No. 18-U,* 998 F.2d 509, 513 (7ᵗʰ Cir. 1993).

183.    "ERISA `did not impose the risk of mistaken contributions on the funds, particularly since the employer is in the best position to monitor the amount of its own contributions.'"  *Central States v. Blue Sky,* 2011 U.S. Dist. LEXIS 57945 at *41, quoting,

*Crown Cork & Seal Co. v. Teamsters Pension Fund,* 549 F. Supp. 307, 311 (E.D. Pa. 1982), aff'd mem., 720 F.2d 661 (3rd Cir. 1983); *Plucinski,* 875 F.2d at 1057.

184.    "To prevent the audit process from being bogged down by the issues of whether actually occurred and which equity favors refund, the funds audits do not seek to identify overpayments, unless a glaring error is detected. Under the [refund policy] and ERISA, the onus is on the employer to make `a request for credit' and identify the overpayment.  Moreover, as the party asserting that there were overpayments, [the employer] has the burden of proof." *Central States v. Blue Sky,* 2011 U.S. Dist. LEXIS 57945 at *41-*42.

185.    "[T[o prevail on its restitution claim, [an employer] must show that `(1) [it] had a reasonable expectation of payment, (2) the [Funds] should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment.'" *Hancock v. Ill. Cent. Sweeping LLC,* 2014 U.S. LEXIS 158457 at *29 (N.D. Ill. November 10, 2014) quoting *Harris Trust & Sav. Bank v. Provident Life & Acc. Ins. Co.,* 57 F.3d 608, 615-16 (7th Cir. 1995).

186.    Accordingly, "[T]o determine if the equities favor recovery under a theory of restitution, courts are directed to consider the following questions:  (1) were the unauthorized contributions the sort of mistaken payments that equity demands be refunded ?. . . (2) has the employer delayed in bringing  the action; (3) has the employer somehow ratified past payments? (4) can the employer demonstrate that the party from whom it seeks payment would be unjustly enriched if recovery were denied?" *Board of Trustees of the Pipe Fitters Retirement Fund, Local 597 v. Master-Tech Refrigeration Service,* 2010 WL 5110210 at *4 (N.D. Ill. December 8, 2010); quoting *UIU Severance Pay Trust Fund v. Local Union No. 18-U United Steelworkers of America*, 998 F.2d 509, 513 (7th Cir. 1993).

187.    These factors "are not a `complete catalog' of what a court may consider, nor is any one factor controlling.'"  *UIU Severance,* 998 F.2d at 513, n 5.

188.    Moreover, in order to prevail on a request for restitution, an employer must demonstrate that the benefit fund's refund policy is arbitrary and capricious and that the equities favored restitution.  *Teamsters Joint/Council No. 83 of Virginia Health and Welfare Fund v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 2005 U.S. Dist. LEXIS 12763 at *12 (N.D. Ill. June 15, 2005); *Laborers' Pension Fund v. National Wrecking Company, Inc.,* 1994 U.S. Dist. LEXIS 13131 at *33 (N.D. Ill.  September 20, 1984).

189.    Funds are not unjustly enriched by retaining allegedly mistaken contributions when the contributions are "in the nature of insurance or are otherwise contingent or (as in the case of pension benefits) deferred so that immediate receipt is not expected; and insurance is not illusory just because the event insured against never occurs."  *Operating Engineers v. Gustafson,* 258 F.3d at 652; *see also, Construction Industry Retirement Fund v. Kasper Trucking,* 10 F.3d 465, 466 (7th Cir. 1993) ("The welfare fund pooled the money to provide benefits for all persons on whose behalf contributions were made therefore, because health coverage was provided the employer is not entitled to a refund).

190.    An employee benefit fund is not unjustly enriched simply because it has received contribution payments on behalf of a particular employee who has not made claims to the Fund, because the employee  presumably would have received coverage had he submitted claims.  A benefit payment is made to the fund for coverage in case a claim is submitted.  A lack of actual claims is irrelevant.  Additionally, an employee benefit plan is expected to have those funds at hand for payout of benefits on behalf of other employees, including employees of other employers who are members of the multiemployer benefit plan.  *Construction Indus. Retirement*

*Fund v. Kasper Trucking,* 10 F.3d 465, 467 (7th Cir. 1993); *Architectural Iron Workers, Local No. 63 Welfare Fund v. Lane General Metal Works, Inc., 1997 U.S. Dist. LEXIS 12420 at \* 15 (N.D. Ill. August 14, 1997)(*employer's refund claim against Welfare Fund denied is like "a person who pays for health insurance," and later tries "to get his money back if he remains healthy.")*; see also, Central Pennsylvania Teamsters v. McCormick Dray Line,* 85 F.3d 1098, 1109 (3rd Cir. 1996).

191.    A benefit fund is not required to refund or credit an employer's overpayments where the overpayments were pooled to provide benefits for all persons on whose behalf contributions were made.  *Constr. Indus. Ret. Fund of Rockford, Ill., v. Kasper Trucking Inc.,* 10 F.3d 465, 467 (7th Cir. 1993).

192.    "[A] welfare fund is not unjustly enriched simply because it has received benefit payments on behalf of particular employees who have not made claims, because they presumably would have received coverage had they submitted claims.  A benefit payment is made for coverage in case a claim is submitted.  As such, a lack of actual claims is irrelevant.  Furthermore, the welfare fund expected to have those funds at hand for payout of benefits of other employees, including employees of other employers who are members of the multiemployer Welfare Fund."  *Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098, 1109 (3rd Cir. 1996).

193.    An employer's continued, unquestioned payment of contributions over a period of years constitutes ratification of the payments. *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corporation,* 258 F.3d 645, 650 (7th Cir. 2001);  *St. Louis Construction Laborers Welfare Fund v. Park-Mark, Inc.,* 700 F.3d 1130, 1135 (8th Cir. 2012) citing *UIU Severance Pay Trust Fund v. Local Union No. 18-U,* 998 F.2d 509, 513 (7th Cir.

1993); *Robinson v. Woodbridge Construction,* 2014 U.S. Dist. LEXIS 79846 at *11-*12 (N.D. Ind. May 22, 2014) (Contributing employer was not entitled to prevail on its refund/set-off counterclaim because it made the alleged mistaken contributions over eight and a half years and three collective bargaining agreements).

194.    Alleged mistaken contributions made by an employer "month after month after month" are not "trivial" mistakes and when the employer is a corporation "and not a hapless individual," it is likely that the employer simply failed to notice its contribution mistake." *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corporation,* 258 F.3d 645, 650 (7th Cir. 2001).

195.    A contributing employer's failure to review its own records routinely for accuracy and errors is inexcusable and prejudices employee benefit funds because such conduct places funds in a position of unwinding numerous years of records to determine if coverage was extended to the employees for whom the employer allegedly mistakenly paid contributions.  *See St. Louis Construction Laborers Welfare Fund v. Park-Mark, Inc.,* 700 F.3d 1130, 111137 (8th Cir. 2012);  *The Construction Industry Retirement Fund of Rockford v. Kasper Trucking, Inc.,* 10 F.3d 465, 469 (7th Cir. 1993);  *Architectural Iron Workers, Local No. 63 Welfare Fund v. Lane-General Metal Works, Inc.,* 1997 U.S. Dist. LEXIS 12420 at *14-*17 (N.D. Ill. August 14, 1997) citing *Frank L. Ciminelli Construction Co., Inc. v. Buffalo Laborers Supplemental Unemployment Benefit Fund,* 976 F.2d 834, 836-37 (2nd Cir. 1992).

196.    A company that mismanages its business is not entitled to a refund of overpaid contributions. *Carpenters Local 1471 and Mississippi Carpenters & Operating engineers Benefit Plan v. Bar-Con,Inc.,* 668 F. Supp. 560, 569 (S.D. Miss. 1987).

42

197.    "Ignorance which is the effect of inexcusable negligence is not an excuse for laches." *Park-Mark, Inc.,* 700 F.3d at 1137, quoting *Weniger v. Success Mining Co.,* 227 F. 548, 557 (8th Cir. 1915).

198.    "[W]hen restitution would result in the underfunding of a plan it would be inequitable to order [restitution]." *Plucinski,* 875 F.2d at 1053; *Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Ben. Fund,* 976 F.2d 834, 835 (2nd Cir. 1992).*see also, Airco Indus. Gases v. Teamsters Pension Trust Fund,* 668 F.Supp. 893, 901-02 (D. Del. 1987), quoting *Dumac Forestry Services, Inc. v. International Brotherhood of Electrical Workers,* 637 F. Supp. 529, 532-33 (N.D.N.Y. 1986), aff'd in part, rev'd in part, 814 F.2d 79, 83 (2nd Cir. 1987) ("One facet of determining whether the [refund] policy violates the statutory standard will be whether a fund's actuarial stability will be threatened by an award [of a refund]."); *Electricians Health, Welfare and Pension Plans v. Ciro C. Gulino,* 594 F. Supp. 1265, 1272 (M.D. La. 1984) ("Where pension benefits are being provided for a large group of employees, it facilitates actuarial certainty by limiting the time and reasons for obtaining refunds. A multiemployer trust providing benefits for many employees could not achieve the goals which the Labor Management Relations Act, ERISA and the MPPAA were enacted for, if funding provided a decade ago or more were to be refunded").

199.    A limited standard exists under which the court may review the administrative acts of pension fund trustees.  "As a general rule federal courts should refrain from interfering with the administration of a pension plan unless its trustee or administrator has acted in an arbitrary or capricious manner." *Dumac,* 814 F.2d at 82-83.

200.    The Funds' September 30, 2009 refund policy provides that refund requests must be in writing and demonstrate conclusively that a contribution error was made. It further

provides that no contribution will be refunded more than one year after the contributions are received by the Fund Office, absent extenuating circumstances or unanticipated equitable considerations.

201.    A refund request is governed by the refund policy in effect on the date the request was made. *Airco Indus. Gases V. Teamsters Pension Trust Fund,* 668 F. Supp.893, 903 (3rd Cir. 1987); *see also, Electricians Health & Welfare and Pension Plans v. Ciro C. Guilino,* 594 F. Supp. 1265, 1272  (M.D. La. 1984 (refund denied under refund policy which provided that erroneous contributions may be refunded only within one year of the erroneous payment) .

202.    A refund in contravention of the trustees' refund policy cannot be awarded unless supported by a determination that the refund policy is arbitrary and capricious. *Dumac Forestry Services, Inc. v. International Brotherhood of Electrical Workers, National Electrical Benefit Fund,*  814 F.2d 78, 82 (2nd Cir. 1987); *see also*, *Teamsters Joint Council No. 83 of Virginia Health and Welfare Fund v. Hook Up, Inc.,* 2005 U.S. Dist. LEXIS 12763 at *12 (N.D. Ill. June 15, 2005);  *Laborers' Pension Fund, et al., v. National Wrecking Company, Inc.,* 1994 U.S. Dist. LEXIS 13131 at *33 (N.D. Ill. September 15, 1994).

### 4.    Interest, Liquidated Damages, Audit Fees, Attorneys' Fees and Costs

203.    Section 502(g)(2) of  ERISA provides that judgment in favor of a plan seeking to collect delinquent contributions from an employer pursuant to Section 515 of ERISA is entitled to, as a matter of law, the unpaid contributions, interest on the unpaid contributions, an amount equal to the greater of interest on the unpaid contributions or liquidated damages provided for under the plan. *ERISA,* 29 U.S.C. § 1132(g)(2).  *Central States, Southeast and Southwest Areas Pension Fund v. Allied systems, LTD.,* 795 F. Supp. 2d 740, 744 (N.D. Ill. 2011) citing *Gilles v. Burton Const. Co.,* 736 F.2d 1142, 1146 n. 6(7th Cir. 1984).

204.    The Funds' Refund Policy prohibits the payment of interest on refunded contributions.

205.    A successful counterclaim defendant is not entitled to interest on the refunded amount as such an award is contrary to Section 1103(c)(1) of ERISA which prohibits fund assets inuring to the benefit of the employer.  *Dumac Forestry Services, Inc. v. International Brotherhood of Electrical workers,* 814 F.2d 79, 83 (2nd Cir. 1987) citing *Peckham v. Board of Trustees of the Int'l Bhd. [of Painters] & Allied Trades Union,* 724 F.2d 100 (10th Cir. 1983); *B + B Electric Co., Inc. v. Electrical Workers Local Union No. 369 Retirement Fund,* 249 F. Supp. 2d 865, 870-71 (W.D. Ky 2003); *Airco Indus. Gases V. Teamsters Pension Trust Fund,* 668 F. Supp. 893, 904 (D. Del. 1987).

206.    To the extent interest and attorneys' fees may be awarded to a defendant, in cases arising under Federal statutes or common law, Federal law dictates whether a successful defendant is entitled to prejudgment interest, as well as the appropriate terms of that interest. *Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1333 (7th Cir. 1992). ("Rules for prejudgment interest therefore usually come from the law defining the elements of damages. In diversity cases governed by *Erie,* federal courts look to state law to determine the availability of (and rules for computing) prejudgment interest.  In cases governed by federal law, courts look first to the statutes, devising federal common law only if they have been authorized to do so.").

207.    For claims based in Federal law, prejudgment interest is within the judge's discretion to award. *Trustmark Life Ins. Co. v. Univ. of Chicago Hospitals*, 207 F.3d 876, 885 (7th Cir. 2000).  Whether to award prejudgment interest to an ERISA plaintiff is "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities."

45

*Landwehr v. DuPree*, 72 F.3d 726, 739 (9th Cir. 1995)(citations omitted). One of the factors considered in determining whether to award prejudgment interest is the presence of bad faith or good will. *Id.* (internal quotations & citations omitted).")

208. Whether prejudgment interest should be compounded or not is within the discretion of the district court. *Fritcher v. Health Care Serv. Corp.,* 301 F.3d 811, 820 (7th Cir. 2002). For the same reasons that interest is not appropriate in the first place, it would be inappropriate to award compounded interest here.

209. When prejudgment interest begins to accrue is a question of balancing the equities. *Kansas v. Colorado*, 533 U.S. 1, 15 (2001). In accordance, case law supports the position that prejudgment interest should not begin to run until the amounts claimed are known, or knowable, to the defendant against whom it is charged. *Id.* Thus, a defendant can only be liable for prejudgment interest accruing where the complaint is filed or the date of formal demand, whichever comes first. *In re Indus. & Mun. Eng'g, Inc.,* 127 B.R. 848, 851 (Bankr. C.D. Ill. 1990).

210. When applicable, the Seventh Circuit applies the prime rate for prejudgment interest. *Berger v. Xerox Ret. Income Guar. Plan*, 231 F. Supp. 2d 804, 820-21 (S.D. Ill. 2002) *aff'd and modified sub nom. Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003) ("In this Circuit, prejudgment interest is typically assessed at the "prime rate," that is, the rate charged on short term, unsecured loans to creditworthy borrowers.") *See Fritcher v. Health Care Serv. Corp.,* 301 F.3d 811, 819–20 (7th Cir.2002); *Gorenstein Enters., Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 436–37 (7th Cir.1989). *See also Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1112–13 (7th Cir.1998)."); s*ee also, Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 436 (7th Cir. 1989) ("we

46

suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate," but declining to set a hard-and-fast rule for appropriate interest).

211.    The prime rate has been 3.25% at all applicable times (from December 16, 2008 to present). Source: http://www.jpmorganchase.com/corporate/About-JPMC/historical-prime-rate.htm

### 5.    Conclusions Based upon Facts and Governing Law

#### a.    Contributions Owed to the Funds

212.    The Commercial and Valet CBAs provisions for holidays, vacations, sick, personal and bereavement leave provide that wages paid for such leave is considered to be hours paid.

213.    The Funds' auditors and field representatives dealt with John Phillips of System Parking when reviewing the audit for accuracy.

214.    L&R did not present Phillips at trial to testify to System Parking's interpretation of the CBAs regarding hours worked and hours paid.

215.    L&R witness William Francis did not consult with Phillips at anytime with regard to L&R's internal audit, including the interpretation of the CBAs.

216.    "Compensation" as used in the vacation, holiday, sick, personal and bereavement provisions of the Commercial and Valet CBAs means wages and benefits, including the benefits administered by the Plaintiff Funds.

217.    L&R's witnesses admitted that wages and benefits are part of their compensation package for performing work for L&R.

218.    Accordingly, the Commercial and Valet CBAs required System Parking to make contributions to the Funds based on all hours paid to employees.

219.    System Parking failed to make contributions to the Funds based on hours paid and therefore it owes contributions to the Funds for all hours paid to employees for holidays, vacations, sick, personal and bereavement leave.

220.    L&R failed to submit any evidence to demonstrate that the Funds' final audit does not accurately reflect the amount of contributions owed to the Funds.

221.    The Funds' final audit accurately reflects the amount of contributions L&R owes to the Funds and therefore the Funds are entitled to the full amount of contributions they seek in this action.

222.    As mandated by ERISA, the Funds are entitled to an award of interest, twenty percent (20%) liquidated damages, attorneys' fees and costs which would include audit fees. *29 U.S.C. § 1132(g)(2)*.

223.    It is the Funds' policy to compound interest monthly at the prime rate established by the federal government plus one percent (1%).

224.    The May 13, 2010 final audit report accurately states the amount of contributions, liquidated damages and audit fees L&R owes the Funds.  A calculation of the interest rate through August 31, 2015 increased the amount of interest owed to each Fund:  Welfare Fund, $473,140.25; Pension Fund, $164,668.80; L&E Fund, $21,062.32.

225.    Interest shall continue to accrue up to the date of payment of the contributions owed.

226.    Alternatively, L&R admits that at a minimum it owes $680,359.78 in contributions to the Funds.

b.      **The Counterclaim**

48

227.    L&R failed to produce any evidence to support its allegation that System Parking mistakenly paid $1,250,000.00 in contributions to the Funds between January 1, 2003 and March 31, 2008 therefore L&R is not entitled to a refund and its counterclaim is denied.

228.    L&R did not review System Parking's payroll records when it performed its internal audit. Instead, L&R assumed by the number of hours reflected in the individual detail reports of the preliminary audit report that any number of hours below 120 (2001 Commercial CBA) and 128 (2006 Commercial CBA) meant the employee was a part-time employee. A review of the payroll records may have demonstrated that an employee was a full-time employee entitled to full-time contributions. Therefore, by failing to review System Parking's payroll records, L&R could not determine within any degree of certainty whether the employees it assumed were part-time were in fact part-time and not entitled to full-time contributions. Therefore, L&R's internal audit is inaccurate and L&R is not entitled to a refund.

229.    L&R failed to produce evidence that the Funds did not credit the contributions System Parking paid to the Funds in 2003 in the amount of $9,649.90 and in 2004 in the amount of $4,475.78. Therefore, L&R is not entitled to a reduction of this amount from the amount of contributions it owes to the Funds.

230.    Defendant admitted that it did not learn it had allegedly made mistaken contributions to the Funds until the Funds' auditors issued a preliminary audit report on December 12, 2008.

231.    L&R witness Vivian Mateega testified that System Parking's payroll manager's work in completing the monthly remittance forms and calculating the amount of contributions owed to the Funds was not supervised.

49

232.   L&R is not entitled to a refund of its alleged mistaken contributions because it failed to review its own records routinely for accuracy and errors.

233.    John Phillips claimed at an April 9, 2009 meeting with the Funds' auditors that System Parking overpaid contributions to the Funds but failed to provide any support for the claim.

234.   Pursuant to the April 23, 2010 letter of L&R's counsel to the Funds' Manager, L&R had not completed its analysis of its claim for a refund for alleged mistaken contributions as of that date.

235.   L&R is not entitled to a refund of the alleged mistaken contributions because it did not timely or expeditiously determine the alleged amount of its mistake until more than a year after the Funds' submitted the December 12, 2008 preliminary audit report.

236.   Vivian Mateega admitted that when completing the remittance reports to be submitted to the Funds, System Parking's payroll manager did not focus on contributions owed for full-time employees because the contribution is a flat rate.

237.   Vivian Mateega admitted that if the Funds' office mistakenly failed to change an employee's status on a remittance form, System Parking's payroll manager could have called the Funds' office to report the error and advise System Parking would not make a contribution for that employee.

238.   Vivian Mateega admitted that prior to joining System Parking in 2009, the company did not have policies in place for managers to report employees' hours and leave time.

239.   The alleged mistaken contributions paid by System Parking were made for the same employees for more than one month and in some instances, for many months.

240.     Contributions are not mistakenly made when the employer fails to focus on the amount of contributions owed for each employee each month because it was simpler to complete the remittance form in this manner.

241.     System Parking's continued, unquestioned payment of contributions over a period of years constitutes ratification of those payments therefore L&R is not entitled to a refund of those contributions.

242.     System Parking's alleged mistaken contributions were not a mistake but rather were the result of System Parking's own haphazard management of its business therefore, L&R is not entitled to a refund of those contributions.

243.     The Funds added to, and/or maintained System Parking's employees on the benefits eligibility lists upon receipt of the requisite number of months or hours of contributions and when the employees met the eligibility requirements therefore L&R is not entitled to a refund of those contributions.

244.     The Funds' pooled the contributions it received from System Parking to purchase insurance, to pay benefits on behalf of all participants in the Funds, to improve benefits and to make investments therefore L&R is not entitled to a refund of those contributions.

245.     L&R is not entitled to a refund because to do so would jeopardize the financial stability of the Funds.

246.     The Funds' September 30, 2009 refund policy provides that refund requests must be in writing and demonstrate conclusively that a contribution error was made and that no contribution will be refunded more than one year after the contributions are received by the Fund Office, absent extenuating circumstances or unanticipated equitable considerations.

247.    More than a year has passed since the Funds' receipt of System Parking's contributions therefore it is not entitled to a refund.

248.    L&R failed to submit any evidence demonstrating that extenuating circumstances existed to warrant a refund therefore it is not entitled to a refund.

249.    Learning through the Funds' payroll audit, years after a contribution was paid, does not constitute an extenuating circumstance or an unanticipated equitable consideration under the Funds' refund policy.

250.    The refund policy was in force on the date L&R requested a refund therefore the refund policy applies to L&R refund request.

251.    The refund policy is not arbitrary or capricious.

252.    Defendant failed to produce evidence sufficient to demonstrate conclusively that it mistakenly paid contributions to the Funds from January 1, 2003 through March 31, 2008.

253.    Defendant lacked a reasonable expectation of a refund in light of the fact that it failed to routinely review and audit its books to assure that it properly paid contributions.

254.    Equity does not demand any contributions be refunded because the cost of any such refund would be borne generally by the contributing employers and/or beneficiaries; these parties share no blame for L&R's failure to remit accurate contributions.

255.    The Refund Policy provides that the Funds will not return mistakenly paid contributions until disputes concerning unpaid contributions are resolved therefore, the Funds were not obligated to refund any contributions to L&R until the dispute over deficient contributions was resolved.

256.    Pursuant to the Court's summary judgment order, the amount of contributions owed by L&R to the Funds may be reduced by $35,428.00.

257.   Alternatively, should the Court determine that the Funds owe a refund to L&R, consistent with the refund policy, L&R's refund is limited to one year from the date of the Funds December 12, 2008 preliminary audit report.

258.   L&R is not entitled to prejudgment interest or attorneys' fees as such an award would inure to L&R's benefit in violation of ERISA and would reduce the amount of assets needed to pay benefits to the Funds' participants.

259.   Should the Court determine that L&R is entitled to prejudgment interest, the interest should run from April 23, 2010, the date L&R submitted its request.

260.   Prejudgment interest should be calculated in the manner prescribed by the federal government.

261.   Under the American Rule, L&R is not entitled to attorneys' fees.

262.   Pursuant to the Funds' refund policy, any refund owed to L&R should be reduced by the cost incurred by the Funds' office to calculate the refund and adjust its financial and eligibility records.

*[Signatures on following page]*

Respectfully submitted,
WILLIG, WILLIAMS & DAVIDSON

/s/     Linda M. Martin_____
LINDA M. MARTIN, ESQUIRE
Attorney I.D. No. 66437
1845 Walnut Street, 24th Floor
Philadelphia, PA  19103
Office         (215) 656-3665
Email          lmartin@wwdlaw.com

*Lead Counsel for Plaintiffs*


ILLINOIS ADVOCATES, LLC

____/s/   William M. Tasch_____
WILLIAM M. TASCH, ESQUIRE
77 W. Washington Street, Suite 2120
Chicago, IL  60602

*Local Counsel for Plaintiffs*

Dated:  September 8, 2015