**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

TEAMSTERS LOCAL UNION NO. 727 )
HEALTH AND WELFARE FUND, )
TEAMSTERS LOCAL UNION NO. 727 )
PENSION FUND, and TEAMSTERS )
LOCAL UNION NO. 727 LEGAL AND )
EDUCATIONAL ASSISTANCE FUND, )
                                    )
            Plaintiffs, )
                                    )      No. 11 C 1747
            v. )
                                    )      Judge Jorge L. Alonso
L & R GROUP OF COMPANIES, )
                                    )
            Defendant. )

**<u>MEMORANDUM OPINION AND ORDER</u>**

On March 14, 2011, plaintiffs, who are three employee benefit funds (collectively, the "Funds"), filed this action pursuant to Sections 502(a)(3), 502(g)(2), and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), and 1145, and Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185(a). The Funds allege that defendant, L&R Group of Companies ("L&R"), owes them delinquent employment contributions for the period between January 1, 2003 and March 31, 2008, plus related damages. The Funds seek $928,157.94 in contributions, $185,631.59 in liquidated damages, $647,689.35 in interest (through the date of the pretrial order) and additional interest to accrue up to the date of payment, and $64,191.71 in payroll audit fees, for a total of $1,825,669.59, plus attorneys' fees and costs. (Dkt. No. 122, Pretrial Order at 4.)[1]

---

[1]The Court believes that plaintiffs' totals as set forth in the pretrial order contain two mathematical errors. The total amount of liquidated damages sought for the Pension Fund should read $46,382.80, not $46,381.80. The grand total sought by plaintiffs should read $1,825,670.59, not $1,825,670.50.

L&R filed a counterclaim for restitution, seeking to recover what it contends were mistaken contribution overpayments. (Dkt. No. 13, Countercl. ¶ 12.) L&R seeks $1,255,802.66 in alleged mistaken overpayments (plus interest and attorneys' fees and costs); $330,000 in "additional overpayments reflecting contributions based on hours paid as opposed to hours worked"; $14,125.60 "in unaccounted-for contributions from 2003 and 2004"; and $35,428.30 in "additional agreed-upon overpayments," for a total of $1,635,356.56 as "a credit for future contribution amounts owed or, alternatively, an offset of any alleged deficiency." (Pretrial Order at 5; Dkt. No. 134, Def.'s Post-Trial Br. at 2.)[2]

On March 31, 2014, Judge Kendall, to whom this case was previously assigned, entered a memorandum opinion and order denying L&R's motion for summary judgment in large part (as to L&R's claims for $1,255,802.66 in overpayments, $330,000 in "overcharges," and $14,125.60 in "understated contributions"), and granting the motion as to $35,428.30 in agreed-upon overpayments related to specific employees. (Dkt. No. 69, Mem. Op. & Order at 14-15.)

The case was reassigned to this Court in January 2015 and proceeded to trial. The Court conducted a bench trial on July 13, 14, and 15, 2015, during which the Court heard the parties' opening and closing arguments and testimony from several witnesses[3] and admitted a number of exhibits into evidence. The parties submitted proposed findings of fact and conclusions of law prior to trial and supplemental findings of fact and conclusions of law after trial. They also submitted post-trial memoranda.

---

[2]Defendant's calculations as set forth in its post-trial brief contain two errors. The amount sought in "agreed-upon overpayments" is $35,428.30, not $35,428.60. Accordingly, the grand total sought by defendant should read $1,635,356.56, not $1,635,356.86.

[3]Plaintiffs' witnesses were William Coli, Thomas Marino, Brian Regan, Robert MacArthur, and Nanette Kmiecik. Defendant's witnesses were William Francis and Vivian Mateega.

The Court has considered all the evidence. On the basis of the findings of fact and conclusions of law set forth below pursuant to Federal Rule of Civil Procedure 52, the Court will enter judgment in favor of the plaintiffs and against defendant as outlined below, with a $35,428.30 setoff.

## FINDINGS OF FACT

To the extent (if any) that the Court's findings of fact as stated may be deemed conclusions of law, they shall also be considered conclusions of law. In the same way, to the extent that the Court's conclusions of law may be deemed findings of fact, they shall also be so considered.

### A. The Parties

The Funds are self-insured, jointly-administered, multi-employer employee benefit funds. Plaintiff Teamsters Local Union No. 727 Health and Welfare Fund ("Welfare Fund") provides medical benefits, prescription drug benefits, short-term disability benefits, life insurance, dental insurance, vision insurance, and a member assistance plan to its participants and their beneficiaries. Plaintiff Teamsters Local Union No. 727 Pension Fund ("Pension Fund") provides retirement benefits to its participants. Plaintiff Teamsters Local Union No. 727 Legal and Education Assistance Fund ("Legal Fund") provides legal and educational assistance benefits to its participants. Each Fund is administered by a Board of Trustees ("Trustees").

William Coli has been the Manager of each Fund since 1993. Coli reports to the Trustees and is responsible for the day-to-day operations of the Funds. Robert MacArthur is employed by the Funds as a collection and field representative. He reports to Coli and is responsible for communicating with plan participants about benefits and with employers about contributions and audit findings. From 2007 through September 2010, MacArthur was the Funds' assigned field representative for System Parking, Inc. ("System Parking"), an employer.

Defendant L&R is a parking-property owner. L&R purchased System Parking and owned that company between 2008 and September 30, 2010. Because L&R is System Parking's successor, the Court will refer to L&R and System Parking interchangeably.

## B. The Collective Bargaining Relationships

The Funds receive contributions from employers who are obligated to contribute as parties to collective bargaining agreements ("CBAs") with the Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers, and Wash Rack Attendants Union, Local 727 ("Union"). About 280 to 300 employers participate in the Funds.

During the period for which the Funds claim delinquent contributions—January 1, 2003 to March 31, 2008—System Parking was a party to various CBAs with the Union. When L&R purchased System Parking, L&R assumed System Parking's obligation under the CBAs to make contributions into the benefit funds each month for full-time and part-time employees covered by the CBAs.

There are four applicable CBAs here. Two of them, one of which was effective from November 1, 2001 through October 31, 2006 ("2001-2006 Commercial CBA") and the other of which was effective from November 1, 2006 through October 31, 2011 ("2006-2011 Commercial CBA"), covered cashiers, hikers, attendants, porters, maintenance men, custodians, drive men, washers, collectors, customer service representatives, drivers, dispatchers, bellmen, doormen, working foremen, and all other garage and parking lot employees. Under those CBAs, which the Court will call the "Commercial CBAs," L&R was obligated to pay contributions to all three Funds. Two additional CBAs, one effective from July 1, 2000 through June 30, 2005 ("2000-2005 Valet CBA") and the other effective from July 1, 2005 through June 30, 2010 ("2005-2010 Valet CBA"),

4

covered employees performing valet services and will be referred to together as the "Valet CBAs." Both Valet CBAs require contributions to the Welfare Fund, and the 2005-2010 Valet CBA also requires contributions to the Legal Fund. The CBAs provide full-time employees with additional, different benefits from those of part-time employees.[4]

The relevant provisions of the 2001-2006 Commercial CBA are as follows:

**Article 9 - Holidays**

**9.1**    . . . . A holiday for which an employee is paid and during which he did not work shall be considered as time actually worked by him under the terms of this Agreement. . . .

**Article 14 - Vacations**

**14.5**    . . . . All hours worked or paid for (personal leave days, holidays, sick leave, bereavement pay) shall be considered as hours worked in determining compensation.

**Article 15 - Leave of Absence**

**15.3**    The Employer shall continue to contribute to the Health and Welfare Fund during FMLA leaves, to the extent required by law.

**Article 20 - Health and Welfare, Pension and Legal and Educational Assistance**

**20.1**    Health and Welfare

(a)  The Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2001 . . . . . . . . . . . . . . . . . . $290.00 per month
Commencing March 1, 2002 . . . . . . . . . . . . . . . . . . . . . $345.00 per month
Commencing March 1, 2003. . . . . . . . . . . . . . . . . . . . . $415.00 per month
Commencing March 1, 2004 . . . . . . . . . . . . . . . . . . . . . $485.00 per month

(b)  The Employer shall contribute monthly to Teamsters Local Union No. 727 Health and Welfare Fund on account of each part-time employee

---

[4]For instance, only full-time employees receive medical, prescription, short-term disability, and wellness benefits. (7/13/15 Tr. 24.)

covered by this Agreement the following:

Commencing November 1, 2001 . . . . . . . . . . . . . . . . . . . . $15.00 per month
Commencing March 1, 2002 . . . . . . . . . . . . . . . . . . . . . . $20.00 per month
Commencing March 1, 2003. . . . . . . . . . . . . . . . . . . . . . $25.00 per month
Commencing March 1, 2004 . . . . . . . . . . . . . . . . . . . . . .$ 2.80 per hour

(c)   Contributions due hereunder to the Health and Welfare Fund for all employees shall commence with the month of their employment.

(d)   The contribution due for the first month of employment shall be reduced by one-half for those full-time employees who start working on the 16th of the month or later.  Thereafter, the Employer shall remit the entire monthly contribution amount for all subsequent employment.

**20.2**   Pension

(a)   The Employer shall contribute to Teamsters Local Union No. 727 Pension Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2001 . . . . . . . . . . . . . . . . . . $105.00 per month
Commencing March 1, 2002 . . . . . . . . . . . . . . . . . . . . . . $110.00 per month
Commencing March 1, 2003. . . . . . . . . . . . . . . . . . . . . . $120.00 per month
Commencing March 1, 2004 . . . . . . . . . . . . . . . . . . . . . . $130.00 per month

(b)   The Employer shall contribute monthly to Teamsters Local Union No. 727 Pension Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2001 . . . . . . . . . . . . . . . . . . . . . $4.85 per day worked if the employee works ten (10) or more days per month
Commencing March 1, 2002 . . . . . . . . . . . . . . . . . . . . . . . $.65 per hour
Commencing March 1, 2003. . . . . . . . . . . . . . . . . . . . . . . $.70 per hour
Commencing March 1, 2004 . . . . . . . . . . . . . . . . . . . . . . . $.75 per hour

(c)   Contributions due hereunder for all new employees to the Pension Fund are to commence the first of the month succeeding that month in which such new employees have completed their probationary period.  For the purpose of this Section, a new employee is defined as an employee with no previous experience in the Parking Industry, or shall not have been in the continuous employment of the Parking Industry as a member of the Union.

(d)   Pension contributions shall be made on behalf of all other employees in covered employment under the terms and conditions of this Agreement on

the first of the month succeeding that month in which such employee begins his or her employment provided such employee has had previous experience in the Parking Industry and on whose behalf pension contributions have been previously made by an Employer signatory hereto.

**20.3**    Legal and Educational Assistance

(a)   The Employer shall contribute to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2001 . . . . . . . . . . . . . . . . . . . . . $10.00 per month
Commencing March 1, 2002 . . . . . . . . . . . . . . . . . . . . . . . $17.00 per month

(b)   The Employer shall contribute monthly to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2001 . . . . . . . . . . . . . . . . . . . . . $5.00 per month
Commencing March 1, 2002 . . . . . . . . . . . . . . . . . . . . . . . $  .10 per hour

(c)   Contributions due hereunder to the Legal and Educational Assistance Fund for all employees shall commence with the month of their employment.

**20.4**    It is agreed that Sections 20.1(a), 20.1(b), 20.2(a), 20.2(b), 20.3(a) and 20.3(b) will be automatically reopened on October 31, 2004 for the sole purpose of negotiating contribution rates to be effective March 1, 2005 and March 1, 2006[5]. . . .

**20.5**    For the purpose of contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds only, any part-time employee who averages over 32 hours per week over any 120 day period shall be considered a regular full-time employee and full-time employee contributions will be required.  Such employee shall not be removed from full-time contributions until another 120 day period elapses in which he does not average over 32 hours per week.

**20.6**    Part time per hour contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds are due only up to the amount of the applicable full time contribution.

**20.7**    No contributions to the Health and Welfare, Pension and Legal and

---

[5]The parties did not submit any writing containing these negotiated rates, but the Court can infer from their submissions that there were such negotiated rates as well as what those rates were, and there is no dispute about them.

Educational Assistance Funds shall be required on behalf of any employee who is on a leave of absence, except as required by law.

**20.8**     By the execution of this Agreement, each Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

**20.9**     It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare, Pension or Legal and Educational Assistance Funds created under this Agreement, in accordance with the rules and regulations of the Trustees of such Funds, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

(Pls.' Ex. 4.)[6]

The relevant provisions of the 2006-2011 Commercial CBA are as follows:

**Article 9 - Holidays**

**9.2**     A holiday for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement. . . .

**Article 12 - Sick and Personal Leave**

**12.6**     A sick or personal day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement.

**Article 14 - Vacations**

**14.7**     Employees shall receive vacation pay on the basis of average hours worked in the previous year. All hours worked or paid for (vacation, personal days, holidays, sick days, funeral leave pay) shall be considered as hours worked in determining compensation. Employees shall also accrue vacation while on Workers' Compensation.
. . .

---

[6]Plaintiffs offered Exhibits 1 through 26 and 30A, and defendant offered Exhibits 27 through 30 and 16A.

**14.9**   A vacation day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement.

**Article 15 - Leave of Absence**

**15.3**   The Employer shall continue to contribute to the Health and Welfare Fund during FMLA leaves, to the extent required by law.

**Article 20 - Health and Welfare, Pension and Legal and Educational Assistance**

**20.1**   Health and Welfare

> (a)  The Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each regular full-time employee covered by this Agreement the following:
>
> Commencing November 1, 2006 . . . . . . . . . . . . . . . . . . $575.00 per month
>
> Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.
>
> (b)  The Employer shall contribute monthly to Teamsters Local Union No. 727 Health and Welfare Fund on account of each part-time employee covered by this Agreement the following:
>
> Commencing November 1, 2006 . . . . . . . . . . . . . . . . . . . . . . $3.30 per hour
>
> Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.
>
> (c)  Contributions due hereunder to the Health and Welfare Fund for all employees shall commence with the month in which their employment begins; provided, however, that contributions to the Health and Welfare Fund on account of newly hired employees shall commence with their seventh (7th) month of employment.  For purposes of this Section, a newly hired employee is defined as an employee hired on or after November 1, 2006 for which no contributions were received by the Health and Welfare Fund within the six (6) months prior to hire.

**20.2**   Pension

> (a)  The Employer shall contribute to Teamsters Local Union No. 727 Pension Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2006 . . . . . . . . . . . . . . . . . . . $180.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)   The Employer shall contribute monthly to Teamsters Local Union No. 727 Pension Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2006 . . . . . . . . . . . . . . . . . . . . . $1.05 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c)   Contributions due hereunder for all new employees hired prior to November 1, 2006 to the Pension Fund are to commence the first of the month succeeding that month in which such new employees have completed their probationary period.  For the purpose of this Section, a new employee is defined as an employee with no previous experience in the Parking Industry, or shall not have been in the continuous employment of the Parking Industry as a member of the Union.

(d)   Contributions due hereunder to the Pension Fund for all employees shall commence with the month succeeding that month in which employment begins; provided, however, that contributions to the Pension Fund on account of newly hired employees shall commence with their thirteenth (13th) month of employment.  For purposes of this Section, a newly hired employee is defined as an employee hired on or after November 1, 2006 for which no contributions were received by the Pension Fund within the six (6) months prior to hire.

**20.3**   Legal and Educational Assistance

(a)   The Employer shall contribute to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2006 . . . . . . . . . . . . . . . . . . . . . $17.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)   The Employer shall contribute monthly to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2006 . . . . . . . . . . . . . . . . . . . . . . $.10 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c)   Contributions due hereunder to the Legal and Educational Assistance Fund for all employees shall commence with the month in which employment begins.

**20.4**   The contribution rates payable to the Health and Welfare, Pension and Legal and Educational Assistance Funds pursuant to Sections 20.1, 20.2 and 20.3 above shall be increased as follows:

(a)   It is agreed that the Employer shall contribute additional amounts over and above those required in Sections 20.1(a), 20.2(a) and 20.3(a) to the Health and Welfare, Pension and/or Legal and Educational Assistance Funds, combined, on behalf of each full time employee as follows:
Effective 3/1/2007. .$62.00 per month
Effective 3/1/2008 . . $67.00 per month (total increase of $129.00 per month)
Effective 3/1/2009 . . $72.00 per month (total increase of $201.00 per month)
Effective 3/1/2010 . . $78.00 per month (total increase of $279.00 per month)
Effective 3/1/2011 . . $84.00 per month (total increase of $363.00 per month)

(b)   The distribution of the additional contributions required in (a) above to the Health and Welfare, Pension, and/or Legal and Educational Assistance Funds shall be left to the decision of the Board of Trustees of the respective Funds, provided however, that at least 50% of the additional contributions to be effective March 1, 2007 and March 1, 2008 shall be allocated to the Pension Fund.

(c)   It is further agreed that the Employer shall contribute an equivalent additional hourly amount over and above those required in Sections 20.1(b), 20.2(b) and 20.3(b) to the Health and Welfare, Pension and/or Legal and Educational Assistance Funds on behalf of part time employees.

**20.5**   For the purpose of contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds only, any part-time employee who works one hundred twenty eight (128) hours or more in a calendar month shall be considered a regular full-time employee and full-time employee contributions will be required for that month.

**20.6**   [This provision is the same as in the 2001-2006 Commercial CBA.]

**20.7**   [This provision is the same as in the 2001-2006 Commercial CBA.]

**20.8**    [This provision is the same as in the 2001-2006 Commercial CBA.]

**20.9**    [This provision is the same as in the 2001-2006 Commercial CBA.]

(Pls.' Ex. 5.)

The relevant provisions of the 2000-2005 Valet CBA are as follows:

## Article 18 - Health and Welfare

18.1    Commencing March 1, 2001, the Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each employee covered by this Agreement and in the employ of such firm the sum of Fifteen Dollars ($15.00) per month.

18.2    Contributions due hereunder to the Health and Welfare Fund for all employees shall commence with the month of their employment.

18.3   No contributions to the Health and Welfare Fund shall be required on behalf of any employee who is on a leave of absence, except to the extent required by law.

18.4   By the execution of this Agreement, the Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such Fund, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

18.5   It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare Fund created under this contract, in accordance with the rules and regulations of the Trustees of such Fund, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

(Pls.' Ex. 6.)

The relevant provisions of the 2005-2010 Valet CBA are as follows:

## Article 19 - Health and Welfare and Legal and Educational Assistance

**19.1    Health and Welfare**

(a)    The Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each employee covered by this Agreement the following:

12

```
Commencing July 1, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . $15.00 per month
Commencing March 1, 2006 . . . . . . . . . . . . . . . . . . . . . . $20.00 per month
Commencing March 1, 2007. . . . . . . . . . . . . . . . . . . . . . $25.00 per month
Commencing March 1, 2008 . . . . . . . . . . . . . . . . . . . . . . $30.00 per month
Commencing March 1, 2009 . . . . . . . . . . . . . . . . . . . . . . $35.00 per month
Commencing March 1, 2010. . . . . . . . . . . . . . . . . . . . . . . $40.00 per month
```

**19.2    Legal and Educational Assistance**

(a)    If the Employer is not a Contributing Employer as defined in Section 19.2(b), the Employer shall contribute to the Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each employee covered by this Agreement the following:

```
Commencing July 1, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . $17.00 per month
```

(b)    A Contributing Employer means an Employer who is obligated to make contributions to the Legal and Educational Assistance Fund pursuant to the terms of the Collective Bargaining Agreement between the Union and the Employer covering residential and commercial locations (referred to as the Parking Industry Agreement).

**19.3**    Contributions due hereunder to the Health and Welfare and Legal and Educational Assistance Funds for all employees for which there are contributions due shall commence with the month of their employment.

**19.4**    No contributions to the Health and Welfare Fund or Legal and Educational Assistance Fund shall be required on behalf of any employee who is on a leave of absence, except to the extent required by law.

**19.5**    By the execution of this Agreement, the Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such Funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

**19.6**    It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare Fund or Legal and Educational Assistance Fund, in accordance with the rules and regulations of the Trustees of such Fund, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

(Pls.' Ex. 7.)

**C.      Contribution Procedure/Reports**

The Funds require all employers who contribute to the Funds to complete a Contribution Report Form/Remittance Report ("remittance form") each month when making contributions. System Parking reported its contributions by using these remittance forms.

The remittance form lists employees and the corresponding required monthly contributions. Each month, the Funds prepare a remittance form for each employer based on information the employer provided to the Funds in the previous month.  The Funds typically enter the current employees' names and social security numbers in the first columns of the remittance form.  The Funds also enter information in other columns to indicate the contribution amounts due (or the applicable rate to be used to calculate contributions for part-time employees) for each employee for each Fund.  Columns for full-time contributions are displayed on the left-hand side of the form, and columns for part-time calculations and contributions are listed on the right-hand side of the form. (Def.'s Ex. 28; Pls.' Ex. 30A.)  The remittance forms that System Parking used from 2003 to April 2007 contain a column for part-time contributions titled "# of Hrs. Worked"; from May 2007 on, that column is titled "# of Hrs."  (Def.'s Ex. 28.)

The Funds  send the partially-completed remittance forms to the employer, or, in more recent years, the employer uses an "employer portal" to access the form electronically.  The employer must complete the remittance form by indicating whether and when any employees have been terminated; listing new employees and their date of hire; calculating and providing the required contribution amounts for any employees whose information was not pre-printed by the Funds or for whom the pre-printed information is inaccurate; and (in earlier years) totaling the contribution amounts due on each sheet of the form.  The forms contain the following statement: "I hereby certify that the

information contained in this report is true and correct and hereby agree to accept and abide by the terms of the Trust Agreements of the above Funds, and by the terms of the applicable Local 727, I.B.T. Labor Agreement and any amendments." (Def.'s Ex. 28; Pls.' Ex. 30A.) After completing the forms, a representative of the reporting employer signs the form on the line below that statement, which calls for an "Authorized Signature." (*Id.*) The reverse side of the remittance form contains "Instructions for Monthly Contribution Payments," which tell employers to verify the accuracy of the report, determine the contribution amounts due based on the requirements of the applicable CBA, make all appropriate changes, and return the completed forms to the Funds' office with the appropriate contributions. (Pls.' Ex. 30A.)

The information provided by employers on the remittance reports is entered into the Funds' database. The Funds rely on the information contained in the reports to extend benefits, calculate pension credit, and provide insurance eligibility information to insurance carriers, claims processors, and third-party administrators. As a matter of course, the Funds do not receive employers' payroll records and accordingly cannot independently determine whether the information reported by an employer on a remittance form is accurate. (7/13/15 Tr. 46.)

D.     **The Audit**

To ensure that participating employers have remitted all required contributions, the Funds hire an outside accounting firm to conduct regular "rotational" payroll audits. Each employer is audited every three years. (Pls.' Ex. 14, 6/25/08 Statement of Audit Procedures at 1; 7/13/15 Tr. 53.) In 2008, the Funds conducted an audit of System Parking's payroll records for the period of January 1, 2003 through March 31, 2008. According to Coli, the System Parking audit began as a "rotational" audit but was expanded to encompass a longer period of time in order to also act as an "exit" audit because of System Parking's impending change of ownership. (7/13/15 Tr. 54.)

15

The Funds hired the accounting firm of Bansley & Kiener, LLP ("B&K") to conduct the System Parking audit. B&K employees Thomas Marino and Brian Regan performed the audit. Marino is employed by B&K as a payroll audit supervisor; he is in charge of all audits that B&K conducts for the Funds. Marino supervises Regan, who is employed by B&K as a compliance auditor. Gary Pater of B&K was also involved in the communications with System Parking. System Parking sent its payroll records to B&K in electronic format on a CD-ROM. The Funds provided B&K with copies of the applicable CBAs and the Funds' electronic records of System Parking's contribution payment history.

Because the System Parking audit encompassed nearly two thousand employees and was thus larger than most of B&K's audits, Marino and Pater then met with a programmer from a consulting firm to develop a computer program that would create an audit report to calculate the proper contribution amounts for each employee and any deficiencies in System Parking's contributions. Marino and Pater told the programmer what information they wanted to include in the audit report and provided him with the criteria contained in the CBAs for contribution rates and determining full-time and part-time status. They told the programmer to include and consider in the report all hours paid to employees (including paid holidays and sick leave) when calculating the contribution amounts due, not simply the hours that the employees had worked. (*Id.* 152.) The programmer was also told to "zero out" any overpayments System Parking had made by calculating the required monthly contribution amount as either the amount due under the CBA or the amount System Parking had paid, whichever number was higher. (7/14/15 Tr. 209.) This was done because as a practice, the Funds' auditors look only for underpayments and do not consider employers' overpayments. (7/13/15 Tr. 95, 133-34; 7/14/15 Tr. 215.)

The programmer created a computer program, entered the information provided by the Funds

and System Parking, and generated a working rough draft of an audit report. (7/13/15 Tr. 152-53.) Marino and Regan reviewed the rough draft by randomly sampling hundreds of employees and manually calculating the appropriate contributions and then conferred with the programmer in a process of revisions to correct errors. (*Id.* 154-57.) Eventually B&K reached a point where it resolved the errors to its satisfaction, and on December 12, 2008, Marino sent a preliminary report of B&K's initial audit findings to System Parking.

System Parking responded on December 31, 2008 in a letter from John Phillips, its Chief Operations Officer. Phillips pointed to several purported errors in the audit report, and he also stated that "[w]hen we were litigating the previous audit,[7] Local 727 assured System Parking that the next audit would cover not only shortfalls, but overpayments. I was disappointed but[8] I did not see any overpayments." (Def.'s Ex. 16A.)[9]

In a letter dated March 20, 2009, Marino replied, stating that B&K had considered all of the information addressed by Phillips and had made the necessary revisions. (Pls.' Ex. 17.) Marino attached a "revised preliminary draft for review and discussion purposes only." (*Id.*) In the letter, Marino specifically discussed each issue raised by Phillips except the overpayments and stated that

---

[7]In December 2005, the Funds had sued System Parking for delinquent contributions, and that case was settled. (Dkt. No. 104, Def.'s Proposed Findings of Fact ¶¶ 11-12; Dkt. No. 118, Pls.' Resps. ¶¶ 11-12.) Except to explain Phillips's comment, that case is immaterial to the present case.

[8]Phillips's use of the word "but" was probably a typographical error; given the context, the word should have been "that."

[9]Over plaintiffs' objection, the Court admitted this portion of Phillips's letter not for the truth of the statement, but because defendant offered it to show its effect on Marino. (7/13/15 Tr. 103-05; 7/14/15 Tr. 275-76.) Earlier in this litigation, defendant had relied to some extent on this alleged agreement, but at trial it abandoned that reliance and failed to introduce any evidence or develop legal argument about it. In the Court's view, Phillips's statement is relevant to show how early in the audit process System Parking was claiming unspecified overpayments.

he would be in touch to schedule a meeting to review the findings. The preliminary draft report B&K issued on March 20, 2009 claimed that System Parking was deficient in its contributions to the Funds in the amount of $808,525.94, excluding interest, liquidated damages, and audit fees. (*Id.* at Bates No. 4385, 4437.)

Some time in early 2009, MacArthur reviewed the audit report to verify that the correct contribution rates were being used, missing contributions indeed had not been paid, and the trigger for the contribution requirement for newly-hired employees (which varied depending on which Commercial CBA applied) was calculated correctly. (7/14/15 Tr. 248-49.) MacArthur found errors with the latter two types of calculations, which were corrected. (*Id.* 249.)

The auditors and representatives of the Funds then met with System Parking's representatives on five occasions between April 9, 2009 and March 19, 2010. At the April 9, 2009 meeting, Marino, Pater, Coli, MacArthur, and Phillips reviewed the preliminary audit report and discussed a number of issues. MacArthur testified that at this meeting, there was discussion about, among other things, Phillips's concern that the audit had not taken into account any overpayments System Parking had made. (*Id.* 250-51.) MacArthur stated: "It was explained to [Phillips] that . . . it was not the parameters of the audits to look for overpayments; it was strictly for the underpayments, and that would have been a conflict of interest for the auditors to look for overpayments on behalf of System Parking." (*Id.* 251.) Marino also recalled this discussion and testified that Coli had explained to Phillips that Phillips would have to "do the research himself" about any overpayments and "if he felt anything was owed to [System Parking], then he would have to present it to the Fund office." (7/13/15 Tr. 160-61.) Coli, on the other hand, testified that there was no discussion about overpayments at the April 2009 meeting. (*Id.* 60.) Because both MacArthur and Marino remembered that the April 2009 meeting included this discussion, and

because the Court found them to be credible and reliable witnesses and generally remembered more details about the audit process than did Coli,[10] the Court finds that there was such a discussion about overpayments at the April 9, 2009 meeting.

After the meeting, Marino sent a letter to Phillips on April 30, 2009 in which Marino memorialized an agreement between the auditors and System Parking that any time an employee had a "significant break" in employment, which they agreed was three months or more, that employee could switch coverage from the Commercial CBA to the Valet CBA. (Pls.' Ex. 18.) Marino stated further that he was attaching a schedule that identified all of System Parking's employees who "switched" CBAs during the audit period and showed any corresponding reduction in System Parking's contribution deficiency. (*Id.*) The total "possible deficiency reduction" on the attached schedule is $35,428.30. (*Id.* at 5.) The Funds admit that L&R is entitled to a refund of $35,428.30, and, as described above, the court previously granted L&R's motion for summary judgment as to this portion of the counterclaim.

Between April and August 2009, Phillips called Marino to discuss the audit's calculations under the "120-day rule" as set forth in Article 20.5 of the 2001-2006 Commercial CBA (which provides that for the purpose of contributions to the Funds, a part-time employee who averages more than 32 hours per week over any 120-day period shall be considered a regular full-time employee, and full-time employee contributions are required). (7/13/15 Tr. 168.) The audit program was not calculating this "rolling average" correctly, so Marino corrected the problem after consulting with B&K's programmer. (*Id.*) During the same period, MacArthur had many emails and conversations with Phillips in an effort to get an update on System Parking's progress with its review of the

---

[10]Coli admittedly did not recall all of the details about the meetings and communications with System Parking and L&R. (E.g., 7/13/15 Tr. 58, 61, 62.)

preliminary audit report. (7/14/15 Tr. 252.) Phillips mentioned the overpayments again, and MacArthur told him that overpayments were outside the scope of the audit and that if Phillips wanted a refund, he would have to present a written request to the Trustees with "all the specific information." (*Id.* 252-53.)

On August 19, 2009, Marino, Regan, and MacArthur met with Phillips; Todd Tucker, System Parking's regional manager and general counsel; and Matt Hafeli, System Parking's intern, to discuss whether System Parking had any additional issues with the revised preliminary audit report. (7/13/15 Tr. 168-69.) Hafeli showed Marino a schedule he had created on his computer that contained System Parking's disputes, and they reviewed a few particular employees as examples. (*Id.* 169-70.) When Hafeli showed Marino System Parking's "detailed payroll records" for these employees, Marino saw that System Parking had "crossed out" various hours paid to the employees for holidays and vacations. Marino asked why System Parking had done so. (*Id.* 170-71; 7/14/15 Tr. 242.) System Parking's response was that those hours had not been worked, and a discussion ensued during which either the Funds' representatives or the auditors (it is unclear who, exactly) said that "all hours paid should be reflected in determining employer contribution." (*Id.* 171.) The meeting ended with Hafeli agreeing to email Marino the records he had shown him on the computer and Marino and Regan agreeing to review the issues that had been discussed, make any appropriate revisions to the preliminary audit report, and send a revised report to System Parking. (*Id.* 172.)

On October 5, 2009, Marino sent a letter to Phillips to which he attached a report that incorporated "numerous" revisions B&K had made as a result of the August meeting. (Pls.' Ex. 20.) The revised report included reductions to the stated deficiency with regard to certain contributions that had been paid and were verified with the Funds' office; certain employees who worked at locations not covered by the CBAs; and certain hours that the computer program had double counted

due to an error.  (*Id.*; 7/13/15 Tr. 175-76.)  The total amount of those reductions was about $210,000.  (7/13/15 Tr. 176.)  The revised report contained a $330,000 increase in the stated deficiency, however, based on the hours paid vs. hours worked issue.  Marino stated in the letter: "During our meeting it was brought to your attention that you were incorrectly remitting contribution [sic] based on hours worked only.  We have also adjusted our report to reflect all hours paid rather than just the hours worked.  As a result of this adjustment you will see that the total deficiency has increased compared to our last report."  (Pls.' Ex. 20.)  Until Marino saw the supporting documentation on which Hafeli relied during the August 2009 meeting, B&K had been unaware that System Parking had been making contributions on an "hours worked" basis, and that is why previous versions of the preliminary audit report were inaccurate in that regard.  (7/13/15 Tr. 177.)  No one from the Funds' office had instructed B&K to revise the audit to capture hours that were paid but not worked.  (*Id.*)  The revised total deficiency was $931,366.29, excluding interest, liquidated damages, and audit fees.  (Pls.' Ex. 20 at Bates No. 4313, 4363.)

The next meeting of representatives from B&K, the Funds, and System Parking occurred on November 4, 2009.  At this point, Phillips was no longer involved in the meetings, and the newcomer to the group was Vivian Mateega, who was System Parking's Regional Human Resources Director from the beginning of 2009 to July 2011.  (7/13/15 Tr. 61-62; 7/14/15 Tr. 258-59; 7/15/15 Tr. 347.)  Mateega had questions about the contributions due for hours paid, as well as the employees who had "moved" from a Commercial CBA to a Valet CBA.  (7/14/15 Tr. 258.)  Those matters were discussed, and Marino agreed to provide Mateega with a list of the employees who had had a three-month break in employment and a coverage change.  (*Id.*)  Another meeting was scheduled for November 24, 2009.

On November 9, 2009, Marino sent a letter to Tucker "[a]s a follow up to" the November

4 meeting.  (Pls.' Ex. 21.)  In that letter, Marino explained precisely what reductions in the stated deficiency had been made for each of the three categories identified in his October 5 letter.  (*Id.*) He also explained the increase in the delinquency for hours paid as follows:

> [B]ased on the additional information provided to us it became apparent that contributions were based solely on hours worked, instead of all hours paid.  Our original report only captured the pay codes for regular and overtime hours worked[;] as discussed during our August 19, 2009 meeting[,] pay codes for all hours paid would be included in our report.  This accounted for the most significant change to our preliminary report, increasing the total deficiency by about $330,000.  Not only does this affect how the part-time contributions are calculated, but it also affects employee status.  Not including all hours paid affects an employee's 120 day rolling average and whether they should be classified as a part-time or full-time employee.

(*Id.*)  Marino did not get a response from Tucker.  (7/13/15 Tr. 177.)

Marino, Regan, MacArthur, and Mateega attended the November 24, 2009 meeting.  (*Id.* 178; 7/14/15 Tr. 259.)  Mateega told the others that Phillips was no longer employed by System Parking, and she asked various questions about the audit and asked the auditors to send her a copy of the preliminary report.  (7/13/15 Tr. 178.)  According to MacArthur, the meeting was short, and Mateega stated that an employee of L&R was going to review the audit report with her.  (7/14/15 Tr. 259-60.)

After the November 24 meeting, B&K sent a copy of the most recent preliminary audit report to Mateega, and at Mateega's request, Marino "walked through" the report with her, using one employee as an example, to explain the information contained therein.  (*Id.* 183-84.)  MacArthur followed up with Mateega to check on her progress in reviewing the report.  (*Id.* 260.)  At the end of January 2010, MacArthur was told that the audit was "being turned over to [] Venishia Price at L&R."  (*Id.*)  When MacArthur was able to speak with Price after several attempts, Price told him that she was going to review B&K's audit to compare it to L&R's internal audit.  (*Id.*)  MacArthur was later told that William Francis (who was L&R's vice president of internal audits at the time)

was going to contact the Funds' office to set up a meeting, which was scheduled for March 19, 2010. (*Id.* 261; 311.)

Francis had become involved in the matter when, some time after October 5, 2009, Gary Gower, who was System Parking's comptroller, gave Francis the assignment of reviewing System Parking's audit. (7/14/15 Tr. 311, 318-19; 7/15/15 Tr. 394-95.) At that time, Gower gave Francis the auditors' "Individual Detail Report," which is a document dated September 2009 that consists of 1803 pages. (Def.'s Ex. 29.) The individual detail report lists each of the covered employees and the hours for which those employees were paid, by month (including the 120-day "rolling average" hours and the weekly average, for purposes of calculating contributions under § 20.5 of the 2001-2006 Commercial CBA); the contributions the auditors calculated were owing (or, if System Parking had made a greater contribution than what the auditors calculated to have been owing, the amount that was paid); the amount of System Parking's actual contribution; and any deficiencies. (*Id.*; 7/14/15 Tr. 201-209.) Prior to the March 2010 meeting, Francis reviewed the data for some of the employees listed in the individual detail report. (7/14/15 Tr. 319.) He calculated "what [he] thought was . . . owed and what the auditors . . . thought was owed" and concluded that "every time there was an underpayment, it was correctly calculated by the auditors. Every time there was an overpayment, the auditors agreed with what L&R paid as being the correct amount." (*Id.* 320.)

Present at the March 19, 2010 meeting were Marino, MacArthur, Francis, and Mateega. (*Id.*

185, 261; 7/15/15 Tr. 379.)[11]  According to Francis, the purpose of the meeting was to "go through the rules of the CBA, the interpretation of the CBA to make sure that there weren't any major problems in the interpretation of the CBA." (7/15/15 Tr. 321.)  MacArthur recalled that Francis had stated that he was concerned with the accuracy of the audit and wanted to review how B&K "came up with their numbers to see if [L&R's] review was compatible with that."  (7/14/15 Tr. 261.)  Marino stated that Francis raised questions about the audit report that were similar to Mateega's previous questions.  He also stated that he reviewed specific employees in the report with Francis to explain what information was contained in various columns and how B&K had arrived at its calculations.  (*Id.* 186.)  According to Marino, Francis did not give the auditors any documents at that meeting, nor did he mention anything about L&R's own internal audit.  (*Id.*)  Francis did not recall if he complained that the Funds had not accounted for overpayments.  (*Id.* 322.)

After the March 2010 meeting, Francis took the Individual Detail Report and, with the assistance of two L&R employees, "put it on an Excel spreadsheet . . . with the help of a programmer to compute the different rates during the different periods and basically duplicated Mr. Marino's audit." (*Id.* 320, 323.)  The resulting report was admitted as L&R's Exhibit 27 and is discussed in greater detail below.

Marino did not hear from anyone at System Parking or L&R again.  (*Id.* 187.)  MacArthur did not hear from anyone at System Parking or L&R, but did receive a telephone call from L&R's

---

[11]It appears that these four people, at least, were present at the meeting.  The witnesses' testimony varied regarding who else was there.  MacArthur stated that he, Marino, Regan, Coli, and Francis attended.  (7/14/15 Tr. 261.)  Marino stated that he, Pater, Mateega, and Francis attended. (*Id.* 185.)  Mateega could not recall the date of the meeting, and stated that she had only attended one meeting with the auditors, but believed that she and Francis met with the auditors in March 2010. (7/15/15 Tr. 365, 379.)  Francis stated that he did not recall who was at the meeting other than himself, Mateega, Marino, "and there may have been one or two other people from the Funds." (7/14/15 Tr. 322; 7/15/15 Tr. 395.)

counsel, who stated that he was "taking the audit now." (*Id.* 261-62.) On April 23, 2010, L&R's counsel sent a letter to Coli that demanded that the Funds credit L&R "$680,359.78 for contributions System [Parking] did not owe during the audit period and for overpayments of full-time contributions System [Parking] made for employees who actually worked part-time hours." (Pls.' Ex. 24 at Bates No. 4694.)

Because it appeared that the Funds and L&R were at an impasse, Coli directed B&K on May 3, 2010 to issue a final audit report for System Parking. (7/13/15 Tr. 63-64; Pls.' Ex. 22.) Before issuing the final audit report, Marino reviewed a sampling of the calculations contained therein to ensure that the report was accurate. (7/14/15 Tr. 190-91.) B&K issued the final audit report on May 13, 2010. (Pls.' Ex. 23.) This litigation ensued.

**E.     The Trust Agreement and the Funds' Refund Policy**

The Trustees of each Fund are governed by a Restated Agreement and Declaration of Trust ("Trust Agreement"). (Pls.' Ex. 8, Welfare Fund Trust Agreement; Pls.' Ex. 9, Pension Fund Trust Agreement; Pls.' Ex. 10, Legal Fund Trust Agreement.) Each Fund's Trust Agreement is dated July 25, 2000 and contains the same language with regard to the Trustees' powers, duties, and obligations and the collection of contributions.[12]   (*Id.*)

The relevant provisions of the Trust Agreements are as follows:

ARTICLE FIVE - POWERS, DUTIES AND OBLIGATIONS OF THE TRUSTEES

5.10.   The Trustees are hereby authorized to formulate and promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the proper administration of the Trust or Plan. All rules and regulations adopted by majority action of the Trustees for the administration of the Trust Fund shall be final and binding upon all parties hereto, all parties dealing with the Trust, and all persons claiming any benefits hereunder. The Trustees shall have the exclusive authority and

---

[12]The paragraph numbers are also the same in each Trust Agreement.

25

discretion to interpret and apply this Trust Agreement and the . . . Plan, including questions involving eligibility for benefits and the standard of proof to be required in any matter, and all such interpretations and applications shall be final and binding upon all parties and claimants. . . .

## ARTICLE SIX - CONTRIBUTIONS

6.01.  (a) The Contributions of the Employers shall be made to the Fund, in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees.  Each Employer agrees that there shall be an absolute obligation to the Trust Fund, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union.  The Trustees shall give consideration to the contribution rate in determining the benefits of any Plan maintained or adopted. . . .

(b)  The Trustees may compel and enforce the payment of Contributions in any manner which they deem proper . . . .  Expenses incurred in the collection of such Contributions shall be paid from the Trust Fund, even though such expenses are subject to reimbursement by the delinquent Employer.

6.02.  The failure of an Employer to pay Contributions by the date established by the Collective Bargaining Agreements or, if no date is set by the Collective Bargaining Agreement, by the rules and regulations adopted by the Trustees shall constitute a violation of the applicable Collective Bargaining Agreement between such Employer and the Union, as well as a violation of the Employer's obligations hereunder.

The Trustees shall have the right to adopt rules and regulations relating to the collection of Employer Contributions, including provisions for time of payment, collection of interest, audit fees, attorneys' fees at the rate set by the Trustees in their sole discretion, costs, and liquidated damages as specified in this Section.  An Employer in default as of the date established by the Collective Bargaining Agreement or the Trustees for payment of Contributions shall be liable for an additional amount of twenty percent (20%) of the delinquent payment or $50.00, whichever is greater, and interest at the rate set forth in the Plan or the rules and regulations.  In the absence of a rate set forth in the Plan or rules and regulations, the interest rate used each month shall be the prime rate plus one percent (1%), as reported in the Wall Street Journal on the first business day of each month. Liquidated damages shall compensate the Fund for some or all of the damages arising from lost earnings, administrative costs, uncertainties causing difficulties in forecasting earnings and managing investments, the disruptive effects to the benefit system of unequal performance of obligations among Employers, and the potential liability of Trustees for transactions prohibited by federal law. . . .

6.04.  Nothing in this Restated Agreement shall prevent a Contribution which is made by an Employer by a mistake of fact or law to be returned by the Trustees to such Employer, upon written request, within twelve months after the Trustees

determine that the Contribution was made by such a mistake.

(Pls.' Exs. 8, 9, & 10.)

On September 30, 2009, the Trustees adopted for each Fund a "Policy for Erroneous Payments and Overpayments Made by an Employer" ("Refund Policy"), which provides that absent extenuating circumstances or "unanticipated equitable considerations," as determined by the Trustees in their sole discretion, no contributions will be refunded more than one year after the Funds' office receives them. (Pls.' Ex. 12 at 2.) The Refund Policy also states that any employer requesting a refund of contributions must send a written request to the Funds' Administrator and that the employer must "conclusively demonstrate" that the contributions at issue were made in error. (*Id.*)

## CONCLUSIONS OF LAW AND APPLICATION OF FACTS TO LAW

The Court has jurisdiction pursuant to 29 U.S.C. §§ 185 and 1132. The Funds are trust funds and multiemployer employee benefit plans within the meaning of the LMRA, 29 U.S.C. § 186(c)(5), and ERISA, 29 U.S.C. § 1002(3) and (37). The Trustees of the Funds are fiduciaries of the Funds within the meaning of ERISA, 29 U.S.C. § 1002(21). The Funds are not parties to the relevant CBAs, but they are third-party beneficiaries authorized to pursue collection under 29 U.S.C. § 1132. L&R is an employer within the meaning of the LMRA and ERISA.

### A.    Hours Worked Versus Hours Paid

The LMRA requires a written agreement that creates the obligation to make contributions to an employee benefit trust fund. 29 U.S.C. § 186(c). Under ERISA, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29

U.S.C. § 1145. The Seventh Circuit has "emphasized the centrality of the collective bargaining agreement" in a claim for delinquent contributions. *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 730 (7th Cir. 1996) (hereinafter *Kroger I*). "It is the collective bargaining and contribution agreements which establish the employer's obligation to the . . . fund." *Id.* (internal quotation marks and brackets omitted).

In her March 31, 2014 memorandum opinion, Judge Kendall held that the language in the Commercial CBAs is ambiguous because it supports different reasonable interpretations of the proper method of calculating L&R's required contributions to the Funds. *Teamsters Local Union No. 727 Health & Welfare Fund v. L & R Grp. of Cos.*, No. 11 C 1747, 2014 WL 1292793, at *6 (N.D. Ill. Mar. 31, 2014).

"When considering a contract in the context of an ERISA claim, federal common law rules of interpretation apply." *Kroger I*, 73 F.3d at 731; *see also Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 838 (7th Cir. 2012). These rules instruct the Court to interpret the CBAs "in an ordinary and popular sense, as they would be understood by a person of average intelligence and experience." *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 632 (7th Cir. 2010) (internal quotation marks and brackets omitted). The Court must construe each contract as a whole, "considering separate provisions in light of one another and in the context of the entire agreement." *Schultz*, 670 F.3d at 838 (citing *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010)).

Sections 20.1(b), 20.2(b), and 20.3(b) of the Commercial CBAs and section 20.5 of the 2001-2006 Commercial CBA are ambiguous because they require System Parking to make contributions with respect to part-time employees on a "per hour" basis (or, in the case of section 20.5, provides that a part-time employee who averages "over 32 hours per week" for an 120-day period shall be

28

treated as a full-time employee for contribution purposes), without specifying whether the required amount is per hour *worked* by the employee or per hour for which the employee was *paid*. Because the Commercial CBAs are ambiguous, the Court, as the trier of fact, resolves questions of their interpretation. *See Kroger I*, 73 F.3d at 732. "When a court is interpreting an ambiguous term, the task of the court is to determine what the contracting parties intended the clause to mean." *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 911 (7th Cir. 2000) (internal quotation marks and ellipsis omitted), *as corrected by* 241 F.3d 842 (7th Cir. 2001). The Court is permitted to look at extrinsic evidence to determine the meaning. *Id.*

The Funds emphasize that a contract should be read as a whole, and they rely on several aspects of the contractual language in support of their argument that the CBAs required System Parking to make contributions based on hours paid to employees. (Dkt. No. 137, Pls.' Post Trial Mem. at 2-3.) The Funds begin with the provision in each CBA that a paid holiday on which an employee does not work is considered time actually worked "under the terms of [the] Agreement." (Pls.' Ex. 4, § 9.1; Pls.' Ex. 5, § 9.2.)[13] Furthermore, in the article titled "Vacations," the Commercial CBAs provide that all hours worked or paid for, such as personal days, holidays, sick leave, or bereavement or funeral leave (and the 2006-2011 Commercial CBA adds the word "vacation"), "shall be considered as hours worked in determining compensation." (Pls.' Ex. 4, § 14.5; Pls.' Ex. 5, § 14.7.) The 2006-2011 CBA has additional provisions stating that a sick, personal, or vacation day for which an employee is paid but does not work is considered time actually worked under the terms of that agreement. (Pls.' Ex. 5, §§ 12.6, 14.9.)

---

[13]The Funds also cite corresponding provisions of the Valet CBAs, but do not explain why those agreements are relevant to the interpretation of the Commercial CBAs. Because the Valet CBAs require contributions strictly on a per-employee basis and not on a per-hour basis, they do not contain the same ambiguity as the Commercial CBAs. Their language is not at issue.

According to the Funds, the phrase "in determining compensation" does not imply an exclusion of hours paid but not worked from consideration in determining required contributions, because "compensation" includes both wages and benefits, according to Seventh Circuit case law and the Illinois Wage Payment and Collection Act ("IWCA"). (Pls.' Post Trial Mem. at 3-4 (citing *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 652 (7th Cir. 2001) ("The market determines compensation, which is the sum of wages and fringe benefits . . . .") and the IWCA, 820 ILCS 115/2 (defining "final compensation" to a "separated employee" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties")). The Funds further assert that L&R's witnesses, William Francis and Vivian Mateega, "are in agreement" with this definition of compensation because they both acknowledged at trial that they consider the benefits L&R gives them to be part of their compensation package. (Pls.' Post Trial Br. at 4.)

L&R first cites the language of the CBAs in support of its contention that it was required to contribute to the Funds only for hours actually worked by System Parking's employees. In L&R's view, because the CBAs expressly require certain hours paid to be considered as hours worked "in determining compensation," and do not include the same language in the articles titled "Health and Welfare, Pension and Legal and Educational Assistance" where the contribution obligations are contained, "the CBAs implicitly require contributions regarding benefits to be based solely on 'hours worked.'" (Def.'s Post-Trial Br. at 34-35.) L&R also relies upon a limited amount of extrinsic evidence, arguing that "the Funds initially appeared to interpret the CBAs" as requiring contributions based on hours worked, for three reasons: 1) the Funds used a remittance form that contained a column titled "# of Hrs. Worked"; 2) during the audit period, the Funds never told

30

System Parking that contributions should be made based on hours paid; and 3) the Funds "did not assert that contributions were to be made based on hours paid (resulting in a $330,000.00 addition to the alleged deficiency) until L&R pointed out over $200,000.00 in errors in the Funds' preliminary audit." (*Id.*)

It is important to recognize that when construing an ambiguous contract, the Court must attempt to determine the intentions of the *contracting parties*. Here, the parties to the CBAs at issue were the Union—not the Funds—and System Parking, so the Court considers only those entities' intentions. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, No. 93 C 3669, 1998 WL 128715, at *2 (N.D. Ill. Mar. 17, 1998) ("[I]t is not the intentions of the plaintiff [Pension Fund], but the terms of the CBA and the way those terms were understood by the union and [the employer] that govern the [Fund's] claims.").[14] L&R's evidence of what it contends was the Funds' understanding is thus irrelevant, as is the Funds' evidence of Francis and Mateega's understandings of what constitutes "compensation." Neither the Funds nor L&R introduced evidence of what the individuals who negotiated the CBAs intended or other extrinsic evidence that would assist the Court, so the parties are left with simply the Commercial CBAs themselves.

In attempting to ascertain the intent of the Union and System Parking, the Court relies principally on the fundamental rule that contracts must be read as a whole. It is true, as L&R points out, that Article 20 of the Commercial CBAs does not contain any language stating that "hours" means "hours paid" and does not contain the provisions that the Funds rely on regarding what is considered hours worked. But Article 20 does not contain *any* language that indicates whether

---

[14]Even if the Funds' intentions were relevant, any statements or conduct by the Funds that occurred *after* the CBAs were executed are irrelevant, for "post-formation interpretations say nothing about what was intended at the time in which the parties entered into the agreement." *See Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1299 (7th Cir. 1992).

System Parking owes contributions based on hours worked by employees or hours paid to them, and both are reasonable possibilities. Therefore, the Court must consider the contribution obligations in light of other provisions of the CBAs, which provide that the time paid to employees for holidays, vacations, sick leave, personal leave, and bereavement leave is considered time that the employees worked, either "under the terms of this Agreement" or "in determining compensation." The Court interprets the phrase "under the terms of this Agreement," used with respect to paid holidays in both Commercial CBAs and also paid vacation, sick leave, and personal leave in the 2006-2011 Commercial CBA, to mean that that kind of time should be considered to have been time worked, generally, under *all* provisions of that agreement, including the sections that set out System Parking's obligations to the Funds.

As for the phrase "in determining compensation," it is the Court's view that it means that the contractually-specified time for which the employee was paid but did not work also must be considered time that the employee worked, for purposes of System Parking's contribution obligations. L&R maintains that "compensation" means wages but not benefits, but it cites no authority for that proposition, which is contrary to the Seventh Circuit's view (stated in an ERISA context) that "compensation" includes not just wages but also benefits.[15] *See Gustafson*, 258 F.3d at 652. L&R's interpretation of the terms "hour" and "compensation" run afoul of the principle that ambiguous contractual phrases derive their meaning from the context of the entire agreement and the consideration of other contract provisions. In light of those provisions, the Court agrees with the Funds' interpretation of the CBAs. System Parking was therefore obligated to make contributions to the Funds on the basis of hours paid to employees.

---

[15]The Court is not persuaded, however, by plaintiffs' reliance on the IWCA's definition of compensation. Plaintiffs do not explain why the IWCA is relevant to interpreting the CBAs.

It is undisputed that during the audit period, System Parking calculated its required contributions to the Funds based on the hours that its covered employees worked and not for additional hours for which those employees were paid. That method of calculating the contributions owed to the Funds violated the Commercial CBAs. Thus, the Court will enter judgment in favor of plaintiffs and against defendant on defendant's counterclaim for $330,000 in "overpayments reflecting contributions based on hours paid, as opposed to hours worked." (Def.'s Post-Trial Br. at 2.)

**B.      Delinquent Contributions**

In order to prevail on their claim for delinquent contributions, the Funds must show by a preponderance of the evidence that System Parking failed to make contributions in accordance with the terms of the CBAs. The Funds assert that L&R is delinquent in its contributions to the Funds in the amounts stated in B&K's final audit report of May 13, 2010: $669,395.20 for the Welfare Fund; $231,913.98 for the Pension Fund; and $26,848.76 for the Legal Fund, (Pls.' Ex. 23 at 1802), for a total deficiency of $928,157.94.

The Funds presented detailed testimony from Thomas Marino[16] regarding how B&K performed the audit, using System Parking's payroll records and the Funds' payment history records; how the provisions of the CBAs were applied to calculate the required contributions; what

---

[16]L&R points out that Marino is not a certified public accountant. The Court finds, however, that he was qualified to perform the System Parking audit. Marino performed the audit as an employee of an independent accounting firm, B&K, that issued the final audit report. Marino had experience with conducting contribution audits. He testified that he has worked for B&K since February 2003 and that prior to the Systems Parking audit, he had performed other audits for the Funds, including audits for employers in the parking industry. (7/13/15 Tr. 142-43.) Marino also testified that the CBAs at issue are substantively identical to other collective bargaining agreements in the parking industry, and when performing the System Parking audit, he applied the provisions of the CBAs in the same way that he had in previous audits. (7/14/15 Tr. 196-97.)

instructions B&K gave the programmer who constructed the audit program; and how the contribution delinquencies were calculated. Marino testified that he and Regan manually performed calculations on a sample of hundreds of employees to check for errors at both the preliminary draft and final draft stages. The correspondence plaintiffs submitted, as well as the testimony of Marino and other witnesses, indicates that B&K responded to the issues System Parking raised during the audit review process and made all necessary corrections and adjustments accordingly. The Court finds that B&K's methodology in creating the final audit report was reliable and in accord with the applicable CBAs and that the information contained in the final audit report, including the calculations of the amounts by which System Parking was delinquent in its contributions to the Funds, is accurate. L&R failed to submit any evidence to contradict the final audit report. Accordingly, the Funds have proven by a preponderance of the evidence that System Parking failed to make contributions in accordance with the terms and conditions of the governing CBAs.

L&R emphasizes that it made $18,818,658.21 in contributions to the Funds for the audit period. Its sole objection to the final audit report is that the report "zeroed out" overpayments, that is, failed to credit System Parking for monthly contributions that were greater than the amount B&K calculated was owing based on the payroll records. (Def.'s Post-Trial Br. 30-32.)[17] This argument conflates the distinct issues of delinquencies and "overpayments" and is a thinly-veiled attempt to shift the burden of proof to plaintiffs on defendant's claim for restitution. The auditors' failure to credit System Parking for what L&R deems to have been mistaken overpayments is a separate issue from whether, in the instances where System Parking had made a contribution that was less than the amount calculated to be owing, B&K accurately calculated the corresponding delinquencies. *See*

---

[17]L&R also makes the undeveloped, and meritless, argument that the Funds "failed to explain the basis for the alleged deficiencies." (Def.'s Post-Trial Br. at 33.)

*Cent. States, Se. & Sw. Areas Pension Fund v. Blue Sky Heavy Hauling, Inc.*, No. 08 CV 3338, 2011 WL 2142816, at *12 (N.D. Ill. May 31, 2011) (rejecting the employer's claim that the plaintiff's calculation of delinquency was wrong because it did not account for unspecified overpayments, noting that in order to "prevent the audit process from being bogged down by the issues of whether a mistake actually occurred and which equity favors the refund," the fund's audits did not seek to identify overpayments, and further stating that ERISA does not "impose the risk of mistaken contributions on the funds, particularly since the employer is in the best position to monitor the amount of its own contributions."). Moreover, this is not an instance where System Parking or L&R was unaware of the auditors' treatment of contributions that were possibly in excess of the amount owing under the CBAs. The evidence is clear that System Parking was aware from the outset of the audit process that the audit report would not account for what System Parking claimed were overpayments.

Based on the foregoing, the Funds are entitled to recover the amounts they seek in delinquent contributions. ERISA provides that when a judgment in favor of an employee benefit plan is awarded in a suit for delinquent contributions, the court shall award, in addition to the unpaid contributions, interest on the contributions at the rate "provided under the plan," plus an amount equal to the greater of that interest or liquidated damages not in excess of twenty percent, as well as reasonable attorneys' fees and costs and "such other legal or equitable relief as the court deems appropriate." 29 U.S.C. § 1132(g)(2). Those awards are mandatory. *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547 (1988).

The Trust Agreements provide for interest on delinquent contributions at the prime rate plus one percent. (Pls.' Exs. 8, 9, & 10, § 6.02.) The Funds contend in paragraph 223 of their Supplemental Proposed Findings of Fact and Conclusions of Law that it is their "policy" to

compound this interest monthly, but they do not cite any document to support this proposition, and there is no support for it in the trial testimony. The Trust Agreements do not provide for compound interest, and although the Funds' "Statement of Collection Procedures" refers to compound interest (Pls.' Ex. 11), that policy was not implemented until February 23, 2011. Plaintiffs submitted no evidence of a governing document in effect at the relevant time that provided for compound interest on delinquent contributions. Therefore, the Court will award simple interest on the delinquent contributions at the prime rate plus one percent. Plaintiffs will have to recalculate the appropriate interest award for each Fund.

The Trust Agreements provide for liquidated damages of twenty percent. Accordingly, the Court will award the Welfare Fund liquidated damages of $133,879.04; the Pension Fund liquidated damages of $46,382.80; and the Legal Fund liquidated damages of $5,369.75.

Pursuant to § 1132(g)(2)(E), the Funds are also entitled to an award of reasonable audit costs. *See Trs. of Chi. Plastering Inst. Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 902 (7th Cir. 2009); *Moriarty v. Svec*, 429 F.3d 710, 721 (7th Cir. 2005). The claimed audit fees are $45,388.08 for the Welfare Fund; $17,506.83 for the Pension Fund; and $1,296.80 for the Legal Fund. (Pretrial Order at 4.) "Any party seeking an award of costs carries the burden of showing that the requested costs were necessarily incurred and reasonable." *Cork Plastering*, 570 F.3d at 906. Plaintiffs have not submitted any records showing how the audit fees were calculated, such as the auditors' billing rates and the time they devoted to this case. Although Marino testified that B&K spent "[p]robably close to" 400 to 500 hours on the audit (7/13/15 Tr. 153), that was a rough estimate and insufficient for the Court to assess the reasonableness of the audit fees. Accordingly, the Court will give plaintiffs the opportunity to file documentation that supports their request for an audit fee award. The Court will also award the Funds their reasonable attorneys' fees and costs incurred in this

action; the parties are directed to follow the procedures set forth in Local Rule 54.3.

**C.      L&R's Counterclaim**

Once an employer remits contributions to a benefit plan, those contributions become assets of the plan, to be used exclusively for the benefit of plan participants and beneficiaries, 29 U.S.C. § 1103(c)(1), although the plan "may" return mistakenly-remitted contributions to the employer within six months after the plan administrator determines that the contribution was mistaken, *id.* § 1103(c)(2)(A)(ii).  Because L&R's claim for restitution is sufficiently related to the policies and concerns underlying ERISA, this Court has jurisdiction under the general federal-question statute even though the claim does not stem directly from a provision in ERISA.  *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Neurobehavioral Assocs., P.A.*, 53 F.3d 172, 174-75 (7th Cir. 1995); *UIU Severance Pay Trust Fund v. Local Union No. 18-U*, 998 F.2d 509, 512-13 (7th Cir. 1993).

L&R contends that it is entitled to $1,255,802.66 in "mistaken overpayments" and $14,125.60 in "unaccounted-for contributions from 2003 and 2004."  (Def.'s Post-Trial Br. at 2.) The first issue is whether L&R has proven by a preponderance of the evidence that it mistakenly made payments in excess of what was due under the CBAs.  For the $1,255,802.66 claim, L&R relies on its "internal audit" and the resulting report.  (Def.'s Ex. 27.)  William Francis testified that the report was prepared at his direction by "two L&R employees," who manually entered data taken from the B&K reports,[18] and "a private outside programmer" who was the spouse of one of the employees who worked on the report.  (7/14/15 Tr. 320, 330; 7/15/15 Tr. 397-98.)

There are a number of reasons, taken together, why L&R's "audit" report is not sufficiently

---

[18]Francis did not rely on System Parking's payroll records to create L&R's report.  He relied only on the auditors' individual detail report.  (7/15/15 Tr. 395.)

reliable to show that L&R overpaid its contributions to the Funds in any particular amount. First, the report was not prepared by an impartial third party, but by L&R itself in contemplation of litigation. Second, it was not prepared by an accounting firm, and there is no evidence that it was prepared at the direction of a person with relevant experience. L&R failed to provide the Court with any information about Mr. Francis's background (other than his job title), his qualifications to perform the "internal audit," or the extent of his experience or familiarity with collective bargaining agreements or reviewing or performing contribution audits. Third, although the spreadsheet in Exhibit 27 appears to be straightforward in the sense that the Court can understand the mechanics of the calculations therein, the assumptions underlying the report are murky. L&R litigated this issue by obfuscation. Counsel elicited testimony from Francis in which he reviewed, in general, some of the relevant provisions of the Commercial CBAs, and later explained the mathematics of certain calculations with respect to a handful of employees, but did not clarify his underlying assumptions or interpretation of the CBAs. Although Francis testified that after the meeting with Marino in which they reviewed the applicable CBAs, he believed that "basically" he and Marino were "on the same page" "in terms of what the CBA said," Francis also stated that he "didn't bring up any line items and say, how did you get to this number." (7/14/15 Tr. 321-323.)

Counsel also failed to ask Francis to explain why he believed his calculations varied from those of the auditors (other than eliciting conclusory testimony that the auditors failed to account for overpayments). It appears that there could be a number of different reasons, but L&R has not attempted to clarify them for the Court or break down in any fashion its claim for $1,255,802.66. It was elicited on Francis's cross-examination that, although Francis agreed that "there were times when the auditor correctly noted that deficiencies were due to the Funds," L&R's audit does not account for any of those deficiencies. (7/15/15 Tr. 397.) The extent to which Francis agreed with

38

the auditors, and why, is unclear. Moreover, it is not clear that, as Francis claimed, he employed the same calculation methods that B&K used, yet Francis merely accounted for the overpayments and failed to account for the deliquencies. Francis may have been defining full-time and part-time employees differently and/or calculating the "rolling average" for purposes of § 20.5 of the 2001-2006 Commercial CBA differently, but L&R failed to present those issues (as opposed to the issue of hours worked versus hours paid) with any clarity. It also appears that L&R's report may be based on the assumption that contributions were owing only for hours that covered employees worked. As explained above, the Court has rejected this interpretation of the CBAs. In any event, the extent to which L&R's calculations are affected by this assumption is unclear. Because L&R's "internal audit" was insufficiently reliable, L&R failed to show by a preponderance of the evidence that System Parking made $1,255,802.66 in "mistaken overpayments" to the Funds.

L&R also failed to prove by a preponderance of the evidence that it is entitled to $14,125.60 "in unaccounted-for contributions from 2003 and 2004." (Def.'s Post-Trial Br. at 2.) In support of this claim, L&R relies *solely* on the April 23, 2010 letter to the Funds from its own counsel in this litigation, in which counsel simply states that L&R's internal auditor conducted a "limited review" of B&K's October 5, 2009 audit report and "found that B&K understated System's contributions by $14,125.68." (*Id.* at 24 n.18, 41 (citing Pls.' Ex. 24); Dkt. No. 135, Def.'s Supplemental Findings of Fact and Conclusions of Law at 31 (citing Pls.' Ex. 24).) The statement is not admissible for the purpose of proving overpayments in that amount because it is hearsay and was not made on personal knowledge. L&R did not elicit testimony from Francis on this subject and submitted no evidence in support of the claim.

Even if L&R's audit were reliable, though, and the Court could conclude that System Parking had made mistaken overpayments, recovery would not follow automatically upon a showing

39

that System Parking contributed more than was required. Rather, L&R would also have to show by a preponderance of the evidence that "the equities favor it."[19] *See UIU Severance Pay*, 998 F.2d at 513. The Court in *UIU Severance Pay* listed the following non-exclusive factors for a court to consider in determining the equities: whether the overpayments resulted from a mistake versus an employee's unauthorized activity; whether the employer delayed its claim so long that laches or some other equitable defense bars recovery; whether the employer's long continuation of the payments without question has ratified the past payments; and whether the employer can show that the pension funds would be unjustly enriched if restitution were denied. 998 F.2d at 513.

The first factor favors L&R. Vivian Mateega testified that she had supervised System Parking's payroll representative who was responsible for completing and submitting the employer's monthly remittance reports to the Funds (although Mateega began working for L&R in 2009 and had not supervised that employee at the time the reports involved in the audit were completed).[20] (7/15/15 Tr. 358, 373-74.) Mateega stated that the employee had made several kinds of errors in completing the reports. (*Id*. 360-64.) She also explained that the employee "kind of was promoted from within" and "didn't really have a grasp on . . . [various employment laws]" and that until

---

[19]The Court does not rely on the Funds' Refund Policy as a consideration in this analysis. The Trustees adopted the Refund Policy on September 30, 2009, which was before L&R made its specific claim for overpayments, but well after the payments at issue in the audit had been made. (Pls.' Ex. 12.) In the Court's view, it would not be equitable to apply a refund policy to payments that were made well before the policy went into effect. L&R also cites law for the proposition that changes to ERISA plans may not be applied retroactively. (Def.'s Post-Trial Br. at 32 (citing *Prudential Ins. Co. of Am. v. Evergreen Oak Elec. Supply & Sales Co. Emp. Benefit Plan*, No. 92 C 7908, 1996 WL 18970, at *5-6 (N.D. Ill. Jan. 18, 1996) (citing cases)).)

[20]L&R submitted selected pages from the remittance reports covering the audit period, some of which bear the signature and printed name of the System Parking employee who had completed the reports. (Def.'s Ex. 28.) L&R did not present the employee as a witness at trial, nor did it present the individual who had supervised her during the audit period.

Mateega "got there and explained that to her, she really did not have an understanding of it." (*Id.* 364.) Thus, the evidence is that if there were mistaken overpayments, they were not the acts of a rogue employee.

The remaining *UIU Severance Pay* factors, however, weigh more heavily here and favor the Funds. The doctrine of laches may apply where there is an unreasonable, prejudicial delay in asserting a claim. *Young*, 615 F.3d at 822. The witnesses at trial, in particular Mateega, painted a picture of a company that was lax in instructing and supervising its payroll representative for the Funds and in reviewing its own records for errors, as well as lax in responding to the audit and calculating and presenting the claim for overpayments. System Parking sat on its hands, even after it received the preliminary audit report and raised the issue of possible overpayments. It was clear from MacArthur's testimony (7/14/15 Tr. 252), as well as the timeline of multiple meetings, that the Funds had to prod System Parking to make progress on its audit review. When L&R's employees took over the responsibility of responding to the audit, they also failed to act with diligence. In addition, there appeared to be little to no communication between defendants' employees about the audit; indeed, L&R relied on the auditors to bring its own personnel up to speed.

Assuming that William Francis was given the assignment of reviewing the audit report as early as the first part of October 2009, that occurred about nine months after John Phillips had raised the overpayments issue with Marino and about six months after the April 2009 meeting during which Phillips was advised that System Parking would have to do its own research on any overpayments and present its findings to the Funds' office. Even though Francis was given his assignment in late 2009, it was not until spring 2010, after the last meeting with B&K, that Francis began creating L&R's internal audit report. And it was not until April 23, 2010 that L&R presented to the Funds the results of its internal audit, which was the first attempt by either System Parking

41

or L&R to quantify the alleged overpayments, notwithstanding John Phillips's having asserted as early as December 2008 that System Parking had possibly overpaid. At the time L&R presented the Funds with its specific claim, the alleged overpayments had been made over the course of two collective bargaining agreements and anywhere from two to seven years earlier. *Two-thirds* of the alleged $1,255,802.66 in overpayments were made five to seven years earlier. (Def.'s Ex. 27 at 1.)

When System Parking submitted the remittance reports that accompanied its contributions, it certified that the information it provided was true and correct. (Def.'s Ex. 28; Pls.' Ex. 30A.) By continuing to make the alleged overpayments over a five-year period without question, System Parking ratified those payments. *See UIU Severance Pay*, 998 F.2d at 513; *Robinson v. Woodbridge Constr. & Carpentry, Inc.*, No. 2:12-CV-178-RLM-APR, 2014 WL 2178013, at *4 (N.D. Ind. May 22, 2014) (rejecting employer's ERISA counterclaim against pension funds for setoff on an equitable restitution theory and stating: "The length of time [the employer] made these payments—eight and a half years, spread over three collective bargaining agreements—flows through the entire analysis. That 102 months fares poorly when compared with the six months ERISA itself allows for refund of mistaken contributions."). There was no apparent reason for L&R's delays in asserting its claim, other than inattention and inertia; therefore, those delays were inexcusable.

The Funds would be harmed if restitution were granted, and there is no evidence that they would be unjustly enriched by retaining the alleged overpayments. Rather, the evidence is to the contrary. "Overpayments may be 'tied to higher pension and welfare benefits for the defendant's employees.'" *Greater St. Louis Constr. Laborers Welfare Fund v. Park-Mark, Inc.*, 700 F.3d 1130, 1136 (8th Cir. 2012) (quoting *Gustafson*, 258 F.3d at 651); *see also Constr. Indus. Ret. Fund v. Kasper Trucking, Inc.*, 10 F.3d 465, 467 (7th Cir. 1993) (holding that an employer was not entitled

to restitution for mistaken overpayments where the plaintiff welfare fund had pooled the money to provide benefits for all persons on whose behalf contributions were made and the plan participants received the health coverage). "Insurance and pension benefits are contingent and deferred, respectively, so although there is no immediate receipt, an employer may receive an immediate benefit because the greater pension and welfare benefits reduce the employees' demands for higher wages." *Park-Mark*, 700 F.3d at 1136.

William Coli testified that the Funds used System Parking's contributions to pay for benefits for all plan participants, not just System Parking's employees. (7/13/15 Tr. 122-23.) All employees covered by the System Parking CBAs receive dental and vision coverage and a member assistance plan, forty-five hours of legal assistance for a schedule of covered matters and two hours of legal consultation for any matter, and educational assistance benefits, including reimbursement of college tuition. Full-time employees receive medical, prescription, short-term disability, and wellness benefits. (*Id.* 24-25.) Employees covered by the Commercial CBAs receive pension credit for time worked in covered employment. (*Id.* 24.) Coli further stated that between January 1, 2003 and March 31, 2008, vision, dental, and chiropractic benefits were improved; life insurance benefits increased; the duration of COBRA coverage was lengthened; and pension benefits were improved. (*Id.* 25.) Employees received those improved benefits through employer contributions received by the Funds. (*Id.* 25-26.)

Coli further testified that the Welfare Fund had enough money in its reserves at the time of trial to pay claims for approximately five months and that in 2014 and 2015, that Fund had been "deficit spending" in that contributions were less than benefit payments. (*Id.* 36-37.) If any overpayments had to be returned to L&R, the refund would have to come out of the Welfare Fund's reserves. (*Id.* 74.) The Pension Fund has a 98 percent funding ratio, *i.e.*, 98 cents for every dollar

owed in benefits.  (*Id.* 37-38.)  If the pension fund had to make refunds, employees' corresponding pension credits would be canceled, but Coli thought that practically speaking, it would be difficult to "walk that back."  (*Id.* 131-32.)  As for the Legal Fund's reserves, "money goes in as quickly as it goes out."  (*Id.* 38.)

Plaintiffs also presented testimony from Nanette Kmiecik, a vice president at Elite Administration ("Elite"), which is a third-party administrator ("TPA") that processed medical and dental insurance claims for the Welfare Fund.  (7/14/15 Tr. 283-84.)  Kmiecik testified that at the request of the Funds' previous counsel, she reviewed a list of System Parking's employees (as contained in L&R's internal audit, Def.'s Exhibit 27) for the period of January 1, 2003 through March 31, 2008 to determine whether the 1,131 employees listed on L&R's report had been on the lists that the Union had sent Elite of employees who were eligible for medical insurance coverage. (*Id.* 284-87, 294; Pls.' Ex. 26.)  There is a ninety-day waiting period before a full-time employee becomes eligible for benefits under the Welfare Fund and a 500-hour contribution threshold for part-time employees to receive three months of medical and prescription benefits.  (7/13/15 Tr. 47, 116.)

Because Elite was not the Welfare Fund's TPA prior to June 1, 2003, Kmiecik was unable to verify whether the 334 employees who were employed prior to that date had been eligible for medical insurance coverage.  (7/14/15 Tr. 289.)  Elite's policy is to hold records for seven years and then destroy them, so Kmiecik was also unable to verify the eligibility of 459 employees whose dates of service fell between June 1, 2003 and December 31, 2005.  (*Id.* 289, 297.)  As for the remaining 338 employees, Kmiecik determined that 139 had been on the Union's eligibility lists and 199 had not.  (*Id.* 289-291.)  Kmiecik checked Elite's records regarding medical coverage only, for which only full-time employees of System Parking were eligible; she did not check Elite's records as to "basic" coverage, which included dental coverage and to which part-time employees were

entitled.  (*Id.* 292-93.)  Kmiecik did not know how much the Funds had paid in benefits for the 139 employees for whom she had verified insurance eligibility.  (*Id.* 299.)

Thus, the evidence is that each plaintiff pooled the contributions received from System Parking to provide benefits for all plan participants and that plan participants received those benefits. L&R contends that the Funds "failed to proffer evidence indicating that the approximately 1,331 individuals on whose behalf System Park[ing] mistakenly overpaid contributions" in fact received greater benefits.  (Def.'s Post-Trial Br. 39-40.)  The Seventh Circuit rejected a similar argument in *Gustafson* as follows:  "It is true that the record contains no evidence that the higher contributions demanded in the successor contract resulted in greater benefits actually received by the defendant's employees, but that is immaterial . . . . [M]ost of the benefits are in the nature of insurance or are otherwise contingent or (as in the case of pension benefits) deferred, so that immediate receipt is not expected; and insurance is not illusory just because the event insured against never occurs."  258 F.3d at 652; *see also Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1109 (3d Cir. 1996) ("[A] welfare fund is not unjustly enriched simply because it has received benefit payments on behalf of particular employees who have not made claims, because they presumably would have received coverage had they submitted claims. A benefit payment is made for coverage in case a claim is submitted.  As such, a lack of actual claims is irrelevant.").  L&R obtained a benefit from the alleged overpayments made to the Funds.  Restitution is inequitable where a payor "obtained a benefit that he intends to retain from the payment" made, but now seeks to have the payment returned.  *Gustafson*, 258 F.3d at 651.

Even if L&R had shown by a preponderance of the evidence that System Parking had made mistaken overpayments during the audit period, equity would not favor their return based on the analysis above.  The Court will enter judgment in favor of plaintiffs and against defendant on

defendant's claims for $1,255,802.66 in "mistaken overpayments" and $14,125.60 in "unaccounted-for contributions."

**CONCLUSION**

Plaintiffs are entitled to judgment in their favor and against defendant for 1) the full $928,157.94 that plaintiffs seek in delinquent contributions ($669,395.20 for the Health and Welfare Fund; $231,913.98 for the Pension Fund; and $26,848.76 for the Legal and Educational Fund); 2) simple interest on the delinquent contributions at the prime rate plus one percent; 3) the full $185,631.59 that plaintiffs seek in liquidated damages ($133,879.04 for the Welfare Fund; $46,382.80 for the Pension Fund; and $5,369.75 for the Legal Fund); 4) reasonable audit fees; and 5) reasonable attorneys' fees and costs. Plaintiffs are also entitled to judgment in their favor and against defendant on defendant's counterclaims for $1,255,802.66 and $330,000 in alleged overpayments and $14,125.60 in unaccounted-for contributions. Defendant is entitled to a setoff with respect to its counterclaim for agreed-upon overpayments in the amount of $35,428.30, but it is unclear from the parties' submissions how to apply this setoff among the three plaintiffs.

The Court directs plaintiffs to calculate interest, determine how the setoff should be applied, and submit a proposed final judgment order that conforms with this opinion to the Court's proposed-order email address by March 1, 2016. Plaintiffs are also directed to submit by March 1, 2016 documentation in support of their request for an award of audit costs.

The parties are directed to follow the procedures outlined in this district's Local Rule 54.3 regarding plaintiffs' reasonable attorneys' fees and costs in an effort to reach agreement on an appropriate amount.

**SO ORDERED.**                                    **ENTERED:   February 10, 2016**

_____
**JORGE L. ALONSO**
**United States District Judge**